No. 24-5358

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE,

*Plaintiff-Appellant*,

v.

GOOGLE INC. AND GOOGLE LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of California, No. 2:22-cv-01904 (Calabretta, J.)

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## REPUBLICAN NATIONAL COMMITTEE

Michael A. Columbo
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post St., Suite 700
San Francisco, CA 94108
(415) 433-1700
mcolumbo@dhillonlaw.com

Thomas R. McCarthy
Thomas S. Vaseliou
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

January 21, 2025

*Counsel for Appellant*

**CORPORATE DISCLOSURE STATEMENT**

The Republican National Committee is not a subsidiary or affiliate of any parent corporation or any publicly held corporation, and no corporation owns 10% or more of the RNC's stock. No publicly owned corporation not a party to this case has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement ...................................................i

Table of Authorities ............................................................ iv

Introduction ................................................................1

Jurisdictional Statement ........................................................3

Statement of Issues ...........................................................3

Statutory Addendum ..........................................................4

Statement of the Case .........................................................4

   I.    Email is vital to the RNC, which is why the RNC takes great pains to optimize email performance...............................................4

   II.   For about nine months, Google relegated nearly all RNC emails to spam during critical times of the month...................................6

   III.  After the RNC sued, Google promptly stopped relegating RNC emails en masse to spam. ............................................8

   IV.  The district court wrongly grants Google's motion to dismiss. ...............8

Standard of Review .......................................................... 10

Summary of Argument ........................................................ 10

Argument ................................................................. 14

   I.    The RNC states its California state-law claims. ............................. 14

       A.   The RNC states an Unruh Civil Rights Act claim. ............................ 15

           1.   Political affiliation is protected by Unruh. ............................. 15

           2.   Google intentionally discriminated against the RNC based on political affiliation. ......................................... 25

           3.   The RNC has statutory standing................................. 30

       B.   The RNC states a common-carrier claim............................... 33

           1.   Google, through its Gmail service, is a common carrier. ....... 33

           2.   Google violated its common-carrier obligations. ................... 37

       C.   The RNC states an unfair-competition claim....................... 41

       D.   The RNC states a claim for intentional interference with prospective economic relations............................................. 47

E.    The RNC states a claim for negligent interference with prospective economic relations.................................................. 51

II.    As the district court concluded, §230 doesn't bar the RNC's claims. .......... 52

A.    Section 230(c)(2) doesn't bar the RNC's claims................................... 52

B.    Section 230(c)(1) doesn't apply here either. ......................................... 54

Conclusion................................................................................................................ 56

Certificate of Compliance..................................................................................... 57

Certificate of Service ............................................................................................. 57

Addendum of Statutory Provisions ......................................................... ADD-1

# TABLE OF AUTHORITIES

## Cases

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ........................................................................ 23

*AMA Multimedia, LLC v. Wanat,*
   970 F.3d 1201 (9th Cir. 2020) ....................................................... 31

*Angelucci v. Century Supper Club,*
   41 Cal.4th 160 (2007) .................................................................... 32

*Apple Inc. v. Superior Ct.,*
   56 Cal.4th 128 (2013) .................................................................... 37

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................... 49

*Bartenwerfer v. Buckley,*
   598 U.S. 69 (2023) ........................................................................ 41

*Brennon B. v. Superior Ct.,*
   57 Cal. App. 5th 367 (2020) ......................................................... 18

*Calise v. Meta Platforms,*
   103 F.4th 732 (9th Cir. 2024) ................................................. 10, 55

*Candelore v. Tinder, Inc.,*
   19 Cal. App. 5th 1138 (2018) ........................................... 16, 42, 46

*Cavallaro v. Tex. & P. Ry.,*
   110 Cal. 348 (1895) ...................................................................... 37

*Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.,*
   20 Cal.4th 163 (1999) .................................................................... 42

*Corales v. Bennett,*
   567 F.3d 554 (9th Cir. 2009) ....................................................... 23

*CRST Van Expedited, Inc. v. Werner Enters.,*
   479 F.3d 1099 (9th Cir. 2007) ..................................................... 50

*Divino Grp. LLC v. Google LLC,*
   2022 WL 4625076 (N.D. Cal. Sept. 30) ..................................... 46

*Doe v. CVS Pharmacy,*
   982 F.3d 1204 (9th Cir. 2020) ............................................... 43, 45

*Dresbach v. Cal. Pac. R.,*
   57 Cal. 462 (1881) ........................................................................ 38

iv

*Dyroff v. Ultimate Software Grp.*,
934 F.3d 1093 (9th Cir. 2019) ................................................................ 10

*Enigma Software Grp. USA v. Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019) ................................................................ 53

*Est. of Bride v. Yolo Techs.*,
112 F.4th 1168 (9th Cir. 2024) .............................................................. 55

*Goldin v. Pub. Utilities Comm'n*,
23 Cal.3d 638 (1979) .............................................................................. 34

*Gomez v. Superior Ct.*,
35 Cal.4th 1125 (2005) .................................................................... 36, 38

*Gray v. Kircher*,
193 Cal. App. 3d 1069 (1987) ................................................................ 17

*Grundy v. Walmart Inc.*,
2018 WL 5880914 (C.D. Cal. June 22) .................................................. 29

*Harris v. Cap. Growth Invs. XIV*,
52 Cal.3d 1142 (1991) .......................................... 16, 17, 18, 20, 21, 25, 30

*Harris v. Pac Anchor Transp.*,
59 Cal.4th 772 (2014) ............................................................................ 42

*Hart v. W. Union Tel. Co.*,
66 Cal. 579 (1885) ............................................................................ 39, 40

*Henderson v. Source for Pub. Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) .................................................................. 55

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ................................................................ 42

*HomeAway.com v. Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .................................................................. 55

*Huang v. The Bicycle Casino, Inc.*,
4 Cal. App. 5th 329 (2016) ............................................................... 38, 47

*In re Adobe Sys. Privacy Litig.*,
66 F.Supp.3d 1197 (N.D. Cal. 2014) ..................................................... 42

*In re Ahn*,
804 F. App'x 541 (9th Cir. 2020) .......................................................... 32

*In re Cox*,
3 Cal.3d 205 (1970) .......................................................................... 16, 17

*In re Google Inc.*,
   2013 WL 5423918 (N.D. Cal. Sept. 26) ........................................ 38

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
   525 F.Supp.3d 1017 (N.D. Cal. 2021) ........................................ 46

*J'Aire Corp. v. Gregory*,
   24 Cal.3d 799 (1979) ........................................ 52

*Jewel v. NSA*,
   673 F.3d 902 (9th Cir. 2011) ........................................ 32

*Kenney v. San Diego*,
   2013 WL 5346813 (S.D. Cal. Sept. 20) ........................................ 25

*Koebke v. Bernardo Heights Country Club*,
   36 Cal.4th 824 (2005) ........................ 15, 16, 17, 18, 20, 21, 22, 46

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ........................................ 10, 49, 54

*Leon v. Cnty. of Riverside*,
   14 Cal.5th 910 (2023) ........................................ 34

*Long v. Valentino*,
   216 Cal. App. 3d 1287 (1989) ........................................ 19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................ 49

*Lunney v. Prodigy Servs.*,
   94 N.Y.2d 242 (1999) ........................................ 35, 47

*Marina Point, Ltd. v. Wolfson*,
   30 Cal.3d 721 (1982) ........................................ 17, 25, 29

*Muniz v. UPS*,
   738 F.3d 214 (9th Cir. 2013) ........................................ 18

*Munson v. Del Taco*,
   46 Cal.4th 661 (2009) ........................................ 16

*N. Am. Chem. Co. v. Superior Ct.*,
   59 Cal. App. 4th 764 (1997) ........................................ 51

*Nationwide Biweekly Admin. v. Superior Ct.*,
   9 Cal.5th 279 (2020) ........................................ 43

*NetChoice v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) ........................................ 36, 41, 47, 50

*Neubauer v. Disneyland, Inc.*,
    875 F.Supp. 672 (C.D. Cal. 1995) ................................................................. 38

*Nia v. Bank of Am.*,
    603 F.Supp.3d 894 (S.D. Cal. 2022) ..................................................... 29, 45

*Osborne v. Yasmeh*,
    1 Cal. App. 5th 1118 (2016) ........................................................................ 32

*Redington v. Pac. Postal Tel. Cable Co.*,
    107 Cal. 317 (1895) ............................................................................... 39, 40

*Rolon v. Kulwitzky*,
    153 Cal. App. 3d 289 (1984) ....................................................................... 22

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
    2 Cal.5th 505 (2017) ............................................................................. 47, 48

*Rubenstein v. Neiman Marcus Grp.*,
    687 F. App'x 564 (9th Cir. 2017) ............................................................... 42

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ....................................................................................... 18

*Sisemore v. Master Fin.*,
    151 Cal. App. 4th 1386 (2007) .............................................................. 19, 21

*Squaw Valley Ski Corp. v. Superior Ct.*,
    2 Cal. App. 4th 1499 (1992) ........................................................................ 41

*Stamps v. Superior Ct.*,
    136 Cal. App. 4th 1441 (2006) .................................................................... 24

*State v. Google LLC*,
    2022 WL 1818648 (Ohio Com.Pl. May 24) ............................................... 36

*Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*,
    138 Cal. App. 4th 1215 (2006) .................................................................... 50

*Thurston v. Omni Hotels Mgmt. Corp.*,
    69 Cal. App. 5th 299 (2021) ........................................................................ 33

*Todd R. v. Premera Blue Cross Blue Shield of Alaska*,
    825 F. App'x 440 (9th Cir. 2020) ............................................................... 31

*Trammell v. W. Union Tel. Co.*,
    57 Cal. App. 3d 538 (1976) ......................................................................... 37

*United States v. Sineneg-Smith*,
    590 U.S. 371 (2020) ..................................................................................... 31

*Venegas v. Cnty. of Los Angeles,*
   32 Cal.4th 820 (2004) ................................................................ 24

*W.U. Tel. Co. v. Brown,*
   253 U.S. 101 (1920) .................................................................. 37

*Webster v. Ebright,*
   3 Cal. App. 4th 784 (1992) ...................................................... 34

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.,*
   42 Cal. App. 4th 507 (1996) .................................................... 49

*White v. Square, Inc.,*
   7 Cal.5th 1019 (2019) ............................................. 16, 20, 32, 34

*White v. Square, Inc.,*
   891 F.3d 1174 (9th Cir. 2018) ..................................... 16, 19, 32

*Williams v. Bakersfield,*
   2015 WL 1916327 (E.D. Cal. Apr. 27) .................................. 25

*Williams v. Gerber Prod. Co.,*
   552 F.3d 934 (9th Cir. 2008) ................................................... 42

*Zhang v. Superior Ct.,*
   57 Cal.4th 364 (2013) .............................................................. 43

**Statutes**

2005 Cal. Legis. Serv. Ch. 420 (A.B. 1400), perma.cc/G9HH-MSW5 ..............21, 23, 24

28 U.S.C. §1291 ............................................................................. 3

28 U.S.C. §1331 ............................................................................. 3

28 U.S.C. §1332 ............................................................................. 3

28 U.S.C. §1367 ............................................................................. 3

47 U.S.C. §230 ........................................... 3, 9, 10, 14, 41, 52, 53, 54, 55

Cal. Bus. & Prof. Code §17200 ................................................. 41

Cal. Civ. Code §2089 ............................................................ 37, 38

Cal. Civ. Code §2090 ................................................................. 37

Cal. Civ. Code §2161 ............................................................ 37, 39

Cal. Civ. Code §2162 ............................................................ 38, 40

Cal. Civ. Code §2168 ................................................................. 33

Cal. Civ. Code §2169 ............................................................ 39, 41

Cal. Civ. Code §2209 ................................................................... 40

Cal. Civ. Code §51 ...........................................................15, 21, 22

Cal. Civ. Code §51.7 ..................................................................... 22

## Other Authorities

Black's Law Dictionary (12th ed. 2024) .........................................5

Candeub & Volokh, *Interpreting 47 U.S.C. §230(c)(2)*,
    1 J. Free Speech L. 175 (2021) ............................................... 54

Candeub, *Common Carrier Law in the 21st Century*,
    90 Tenn. L. Rev. 813 (2024) ................................................... 50

MacLeod, *The First Amendment, Discrimination, and Public Accommodations at Common Law*,
    112 Ky. L.J. 209 (2024) ...................................................35, 41

Sitaraman & Ricks, *Tech Platforms and the Common Law of Carriers*,
    73 Duke L.J. 1037, 1047 (2024) ............................................. 36

Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*,
    15 N.Y.U. J.L. & Liberty 490 (2022) ..................................... 18

## INTRODUCTION

This case is about the market-dominant communications firm's unlawful discrimination against the Republican National Committee because of the RNC's political affiliation. Email is an indispensable means of communication. The RNC relies on this crucial conduit as it engages in its core mission of conducting political activity in support of the Republican Party. This includes communicating political messaging and important voting information to supporters, as well as maintaining relationships with individuals who have and will continue to financially support the RNC.

To effectively reach and grow its community, the RNC takes great pains to ensure that every email from the domain name in question is to someone who requested it and recently engaged with RNC content. The RNC also uses industry-standard tools and contracts with leading companies in this field to optimize its email performance and ensure compliance with email platforms' best practices. As a result, the RNC has a strong email reputation, a high inboxing rate, and an extremely low spam rate.

Still, Google relegated millions of RNC emails en masse to potential donors' and supporters' spam folders during pivotal points in election fundraising, voting, and community building. The timing of Google's most egregious filtering is telling. For most of each month, nearly all of the RNC's emails made it into Gmail users' inboxes. But at about the same time at the end of each month, Google diverted to spam *nearly all* of the RNC's emails. Critically, this end-of-month period is when the RNC's fundraising is most successful, as Google knew.

Google's discrimination went on for about nine months—despite the RNC's best efforts to work with Google to obtain an explanation and a solution and even though at all relevant times, the RNC's metrics met Google's standards. The most reasonable inference from Google's debunked explanations and stonewalling is that Google was intentionally sending critical RNC emails to spam folders because it was the RNC sending them.

If there were any doubts that Google was discriminating against the RNC, they vanished once the RNC sued: Google promptly ceased its cyclical mass diversions. Even though the RNC did not materially change its email sends (*e.g.*, how it sent emails, how often it sent emails, who it sent emails, or the emails' content) for the last two years, the RNC has experienced its usual high inboxing rates without any mass diversion to subscribers' spam folders. If Google's explanations were legitimate, the RNC's emails should have continued going to spam toward the end of the month. Yet no mass diversion occurred then or after. The post-lawsuit, post-election timing of Google's cessation in discrimination is damning: It shows that Google had control over the RNC's inboxing; that Google feigned misunderstanding the problem when it knew how to stop relegating the RNC's email to spam the whole time; and that Google suppressed those emails because it was the RNC sending them.

The district court *agreed* that the RNC plausibly alleged Google acted in bad faith and intentionally discriminated based on political affiliation. It also *agreed* that Google's

defense under 47 U.S.C. §230 failed. But the district court still granted Google's motion to dismiss because it thought no law prohibited Google's invidious discrimination.

The district court is wrong. Google violated several California laws: It violated the Unruh Civil Rights Act because that act bars arbitrary discrimination, including political discrimination. It violated the common-carrier laws because email is akin to traditional common carriers like the telegraph and telephone and Google violated its common-carrier obligations when it discriminatorily hid the RNC's emails in subscribers' spam folders. It violated the unfair-competition law because of the violations the RNC stated in its other claims or because Google's conduct is unfair. And it violated tortious-interference law because Google unlawfully interfered with the RNC's relationship with its supporters. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§1331, 1367(a), 1332(a). This Court has jurisdiction because the RNC appeals from a grant of a motion to dismiss, which dismissed the RNC's complaint with prejudice. §1291. The district court entered that order on July 31, 2024, and the RNC timely appealed 27 days later on August 27. ER.3-30, 256-58.

## STATEMENT OF ISSUES

Though the district court concluded the RNC plausibly alleged that Google intentionally discriminated against the RNC based on political affiliation and that the RNC's claims were not barred by 47 U.S.C. §230, the district court still dismissed the

3

RNC's complaint, concluding that it did not state any of its California state-law claims.

The questions presented are:

1. Does the Unruh Civil Rights Act prohibit Google's intentional political discrimination against the RNC and does the RNC have statutory standing to bring an Unruh claim?

2. Is Gmail a common carrier under California law because it is an indispensable form of communication much like other traditional common carriers, such as the telegram and telephone?

3. Does California's unfair-competition law prohibit a discriminatory practice that concededly has no legitimate business justification?

4. Did the RNC plausibly allege an intentional or negligent interference with prospective economic relations because there's a probability of economic benefit from contacting donors and subscribers, including for donations, during key periods in election fundraising?

## STATUTORY ADDENDUM

The relevant statutory provisions are reproduced in an accompanying addendum.

## STATEMENT OF THE CASE

**I. Email is vital to the RNC, which is why the RNC takes great pains to optimize email performance.**

The RNC's ability to reach its supporters through email is indispensable to its basic operations. ER.95. It uses email to fund campaigns, encourage voting, and build a community. *Ibid.* As Google was aware, the end-of-month and end-of-quarter periods are critical for email campaigns by political organizations like the RNC: During this time, the RNC's supporters are "particularly attuned to politics and expect the RNC to be communicating with them," and "fundraising and donations go up." ER.104; ER.113; ER.124.

The RNC takes great pains to optimize email performance. To start, the RNC does not send spam. Instead, it targets its most engaged audience with emails they solicited. *See Spam*, Black's Law Dictionary (12th ed. 2024) ("Unsolicited commercial email."). The RNC sends emails only to those who request them and recently actively engaged with RNC content.[1] ER.97-98. Anyone who no longer wants to receive emails (or a type of email) will stop receiving them within about 24 hours of unsubscribing. *Ibid.* The RNC also uses "audience segmentation" to determine what segments of the subscriber audience should be sent which emails and how often. ER.98-99. At a high-level, the RNC "sends more emails to users who had engaged with RNC emails more frequently and more recently," "so would ostensibly be much less likely to report those emails as spam." ER.9. By contrast, "the RNC sends fewer and less frequent emails to users who are less likely to engage and may be more likely to view the emails as spam." *Ibid.* This process is an industry-standard method; it's what responsible bulk emailers do to optimize engagement with their content, and it's a best practice according to Google. ER.98-99.

---

[1] The RNC sends almost all its emails from the domain name campaigns.rnchq.com, and it is from this domain name that the RNC sends every email exclusively to those who request them and recently actively engaged with RNC content. *See* ER.89 n.1; ER.96-98. Google knew that this domain name was the one in question. *E.g.*, ER.96-97; ER.113. So when this brief refers to "nearly all RNC emails" (and similar phrases), it is mainly referring to emails sent from the campaigns.rnchq.com domain name.

The RNC also uses industry-standard tools and contracts with leading companies in the field of email marketing to ensure that the RNC's email practices adhere to service providers' best practices and to maximize how often its emails reach a recipient's inbox rather than its spam folder. ER.100-02; ER.106-07. With these services and tools, the RNC analyzes several metrics, including "inboxing rate." *Ibid.* The "inboxing rate" is how often a sender's emails reach a user's inbox as opposed to the spam folder or reaching no folder. ER.100. The inboxing rate is "a critical metric to diagnose and fix issues that cause emails to go to spam." *Ibid.* The RNC strives to have a high inboxing rate, maintain low user complaints, stay authenticated, and keep high domain reputations. ER.100-03.

## II. For about nine months, Google relegated nearly all RNC emails to spam during critical times of the month.

Google's most serious diversions to spam began in February 2022. That month the RNC began "working on matters related to the 2022 midterm election," and it "detected that its Gmail 'inboxing' rate suddenly dropped from rates consistently above 90% to nearly 0% on certain days" toward the end of the month. ER.104. An "inboxing rate of nearly 0% means that Gmail hid nearly every campaign email sent by the RNC from the Gmail users." *Ibid.*

The RNC immediately began investigating the issue and contacted Google. Google offered the first of many shifting excuses for the mass diversions. For example, Google initially "responded that the monthly crashing of the RNC's inboxing rate was

due to a high number of user complaints." ER.109. But as the RNC told Google, that was not true. The RNC's industry-standard tools showed that the RNC's "complaint rate was incredibly low," "there were no reputational issues," and that there were "no [other] irregularities causing the issue." ER.109-10 (cleaned up).

Toward the end of the next month, Google again relegated nearly all RNC emails to spam. ER.110. Once again, the RNC employed the industry-standard tools to try to assess the cause. But all the tools suggested that it was not the RNC or Gmail-user complaints causing the problem. ER.110-11. Unsurprisingly, no other major email service provider was consigning RNC emails to spam en masse, let alone cyclically. *See* ER.121-22 (figure showing inboxing rate for other email platforms).

The RNC again contacted Google. But Google never identified the problem or provided a concrete plan to remedy the mass diversions. ER.110-11.

The problems with Gmail continued for many more months. Each time the RNC contacted Google, the RNC explained how it was following Google's "best practices" and submitted reports showing that it had a high email reputation and that user complaints could not be the problem. ER.111-20. During these nine months, industry-standard tools showed that the RNC had strong performance metrics. *E.g.*, ER.102; ER.120.

Eventually Google stopped responding to the RNC's good-faith attempts to discuss these issues and diagnose the problem, forcing the RNC to sue. ER.120.

**III.    After the RNC sued, Google promptly stopped relegating RNC emails en masse to spam.**

After the RNC filed this suit in October 2022, Google voluntarily ceased the mass relegation of RNC emails to subscribers' spam folders. *E.g.*, ER.90. The RNC has since experienced its usual high inboxing rates consistently throughout the year without any mass diversion to subscribers' spam folders.



ER.90. But the RNC has done nothing materially different. For example, the RNC didn't meaningfully change how it sent emails, how often it sent emails, who it sent emails, or the emails' content. And the RNC's spam rate and other metrics have not "meaningfully changed since filing this suit." ER.102. If Google's explanations were legitimate, then nearly all of the RNC's emails should have continued to go to spam toward the end of the month. ER.90. Yet no mass diversion occurred then or after.

**IV.    The district court wrongly grants Google's motion to dismiss.**

The RNC asserts claims under California law, specifically, that Google violated California's Unruh Civil Rights Act, common-carrier law, unfair-competition law, and

8

tortious-interference law. ER.129-40. Google moved to dismiss, arguing that the RNC stated no claim and that §230 bars every claim.

The district court granted Google's motion, dismissing all the RNC's claims with prejudice. Though the district court concluded that the RNC plausibly alleged that Google "was not acting in good faith" because it was discriminating based on political affiliation, ER.4, the court determined that the RNC stated none of its claims, ER.29-30.[2] As to Unruh, the court concluded that the act doesn't protect political affiliation and sua sponte determined that the RNC lacked statutory standing. ER.167-72. As to common-carrier law, the court determined that email didn't qualify as a common carrier because email providers, like Gmail, "do not 'carry' messages" but "receive and store messages, and make them available for retrieval by the user after" internet service providers transport the message. ER.162. As to the UCL, the court concluded that although the RNC alleged that Google's conduct was "'unfair,'" it did so only "in a colloquial, as opposed to a legal, sense." ER.25, 5. As to tortious interference, the court determined

---

[2] There were two rounds of motion-to-dismiss briefing: one on the original complaint, and another on the first amended complaint. The first time around, the district court granted Google's motion to dismiss but noted that it was a "close case" and gave the RNC "leave to amend to establish that section 230 does not apply to this action, and to amend" the unfair-competition and intentional-tortious-interference claims. ER.182. The RNC amended its complaint, and Google moved to dismiss. The district court granted the motion and dismissed all claims with prejudice. For this appeal, only the factual allegations in the first amended complaint matter. Moreover, the RNC pressed a federal Telecommunications Act claim, which the district court also dismissed with prejudice. ER.137-39. The RNC doesn't appeal dismissal of that claim.

that the RNC didn't allege an "independently wrongful act" or "the probability of future economic benefit" with any of its subscribers. ER.25-29.

The district court, though, rejected Google's argument that §230 bars the RNC's claims. Section 230(c)(1) didn't bar the claims because "there is no allegation that Google published or failed to remove some potentially harmful content." ER.11. Section 230(c)(2)(A) didn't apply because Google "was not acting in good faith" when it repeatedly diverted the RNC's emails en masse to spam. ER.4. And Section 230(c)(2)(B) didn't apply because "Google took unilateral action that was '*not* based on users' spam designations.'" ER.11-12.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss under Rule 12(b)(6) de novo. *Calise v. Meta Platforms*, 103 F.4th 732, 738 (9th Cir. 2024). "The Court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1096 (9th Cir. 2019) (cleaned up). The "complaint will survive at this stage if it states a plausible claim for relief, *i.e.*, if it permits the reasonable inference that the defendant is liable." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021) (cleaned up).

## SUMMARY OF ARGUMENT

The district court should have denied Google's motion to dismiss. The key issue on appeal isn't whether Google intentionally discriminated against the RNC because of the RNC's political affiliation. The district court *agreed* with the RNC that it plausibly

alleged this invidious discrimination. And for good reason: While the RNC used its best efforts to work with Google to stop Google's monthly mass diversion of RNC emails to subscribers' spam folders, Google provided flimsy and shifting explanations that the RNC immediately debunked. As the RNC showed Google, the RNC was following Google's best practices, and the RNC's email metrics exceeded Google's standards—according to Google's own tools. Rather than stop diverting RNC emails, Google stopped responding to the RNC, leading to this suit. Google promptly ceased its discriminatory relegation of RNC emails to subscribers' spam folders—even though the RNC has not meaningfully changed its email sends. The post-lawsuit, post-election timing of Google's cessation of its discrimination at least plausibly shows that Google had control over the RNC's inboxing; that Google feigned misunderstanding the problem when it knew how to stop relegating the RNC's email to spam the whole time; and that Google suppressed those emails because it was the RNC sending them.

Instead, the key issue on appeal is whether the district court erred when it concluded that California law did not prohibit Google's invidious discrimination. It did err. California's Unruh Civil Rights Act, common-carrier law, unfair-competition law, and tortious-interference law all prohibit Google's discrimination.

**Unruh:** The district court dismissed this claim because it concluded that political affiliation isn't a protected characteristic and that the RNC lacked statutory standing. Per the district court, "political affiliation" is not protected because it's not listed in Unruh. But that conclusion contradicts California law, which says that Unruh's list is

illustrative, not restrictive. It's well-established that Unruh protects unenumerated characteristics that meet a three-part test. Political affiliation passes that test because it's a personal—not economic—characteristic, Google concedes that it has no legitimate business interest justifying the discrimination, and any consequences for allowing these claims are outweighed by Unruh's purpose of remedying victims of arbitrary discrimination. Hence why the California Supreme Court has three times suggested that Unruh prohibits political-affiliation discrimination.

Statutory standing is also no bar here. If the party-presentation rule means anything, it means that a district court cannot inject new non-jurisdictional issues into a case that a party's counsel never raised. Yet that is exactly what happened. In any event, there is a reason Google's counsel never contested statutory standing: Standing under Unruh is broad and plainly covers victims of discriminatory acts, like the RNC here.

**Common-Carrier Law:** The district court rejected the RNC's claim because it determined that email service providers like Gmail are not common carriers and, regardless, Google owes no duty to non-Gmail users like the RNC. In the district court's view, Google doesn't "carry" emails because it "receive[s] and store[s] messages" and merely makes the emails "available for retrieval by the user" after the internet service provider transmits the messages. ER.162-65. But the district court ignored the statute's text, which centers on what Google "*offers*," not what Google as a matter of technological complexity "does." Google offers itself to the public as merely a neutral conduit for sending and receiving messages.

12

Contra the district court, common carriers owe duties to the sender and the receiver of a message. And nothing in the text of California's law limits common-carrier obligations to users. Google violated its common-carrier obligations because hiding emails in subscribers' spam folders based on political affiliation violates any duty of care and constitutes "refusing" or "postponing" delivery of the RNC's emails.

**Unfair-Competition Law:** The RNC has stated a UCL claim because it plausibly alleged an unlawful and unfair business practice. Because the RNC has stated its other claims, the RNC alleges unlawfulness. Regardless, Google's conduct is unfair. Though the district court agreed that Google's actions are "unfair" at least in a "colloquial" sense, it ultimately concluded that the unfairness is not "cognizable." ER.25. But that reasoning distorts California law. California courts have stated three tests: whether the victim's harm outweighs the wrongdoer's justification; whether the practice is immoral; or whether the conduct's effect is comparable to violations of another law. The RNC need only satisfy one, but it satisfies all three: Google's discrimination significantly harmed the RNC and its supporters, and Google conceded that it has no legitimate reason for its discrimination; for substantially the same reasons, Google's practice is immoral; and Google's actions are comparable to a violation of Unruh or common-carrier law.

**Tortious Interference:** The district court dismissed the intentional-interference claim because the RNC lacks a probability of future economic benefit from its subscribers and can't point to an independently wrongful act. But the RNC alleged an ongoing

relationship with subscribers who donated before and that it tried to contact these past donors during a time when fundraising and donations go up. And because the RNC states its other claims, it shows an independently wrongful act. For the same reasons, the RNC states its negligent-interference claim.

This Court should reverse the district court's judgment.

## ARGUMENT

Though the district court agreed that the RNC plausibly alleged that Google intentionally discriminated against the RNC based on political affiliation and that 47 U.S.C. §230 does not bar any of the RNC's claims, it erred when it granted Google's motion to dismiss and determined that no California law prohibited such invidious discrimination. California's Unruh Civil Rights Act, common-carrier law, unfair-competition law, and tortious-interference law each prohibit Google's conduct. This Court should reverse.

## I. The RNC states its California state-law claims.

Google violated California law. It violated Unruh because Unruh bars intentional discrimination based on political affiliation. It violated the common-carrier laws because email is materially similar to other common carriers, such as the telephone and telegraph, and discriminatorily hiding emails based on political affiliation violates Google's common-carrier obligations. It violated the UCL because the RNC stated its other claims or because Google's conduct is unfair. And it violated tortious-interference law

14

because Google unlawfully interfered with the RNC's relationship with its supporters—relationships Google knew about.

## A. The RNC states an Unruh Civil Rights Act claim.

To state an Unruh violation, a plaintiff must plausibly allege that a business intentionally discriminated against a protected characteristic and the plaintiff has statutory standing. *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 854 (2005). The RNC plausibly alleged that political affiliation is a protected characteristic, that Google intentionally discriminated against the RNC, and that even when putting aside the district court's clear violation of party-presentation principles, the RNC has statutory standing.

### 1. Political affiliation is protected by Unruh.

Unruh is a broad anti-discrimination statute that gives everyone the right "to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments." Cal. Civ. Code §51(b). In enacting Unruh, the California legislature "intended to ban *all* forms of arbitrary discrimination in public accommodations." *Koebke*, 36 Cal.4th at 840. For this reason, "courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses" and must "liberally" interpret Unruh "to carry out [that] purpose." *White v. Square, Inc.*, 7 Cal.5th 1019, 1025 (2019) (cleaned up); *accord, e.g., Munson v. Del Taco*, 46 Cal.4th 661, 666 (2009).

Although Unruh contains a list of protected classes, the California Supreme Court has repeatedly held that Unruh's list is merely illustrative. *See, e.g., In re Cox*, 3

Cal.3d 205, 212 (1970); *White v. Square, Inc.*, 891 F.3d 1174, 1177 (9th Cir. 2018) ("The California Supreme Court has held that the identification of particular bases of discrimination" in Unruh "is illustrative rather than restrictive." (cleaned up)). To determine whether an unenumerated characteristic is protected under Unruh, the California Supreme Court uses a "three-part analytic framework," *Koebke*, 36 Cal.4th at 840:

> (1) the category is a "personal characteristic[]" rather than an "economic characteristic[]," *Harris v. Cap. Growth Invs. XIV*, 52 Cal.3d 1142, 1160-61 (1991), *superseded by statute on other grounds*, *Munson*, 46 Cal.4th 661;
>
> (2) no "legitimate business interest" outweighs recognizing the right, *Koebke*, 36 Cal.4th at 831-32; and
>
> (3) the "potential consequences of allowing [the] claims" do not outweigh recognizing them, *id.* at 841.

Political affiliation meets all three parts.

***First,*** political affiliation is based on "personal characteristics" rather than "economic characteristics." *Harris*, 52 Cal.3d at 1160-61. Personal characteristics "are not defined by immutability"; rather, "they represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition." *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1145 (2018) (cleaned up); *accord Harris*, 52 Cal.3d at 1160 ("personal beliefs"). Because one's political affiliation is substantially intertwined with one's "deeply held personal beliefs and core values," it is a personal characteristic. *Koebke*, 36 Cal.4th at 843.

The California Supreme Court has at least three times stated that political affiliation is protected and akin to the other characteristics expressly listed in the statute. *See*

16

*Marina Point v. Wolfson*, 30 Cal.3d 721, 726 (1982) ("Whether the exclusionary policy rests on the alleged undesirable propensities of those of a particular race, nationality, occupation, political affiliation, or age, in this context the Unruh Act protects individuals from such arbitrary discrimination."); *Cox*, 3 Cal.3d at 217-18 ("The shopping center may no more exclude individuals … who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union, merely because of these characteristics or associations, than may the City of San Rafael."); *Harris*, 52 Cal.3d at 1162 n.10. In fact, in the seminal California Supreme Court decision laying out the three-part framework, the court recognized that political affiliation is a personal characteristic: "Again, the examples [from other States] relate almost exclusively to *personal*, as opposed to economic, characteristics and attributes such as personal appearance, sexual orientation, family responsibilities, residence, and *political affiliation*." *Ibid.* (emphases added). And one California court of appeals concluded that Unruh protects political affiliation or beliefs. *See Gray v. Kircher*, 193 Cal. App. 3d 1069, 1075 (1987) ("Hotel owners cannot classify and isolate their guests according to their perceived social or political philosophies. Such discrimination … runs afoul of the Unruh [Act]."). The "reasoned dicta" and holdings from these cases "are binding" on this Court. *Muniz v. UPS*, 738 F.3d 214, 219 (9th Cir. 2013).

Even if the reasoning is not binding, it's right. One's political affiliation is substantially intertwined with one's "deeply held personal beliefs and core values." *Koebke*, 36 Cal.4th at 843. That many States have laws that protect against political-affiliation

discrimination confirms that the category is in the "'same general nature or class as those enumerated'" in Unruh and other civil-rights statutes. *See Harris*, 52 Cal.3d at 1159-62 & n.9 (finding whether other States have protected economic characteristics in their public-accommodations laws significant to whether Unruh covers economic characteristics); Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022) (collecting statutes prohibiting political discrimination).

Right-of-association precedent further confirms that conclusion. Unruh, like other civil-rights acts, extends fundamental rights that protect against discriminatory state actions to also protect against discriminatory private actions. *See Brennon B. v. Superior Ct.*, 57 Cal. App. 5th 367, 388 (2020) ("our public accommodation laws … [are] directed at private, rather than state, conduct"). The First Amendment, generally speaking, prohibits the government from arbitrarily discriminating against a person's political affiliation. *See, e.g., Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990). Here, it makes sense for Unruh to extend that right to associate against private businesses.

Other unenumerated characteristics California courts have recognized reinforce that Unruh protects political affiliation. For example, Unruh protects "occupational status." *Sisemore v. Master Fin.*, 151 Cal. App. 4th 1386, 1404-05 (2007); *accord White*, 891 F.3d at 1177 ("California Courts of Appeal have interpreted this reference to mean that the Unruh Act prohibits arbitrary occupational discrimination."). In *Sisemore*, the California Court of Appeals concluded that a financial institution illegally discriminated

when it denied a loan "solely on the basis of [the person's] occupation" of "operat[ing] a family day care business." 151 Cal. App. 4th at 1405-06. A person's "choice of an occupation," the court explained, is a protected personal characteristic because "while it may … be motivated at least in part by economic considerations," the choice "is often a very personal one." *Id.* at 1407.

Similarly, the California Court of Appeals has concluded that Unruh protects a person's occupational status as a government employee. *Long v. Valentino*, 216 Cal. App. 3d 1287, 1298-1300 (1989). Unruh prohibits a restaurant from "refusing to serve a beat cop a cup of coffee because the owner does not like police," *id.* at 1298; a car-rental company from "refus[ing] to rent an automobile to an officer because his purpose is to examine it for possible violations of safety standards," *id.* at 1300; or a bus company from "refus[ing] the fare of a civil rights investigator who wishes to observe whether minorities are being required to ride in the back of the bus," *ibid.* Each one is "discrimination based on employment"—a characteristic protected by Unruh. *Ibid.*

If occupational status is a protected characteristic, then political affiliation is too. Political affiliation is a personal choice at least as much as choosing a job. Concluding otherwise would contradict Unruh's purpose of "ban[ning] *all* forms of arbitrary discrimination." *Koebke*, 36 Cal.4th at 840. It would mean that Unruh, for example, prohibits a restaurant from denying service to someone because the person is a lawyer but not because the lawyer is affiliated with the RNC. Courts can't reach that backwards result when "'liberally'" interpreting Unruh. *White*, 7 Cal.5th at 1025.

19

***Second,*** and as Google conceded below, there is no legitimate business interest for an email provider to discriminate against political affiliation and politically affiliated emails. *See* ER.239 56:7-11 (Q: "So what, what are the legitimate business interests that Google has, theoretically, in discriminating against people on the basis of political belief?" A: "Well, we don't, your Honor."); *Harris*, 52 Cal.3d at 1162-63 (listing potential legitimate business reasons inapplicable here). That's especially true when Google is the market-dominant communications firm whose discrimination systematically choked off one major political party's ability to communicate with millions of its subscribers.

***Finally,*** the consequences of allowing Unruh suits for political discrimination are outweighed by Unruh's purpose. Discrimination based on political affiliation is harmful; it's discrimination based on a personal characteristic fundamental to a person's identity. Recognizing claims against political-affiliation discrimination compensates victims and deters future discrimination. And allowing these claims would not require courts to make "microeconomic decisions [that they] are ill equipped to make." *Harris*, 52 Cal.3d at 1166.

Though the district court acknowledged that "[s]ome California courts have embraced" the above "tri-partite test" and that Unruh's list is "illustrative," it nonetheless declined to apply the test, concluding instead that courts must treat the current list as exhaustive or risk "usurp[ing] a legislative function by adding a new protected class" to Unruh. ER.170 & n.4. That categorical conclusion contradicts binding precedent of California courts and the clear intent of California's legislature.

Start with California courts. The California Supreme Court in *Koebke* explained that "in *Harris*," the court "created a three-part analytic framework for determining whether a future claim of discrimination … should be cognizable under the Act." 36 Cal.4th at 840. Far from foreclosing new unenumerated categories, the court explained, *Harris* "affirmed the principle articulated in our earlier decisions that [Unruh's] enumerated categories are illustrative." *Ibid.* California courts of appeals read *Harris* and *Koebke* and subsequent precedent the same way as the RNC. *E.g.*, *Sisemore*, 151 Cal. App. 4th at 1404-05.

Never recognizing new characteristics also contradicts the California legislature's well-established intent. After *Harris*, the legislature has made clear in findings attached to amendments to Unruh that Unruh's list of characteristics is non-exhaustive: "It is the intent of the Legislature that these enumerated bases shall continue to be construed as illustrative rather than restrictive." 2005 Cal. Legis. Serv. Ch. 420 (A.B. 1400, §2), perma.cc/G9HH-MSW5. Though the district court inferred from the California legislature's amendments that no more unlisted characteristics should be recognized, *see* ER.170, the legislature has stated the opposite: "By specifically enumerating these bases in the Unruh Civil Rights Act, the Legislature intends to clarify the existing law, rather than to change the law, as well as the principle that the bases enumerated in the act are illustrative rather than restrictive." 2005 Cal. Legis. Serv. Ch. 420 (A.B. 1400, §2); *accord* Cal. Civ. Code §51, Historical and Statutory Notes (2015 and 2024) (similar). The California Supreme Court has understood the legislature to affirm, not overrule, recognizing

new unenumerated categories. *See Koebke*, 36 Cal.4th at 849-51 ("We did not hold that this legislative activity foreclosed judicial expansion of the Act to include new categories."). And the district court's inference ignores that many of the amendments adding classes to the list were *after* a court first recognized that Unruh protected the unenumerated class. *Compare, e.g.*, Cal. Civ. Code §51 (2006) (adding sexual orientation and marital status), *with Rolon v. Kulwitzky*, 153 Cal. App. 3d 289, 291 (1984) (recognizing that Unruh protects sexual orientation); *Koebke*, 36 Cal.4th at 824 (Aug. 1, 2005) (marital status).

The district court also concluded that it didn't have to apply the three-part framework because the Ralph Civil Rights Act defeated any inference that Unruh protected political affiliation. ER.169-70 & n.4; Cal. Civ. Code §51.7. According to the district court, "if the Unruh Act covered political affiliation," the California legislature "would have had no need to specify political affiliation in the Ralph Act, as the citation to the Unruh Act (that is, subdivision (b) of Section 51) would have included political affiliation." ER.169-70. The district court misread the Ralph Act and failed to consider that the act has a critically different context.

Contra the district court, the Ralph Act's text is consistent with understanding Unruh to bar political-affiliation discrimination. The Ralph Act's express language incorporates only Unruh's expressly listed characteristics. True, the Ralph Act incorporates "characteristic[s] listed or defined in" Unruh, Cal. Civ. Code §51.7(b), but that does not mean the Ralph Act incorporates all of Unruh's *un*enumerated characteristics rather than only Unruh's expressly *enumerated* characteristics, *see Corales v. Bennett*, 567

F.3d 554, 571 (9th Cir. 2009) (understanding the Ralph Act's language to refer to only the enumerated list from Unruh). To read the Ralph Act's reference to Unruh to incorporate all of Unruh's (listed and unlisted) characteristics would render another part of the Ralph Act declaring that its own list is "illustrative" superfluous. *See* Cal. Civ. Code §51.7(b)(1) ("The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive."). So the district court erred when it concluded that "if the Unruh Act covered political affiliation," the California legislature "would have had no need to specify political affiliation in the Ralph Act." ER.169-70. Regardless, a term is not "superfluous" if it "remove[s] any doubt" about the statute's scope. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008). The term "political affiliation" in the Ralph Act at least does that and thus defeats the district court's superfluity conclusion.

Statutory history confirms that the district court's inference from the Ralph Act is unwarranted. When the Ralph Act was enacted, it contained the term "political affiliation," but it didn't reference Unruh. Nearly 30 years later, the California legislature passed "The Civil Rights Act of 2005," which amended Unruh, the Ralph Act, and other civil-rights statutes. 2005 Cal. Legis. Serv. Ch. 420 (A.B. 1400). The amendment added two protected classes ("marital status" and "sexual orientation"), "define[d]" those terms and others in Unruh, and then "integrate[d] those definitions into other related provisions," like the Ralph Act. *Ibid.* In that very amendment, the legislature added findings that its amendments—including the amendment to the Ralph Act that incorporated Unruh's list and definitions—were not "intend[ed] … to change the law"

23

or "the principle that the bases enumerated in [Unruh] are illustrative rather than restrictive." *Id.* §2. This statutory history confirms that the listed-or-defined cross-reference incorporates only the *enumerated* characteristics in Unruh and that courts should not read the Ralph Act to limit Unruh's scope.

Plus, the Ralph Act's context is critically different, so limiting Unruh's scope based on the Ralph Act makes little sense. The Ralph Act was intended to fill a potential gap in civil-rights law by protecting individuals from violent "hate crimes." *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th 820, 845 (2004) (Baxter, J., concurring). Indeed, "while there were 'numerous state and federal laws providing for full and equal civil rights protections in employment, housing, and access to public accommodations and facilities,' there was no specific prohibition protecting individuals from 'violence because of their race, religion, color, ancestry, or national origin.'" *Stamps v. Superior Ct.*, 136 Cal. App. 4th 1441, 1446 (2006). Reading the Ralph Act—which was focused on covering violence for the same type of characteristics as Unruh—to narrow Unruh's broad scope makes little sense. That's especially true given that since the Ralph Act's enactment in 1976, the California Supreme Court continued to suggest that Unruh protected political affiliation. *See Marina Point*, 30 Cal.3d at 726 (1982); *Harris*, 52 Cal.3d at 1162 n.10 (1991).

The district court also relied on two federal district-court opinions to support its "modern approach of giving deference to the Legislature." ER.170-71. But there is no modern approach. *Williams v. Bakersfield* concluded that "the Unruh Act protections are limited to the characteristics identified in" the statute, even though that sharply conflicts

with longstanding California precedent. 2015 WL 1916327, at *6 (E.D. Cal.). And *Kenney v. San Diego* did not even address the issue because both parties "conceded" no Unruh claim was stated. 2013 WL 5346813, at *3 (S.D. Cal.).

### 2. Google intentionally discriminated against the RNC based on political affiliation.

The district court concluded the RNC plausibly alleged that Google intentionally discriminated against the RNC based on political affiliation. ER.8-10, 4-5. And wisely so: The most reasonable inference from the RNC's many precautions ensuring compliance with Google's own best practices, Google's pattern of conduct, Google's refuted excuses, and Google's knowledge of how the timing of the mass diversions would particularly harm the RNC is that Google discriminated against the RNC based on political affiliation. Google's post-filing cessation of diverting RNC emails en masse to subscribers' spam folders confirms the RNC's plausible allegations that Google intentionally discriminated based on political affiliation.

Since long before the mass diversion of RNC emails, as now, the RNC ensures that every email it sends is to someone who requested it and who recently actively engaged with RNC content. ER.97-99. The efforts include contracting with email-deliverability platforms that help the RNC optimize its email engagement and inboxing rate by ensuring that the RNC follows email providers' best practices, including Google's. ER.101-03. And the RNC runs many internal tests to improve email inboxing and

engagement and ran tests to assess what could have been causing Google to relegate nearly all its emails to spam. *See, e.g.*, ER.106.

Despite these precautions, Google, for nearly a year, relegated millions of RNC emails en masse to donors' and supporters' spam folders during pivotal points in election fundraising and community building. Google did so even when the RNC was "only emailing those Gmail users who are [subscribers and] *donors* to [the RNC,] and have also *opened [an RNC email] within the last 15 days*." ER.105-06 (emphases added). Google did so even though no industry-standard tool (including Google's) showed anything wrong with the RNC's domain or email sends. At all relevant times, the RNC's domain was authenticated and verified, its "spam metric" was extremely "low and within the limits suggested by Google," ER.9, and there was "no significant change in the spam rate each month" or in "user reported spam" that "would account for the monthly drop[s]," *ibid.*; *e.g.*, ER.102; ER.120.

From the beginning, the RNC used its best efforts to work with Google to resolve the problem. For example, after each period of mass relegation, the RNC contacted Google and explained how the RNC was following Google's "best practices" and submitted reports showing that it had a high email reputation and that user complaints could not be the problem. ER.111-20. The RNC also always promptly "submitted information to Google" using Google's form that's "designed to collect … information to avoid mislabeling a sender's email as spam," as Google suggested. ER.110.

Though Google responded with shifting excuses for the mass diversions, the RNC would promptly explain why each excuse failed. For example, at one point Google claimed "the RNC's domain authentication … was possibly at fault." ER.116. But the RNC immediately refuted that claim, informing Google that Google's own tool and other industry-standard tools showed that the RNC's domain is "authenticated and verified." *Ibid.*; ER.117 (evidence emailed). Google also claimed the RNC's "press releases" were to blame. ER.96-97; ER.113. The RNC debunked that claim, too, explaining to Google that the domain at issue does not send press releases; press releases are sent from an "entirely different email domain (specifically, team.gop.com)" that is unaffiliated with and, "comparatively, has a minuscule email volume from the RNC's main marketing domain (campaigns.rnchq.com)," so the press releases could not be the problem. ER.113-15.

Google also claimed the RNC's email volume and frequency were to blame. *E.g.*, ER.106. But as the RNC explained, that could not be the reason: "Since the 2020 election, the RNC has dramatically reduced both email volume and frequency," yet there were no mass diversions to spam during the 2020 election. ER.105; ER.8-9. And the mass diversions would occur *before* the RNC's ramp up in email volume and frequency, "meaning that the diversion[s] w[ere] not responding to such an increase." ER.9-10; *see* ER.112-13.

Over nearly a year, each of Google's shifting explanations were disproved with industry-standard tools, and no solution it offered worked—not even following

Google's "training on 'Email Best Practices.'" ER.118-19. Eventually, Google fell silent altogether. ER.105. Google's shifting and debunked explanations suggests that Google's conduct was based on invidious discrimination.

So does the fact that during this time, Google was well-aware that the end-of-month and end-of-quarter periods are vital to the RNC. *See, e.g.*, ER.177 ("the RNC made Google aware of the potential harm"). Google knew that the emails being diverted to spam were "expected to be top-performers" during key periods for election fund-raising and voting. ER.110; *see, e.g.*, ER.113 (informing Google that it was "'tanking the RNC's deliverability during the EOM period when fundraising and donations go up'"). Google knew that diverting end-of-month, end-of-quarter emails would hamper fund-raising and hinder the RNC's "'ability to properly deploy [its] GOTV [get-out-the-vote] messaging, which would be an extreme hinderance to [the] organization and the Party as a whole.'" ER.111 (quoting RNC email to Google). And Google was aware of the upcoming midterm election, yet Google relegated the RNC's emails en masse to spam "'the day before [the RNC's] FEC deadline'" during the RNC's "'EOQ period which are two of the most critical days of the year'" and when the RNC had "'key get out the vote emails … in PA, IL, and MI.'" ER.119-20 (quoting RNC email to Google). Google knew all this—and more—and yet it continued to relegate virtually all of the RNC's emails to subscribers' spam folders without providing any legitimate reason.

That the same type of mass diversion to spam does not happen with other popular email platforms, such as Yahoo! Mail and Microsoft's Outlook Mail, reinforces the

plausibility of the RNC's allegations. Though those providers "have an identical interest to Google in limiting 'spam' to their users," they "did not conceal all (or nearly all) of the RNC's emails from its supporters at any point." ER.121-22. In fact, "the inboxing rates on these platforms did not reflect any dramatic cyclical decreases in inboxing rates, let alone to the rate of nearly 0%." *Ibid.*

The most reasonable inference from Google's pattern of conduct is that Google intentionally relegated critical RNC emails to the spam folder because it was the RNC sending them. *See Grundy v. Walmart Inc.*, 2018 WL 5880914, at *4 (C.D. Cal.) ("[C]ourts routinely consider patterns of conduct in drawing plausible inferences of intentional racial discrimination." (citing *Marina Point*, 30 Cal.3d at 725)). The RNC need only "include some factual context that gives rise to a plausible inference of discriminatory intent." *Nia v. Bank of Am.*, 603 F.Supp.3d 894, 906 (S.D. Cal. 2022) (cleaned up). It has done far more.

Evidence of disparate impact also "may be probative of intentional discrimination." *Harris*, 52 Cal.3d at 1175. This is one of those cases. For example, "a recent study by researchers at North Carolina State University … found that Google's Gmail labels significantly more campaign emails from Republican political candidates as spam than campaign emails from Democratic political candidates." ER.122. The study found no similar disparity in other major email providers. *E.g.*, *ibid.*

If any doubt remained that the RNC met the plausibility standard, Google's post-filing conduct extinguishes it. Since this suit's filing, Google ceased its discriminatory

treatment of the RNC. The RNC has experienced high inboxing rates consistently for over two years without any mass diversion to subscribers' spam folders. But it's not because the RNC has done anything materially different. The RNC has made no "substantive changes to its email practices [that] would account for the change." ER.9. In fact, in November 2022, the RNC *increased* its email send volume and frequency to Gmail users. ER.90. If Google's explanations were legitimate, the RNC's emails should have continued going to spam toward the end of the month. Yet no mass diversion occurred then or after.

The only relevant differences are that the RNC filed this lawsuit and the midterm elections had ended. ER.105. Both facts tend to show that Google was feigning misunderstanding the problem when it actually knew how to stop diverting the RNC's email to spam the whole time and that Google stopped only when this suit shined a light on its discriminatory conduct. *See* ER.8-9 (calling Google's post-filing, post-election cessation "[p]erhaps the strongest allegation"). As the district court agreed, the RNC plausibly alleged that Google intentionally discriminated against the RNC because of its political affiliation. ER.8-10.

### 3. The RNC has statutory standing.

Though Google never challenged statutory standing, the district court sua sponte concluded that the RNC lacks statutory standing to bring its Unruh claim. ER.171-72. To reach this conclusion, the district court violated the party-presentation rule and regardless, got the law and facts wrong.

To start, the district court violated the party-presentation principle. Under that principle, courts must "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Reliance on the parties to make arguments "applies all the more in a case such as this, involving … competent, highly experienced counsel on both sides." *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020). Absent "extraordinary circumstances," a court cannot, as the district court did here, "takeover" a case by injecting new unraised issues. *Sineneng-Smith*, 590 U.S. at 379; *accord, e.g.*, *Todd R.*, 825 F. App'x at 441 (reversing a district court that "crafted [a] theory sua sponte," as the prevailing party had not "even so much as hinted" at the argument (cleaned up)).

No extraordinary circumstances exist here. Google had "numerous opportunities to raise" statutory standing "but did not do so." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1214 (9th Cir. 2020). "'A party's unexplained failure to raise an argument that was indisputably available … is perhaps the least exceptional circumstance." *Id.* at 1214-15 (cleaned up). Especially when, as here, the unbriefed, unraised issue is not jurisdictional. *See, e.g.*, *White*, 891 F.3d at 1175 (this Unruh issue goes to "statutory standing"); *Jewel v. NSA*, 673 F.3d 902, 907 n.4 (9th Cir. 2011) (statutory standing is non-jurisdictional); *In re Ahn*, 804 F. App'x 541, 543 (9th Cir. 2020) (same).

In any event, there is a reason Google's counsel never contested statutory standing: The RNC plainly alleged it. "Standing under the Unruh Civil Rights Act is broad." *Osborne v. Yasmeh*, 1 Cal. App. 5th 1118, 1127 (2016). A "plaintiff has standing under the

Act if he or she has been the victim of the defendant's discriminatory act." *Angelucci v. Century Supper Club*, 41 Cal.4th 160, 175 (2007). That is the case here. The RNC suffered intentional discrimination by Google for nearly a year, even though the RNC "requested equal treatment" many times from Google. *White*, 7 Cal.5th at 1027. Suffering discrimination from Google when Google was operating its Gmail service means that the RNC has "a concrete and actual interest that is not merely hypothetical or conjectural," which is all that statutory standing requires. *Id.* at 1032.

The district court concluded otherwise because the RNC was not itself a Gmail user and lacked "a similar relationship with" Google as a customer. ER.171. But even if such a relationship is required, the RNC has one with Google. Google offers to receive emails from non-Gmail users and deliver them in the Gmail user's inbox. In operating its service, Google discriminated against the RNC when the RNC tried to email its subscribers who are Gmail users. That connection is enough for statutory standing, but the RNC's relationship with Google is even more significant. Google "has a distinct relationship with bulk emailers" and "politically oriented email senders" like the RNC, regardless of whether the sender is a Gmail user. ER.103. For example, Google offers Postmaster Tools to provide senders some "data on email performance" and a "Sender Contact Form" so that bulk senders have a way to contact Google's Gmail team for improperly marking the senders' emails as spam. ER.102; ER.103. Further, "Google has told the RNC that its 'Civics Outreach team,'" whose purpose is helping political organizations or officials, "'is always here to assist' the RNC." ER.103. Google also

went to RNC headquarters to give training on email best practices. ER.118-19. And during Google's discriminatory mass diversions of RNC emails, Google and the RNC exchanged many emails and had numerous conversations on why the discrimination was occurring and whether it would stop. ER.103-20. For purposes of Unruh, this relationship is sufficiently "similar to that of the customer in the customer-proprietor relationship." *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 306 (2021) (cleaned up).

The district court's contrary theory leads to absurd results. Under its theory, if Google diverts an email to the spam folder solely because of the sender's race, the emailer could not bring an Unruh claim unless the email was sent by a Gmail user through Gmail to another Gmail user. But it would make no sense for Unruh to not allow a claim from a plaintiff who suffered direct intentional discrimination by a defendant when the defendant operated its services. Because the district court's theory "would not adequately serve the Act's broad purpose of eradicating discriminatory business practices," it cannot be right. *White*, 7 Cal.5th at 1032.

**B.    The RNC states a common-carrier claim.**

### 1.    Google, through its Gmail service, is a common carrier.

Under California law, "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code §2168. This statute, which invokes common-law terms and doctrine, should be read considering that backdrop. *See, e.g.,*

33

*Webster v. Ebright*, 3 Cal. App. 4th 784, 786 (1992) (California common-carrier statutes "codified the common law"); *Leon v. Cnty. of Riverside*, 14 Cal.5th 910, 921 (2023) ("We generally presume that when the Legislature uses common law terms in its enactments, it intends to incorporate their settled common law meanings."). The district court concluded that Google isn't a common carrier because Google does not "carry" the RNC's emails to Gmail users. ER.160-66. But Google "offers" to carry emails, which is all the statute requires.

Google "offers … to carry" emails. All agree that the term "carry" includes "transmitting," "communicating," and accepting electronic messages through data processing. *E.g.*, *Goldin v. Pub. Utilities Comm'n*, 23 Cal.3d 638, 662 (1979) ("A company providing telephone services to the public is a common carrier."); ER.161-63 (using "transmit" and "transport" interchangeably with "carry"). The district court still concluded that Google doesn't transmit emails because it "receive[s] and store[s] messages" and merely makes the emails "available for retrieval by the user after the message has been shuttled through the email protocol," while "the various computers that comprise the network" carry the messages. ER.162. The district court ignores the statute's text and the common law.

The statutory language centers on what Google "*offers*," not what Google as a matter of technological complexity "does." Put differently, the statute's focus is on what Google offers the public, not on the precise technical details of how email works. That focus makes sense because the public doesn't care how email is sent or received, but

who is purporting to take responsibility to make it happen. The common law has the same focus. *See* MacLeod, *The First Amendment, Discrimination, and Public Accommodations at Common Law*, 112 Ky. L.J. 209, 239-41 (2024).

Google is offering the public the service of sending and receiving electronic messages. For example, Google provides instructions for non-users and users on sending and receiving emails, including how to "multi-send for email marketing, newsletters, and announcement." *See, e.g.*, D.Ct.Doc.30-4 at 3. Google also offers to receive emails from non-Gmail users and deliver them in the Gmail user's inbox. *See ibid.*; ER.103. Email service providers like Gmail thus offer themselves to the public as conduits for sending and receiving messages, just like the telephone and postal mail, both of which are common carriers. *See Lunney v. Prodigy Servs.*, 94 N.Y.2d 242, 248-49 (1999) (viewing the "role in transmitting e-mail [to be] akin to that of a telephone company" and stating that "[e]-mail is the day's evolutionary hybrid of traditional telephone line communications and regular postal service mail").

Regardless, Gmail is at least responsible for carrying emails when it "displays [electronic] messages to users in the Gmail platform." ER.165; *see State v. Google LLC*, 2022 WL 1818648, at *3 (Ohio Com.Pl.) (concluding that Google Search is a common carrier partly because for that service, "Google carries information"). After all, to be a common carrier, "the distance between these two points (assuming any distance at all is required) need not be great." *Gomez v. Superior Ct.*, 35 Cal.4th 1125, 1138 (2005). The common law of common carriers similarly rejects the district court's "distinction

between *literal* 'carriage' and the processing of data" and its backup distinction between "more complicated communications processing" (*e.g.*, email) and "less complicated communications processing (*e.g.*, telephony)." *NetChoice v. Paxton*, 49 F.4th 439, 478 (5th Cir. 2022), *vacated*, *Moody v. NetChoice*, 603 U.S. 707 (2024); *see* Sitaraman & Ricks, *Tech Platforms and the Common Law of Carriers*, 73 Duke L.J. 1037, 1047, 1086 (2024) ("literally 'carrying' things has never been a relevant litmus test for the application of the common law's common carrier principles" as "the common law's carrier principles have been applied not only to literal carriers but also to stationary businesses like warehouses, inns, wharves, mills, and cotton gins").

It is irrelevant that Google does not transport the email the entire way. Common carriers have typically transmitted a message using several companies. For example, a telegraph was typically sent using multiple different telegraph company lines. *See, e.g.*, *W.U. Tel. Co. v. Brown*, 253 U.S. 101, 107-08 (1920) (telegraph would travel from Oakland, California, to Wabuska, Nevada, on Western Union lines and from Wabuska to Yerington, Nevada on another company's lines). Telegraph services could be divided further into transmission and delivery, both of which were regulated as a common carrier. The message's transmission would be done across the lines while the actual physical message would be delivered by a courier to the addressee. *See, e.g.*, *Trammell v. W. Union Tel. Co.*, 57 Cal. App. 3d 538 (1976). Google's liability, even if it is just the final company handling email delivery, mirrors the treatment of a common carrier's delivery of goods using multiple vendors, where the company that carries the goods to their destination

36

is liable for a mis-delivery. *See Cavallaro v. Tex. & P. Ry.*, 110 Cal. 348, 355-56 (1895) (The "last duty required of the common carrier is that of delivery…. He must not only deliver goods intrusted to him to carry, but becomes also responsible for their proper delivery.").

In essence, the district court concluded that California's common-carrier statute can't apply to technology or corporate structures more advanced than the telegraph and the telephone. But the California Supreme Court has rejected arguments that California statutes cannot be applied to new complex circumstances: "In construing statutes that predate their possible applicability to new technology, courts have not relied on wooden construction of their terms. Fidelity to legislative intent does not make it impossible to apply a legal text to technologies that did not exist when the text was created." *Apple Inc. v. Superior Ct.*, 56 Cal.4th 128, 137 (2013) (cleaned up). California courts have a history of "updating obsolete statutes in light of emerging technologies." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal.). The common-carrier provisions are no exception. "[T]he California statutory common carrier definition is very broad." *Neubauer v. Disneyland, Inc.*, 875 F.Supp. 672, 673 (C.D. Cal. 1995); *see Gomez*, 35 Cal.4th at 1130 ("section 2168 defines a 'common carrier' in expansive terms").

## 2. Google violated its common-carrier obligations.

The RNC states a common-carrier violation in two ways. Google violated its common-carrier obligations because relegating emails to subscribers' spam folders based on political affiliation (1) violates its duty of care, Cal. Civ. Code §§2089-90, 2161-

62, and (2) constitutes "refus[ing]" or "postpon[ing]" transmitting the RNC's emails, §2169.

**First,** Google violated its duty of care. All carriers owe at least an ordinary duty of care. Cal. Civ. Code §§2089-90. But "a carrier of messages for reward" owes a higher duty: It "must use great care and diligence in the transmission and delivery of messages." §§2161-62. Google is a carrier of messages for reward because it doesn't carry messages "gratuitously" but for "profit." *See Huang v. The Bicycle Casino, Inc.*, 4 Cal. App. 5th 329, 338-39 (2016); ER.161 (agreeing Gmail is for profit). Google thus owes a greater duty.

Regardless, under either standard, Google violated its duty. A common carrier violates its duty of care when it does not deliver an item to the proper location but reasonably could have. *See Dresbach v. Cal. Pac. R.*, 57 Cal. 462, 462 (1881) (concluding that a common carrier violated its duties when "goods consigned" for delivery at a particular location were not delivered to the designated "agents" at the location). Here, Google violated that duty when it placed the emails in the spam folder (the wrong location) rather than the recipient's inbox (the right location) because of the sender's political affiliation rather than because Google reasonably believed the emails were spam. *See supra* I.A.2. Discrimination based on political affiliation when delivering messages, especially without any legitimate business justification, does not amount to "great care and diligence" or "ordinary care."

The district court disagreed because in its view, California's duty-of-care obligation does not "extend[] to any message carrier beyond a telegraph company." ER.167.

38

But nothing in the text of California's law requires that result. In fact, the statute says the opposite: "A carrier of messages for reward, *other than by telegraph or telephone*, must deliver them at the place to which they are addressed." Cal. Civ. Code §2161 (emphasis added). The exclusion of "telegraph" and "telephone" from the definition of carrier of messages for reward implies inclusion of all other carriers that meet the definition— including email.

The district court also concluded that the RNC couldn't state a common-carrier claim because "the RNC has not paid Google any sum to transmit messages," which, the court claimed, are the only damages permitted. ER.167 (relying on *Redington v. Pac. Postal Tel. Cable Co.*, 107 Cal. 317 (1895); *Hart v. W. Union Tel. Co.*, 66 Cal. 579 (1885)). But nothing in the cases the district court relies on hold that the law limits damages to only the amount paid to send the message. Instead, they conclude that if the sender of the message is partially at fault for not ensuring delivery and agrees to a company's "stipulation" that "limit[s]" its "liability" to damages equal to the amount the sender spent to transmit the message, then that stipulation is "binding." *Hart*, 66 Cal. at 581-82; *Redington*, 107 Cal. at 323. No such stipulation is here.

**Second,** Google also violated California law because it "refused" or "postponed" RNC emails by relegating them to spam. As a common carrier, Google must, "if able to do so, accept and carry" any email messages offered to it "at a reasonable time and place." Cal. Civ. Code §2169. "Every person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his

39

actual damages, and fifty dollars in addition thereto." §2209. Google violated the common-carrier provisions because Google refused to accept—or at least postponed—the RNC's messages each time Google relegated in bad faith the emails to spam. Google does not notify users that the email is in the spam folder; nor do users regularly (if ever) check the spam folder, particularly without prompting.

*      *      *

The district court gave two other reasons for why California's common-carrier obligations can't extend to Gmail. Both are unpersuasive.

First, contra the district court, it's irrelevant that the RNC is a non-Gmail user emailing a Gmail user. ER.166. Google's offer to carry messages extends beyond those who have Gmail accounts. People using email service providers other than Gmail may still send messages to Gmail addresses. Gmail welcomes such emails—indeed, the value of its service depends on receiving them—just as it welcomes all email users that follows its terms and best practices. The statute says Google must "use great care and diligence" without limiting the duty to the receiver, Cal. Civ. Code §2162—that is, the provision is "broad" and the California legislature was "agnostic[]" to whom the duty was owed, *Bartenwerfer v. Buckley*, 598 U.S. 69, 75-76 (2023). Moreover, Google offered itself to the public as a carrier of messages to Gmail accounts as part of its highly lucrative business. An email sender who directly relies on Google's service, based on the function it holds itself out to the public to perform, is hardly a third party that Google owes no duty to.

Second, the district court claimed that finding Gmail to be a common carrier "would dramatically alter the manner in which email providers conduct their business" because email providers could not "filter[] spam or other messages." ER.165-66. That contention directly conflicts with the district court's §230 conclusion that providers could filter spam if, unlike Google, they do so in "good faith." ER.150-53. Regardless, if Gmail is a common carrier, Google could still reasonably filter spam. *See Squaw Valley Ski Corp. v. Superior Ct.*, 2 Cal. App. 4th 1499, 1509 (1992) ("A common carrier … undertakes generally and for all persons indifferently to transport those *it is accustomed to carry* for reasonable compensation."); Cal. Civ. Code §2169 (obligation only to carry "of a kind that he undertakes or is accustomed to carry"). Just as "a mail carrier [can] refus[e] to carry a dangerous or explosive device," so can an email provider filter a harmful message. ER.161; *see, e.g.*, *NetChoice*, 49 F.4th at 474 (common carriers can still "filter some obscene, vile, and spam-related expression"); MacLeod, *supra*, at 239 (carrier may "refuse to carry on a 'reasonable ground'"). The point here is that Google is not reasonably filtering spam but discriminating based on the sender's political affiliation.

## C.     The RNC states an unfair-competition claim.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200. The RNC has plausibly alleged the first two.

Because the RNC has stated its other claims, the RNC plausibly alleges unlawfulness. *See Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 179-80 (1999).

41

Regardless, Google's conduct is unfair. "Unfair" conduct is framed broadly "to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Id.* at 181 (cleaned up); *accord Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013) ("The UCL is a broad California statute."). A business practice may be unfair without being "proscribed by some other law." *In re Adobe Sys. Privacy Litig.*, 66 F.Supp.3d 1197, 1226 (N.D. Cal. 2014). This standard is "intentionally broad." *Candelore*, 19 Cal. App. 5th at 1155 (cleaned up); *accord Harris v. Pac Anchor Transp.*, 59 Cal.4th 772, 783 (2014). Whether a practice is unfair is "usually … a question of fact not appropriate for decision on a motion to dismiss." *Rubenstein v. Neiman Marcus Grp.*, 687 F. App'x 564, 566 (9th Cir. 2017) (cleaned up); *accord Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

California courts have stated three "unfairness" tests: (1) "whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer'"; (2) "whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers'"; and (3) "whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision.'" *Doe v. CVS Pharmacy*, 982 F.3d 1204, 1214-15 (9th Cir. 2020).[3]

---

[3] Courts generally agree that the proper test for unfairness is "unsettled." *Zhang v. Superior Ct.*, 57 Cal.4th 364, 380 n.9 (2013); *accord Nationwide Biweekly Admin. v. Superior Ct.*, 9 Cal.5th 279, 303 & n.10 (2020) ("split of authority"). Because the RNC meets all three tests for unfairness, this Court needn't decide the proper test.

The district court *agreed* with the RNC that Google's actions are "unfair" at least in a "colloquial" sense, but ultimately concluded that the unfairness is not "cognizable" in a "legal[] sense." ER.25, 5. The district court erred. Though the RNC need state only one unfairness test, it satisfies all three.

**1.** The first test is easily met because Google's discriminatory relegation of RNC emails to spam significantly harmed the RNC and its supporters and "outweighs 'the reasons, justifications and motives of'" Google. *Doe*, 982 F.3d at 1215. Google conceded that it has no legitimate reason or justification for discriminating based on political affiliation. *See* ER.238 56:7-11 (Q: "So what, what are the legitimate business interests that Google has, theoretically, in discriminating against people on the basis of political belief?" A: "Well, we don't, your Honor."); ER.24 ("Nor did Google realize any monetary benefit from diverting the RNC's emails."). That concession makes sense. There is no business interest—especially not from the market-dominant communications firm—in systematically choking off one major national political party's ability to communicate with its supporters. Google's discrimination also significantly harmed the RNC by obstructing the RNC's relationship with its supporters, reducing revenue from donations, decreasing event turnout, and hampering voter turnout. *E.g.*, ER.90; ER.11; ER.113; ER.24 (Google's practice caused "substantial monetary injury to the RNC."). While Google's discrimination significantly harmed the RNC, there's no legitimate justifications to weigh against the harm—by Google's own concession. The RNC's harm easily outweighs no justification at all.

The district court never denied that Google has no legitimate business justification. Instead, it discounted the harm Google's discrimination caused the RNC and its subscribers. ER.22-25. According to the court, it could consider the harm only to Gmail users because they are the only "consumers." ER.22-23. But the RNC's injuries must be considered. The RNC is also a consumer in the relevant sense because it has a material relationship with Google as a political bulk sender and the RNC took Google up on its offer to receive emails from non-Gmail users and deliver them in the Gmail user's inbox. *Supra* I.A.3.

In any event, the RNC states a claim solely on the harm to the Gmail users because the RNC has suffered an injury from Google's discriminatory practice and the injury to the RNC's subscribers alone is enough to establish that Google's practice is unfair. *See* ER.22 n.9 (agreeing the RNC "may still bring a claim under the UCL even if it has not suffered harm as a consumer or competitor"). The district court determined that the harm to the RNC's donors and subscribers isn't severe enough because "a small number of wanted emails diverted to spam on occasion is not 'substantially injurious' to Gmail users" to warrant a UCL claim. ER.24. But nothing in the balancing test requires substantial injury; the test requires only that the harm outweighs the benefits. Here, the injury to each individual Gmail user alone outweighs the zero benefit from Google's discriminatory practice.

Even if substantial injury is required and the injury to each user individually is not substantial, the harm when combined is substantial: Millions of emails to donors

and subscribers were relegated to spam during critical times in election fundraising, voting, and community building, when these recipients are generally most interested in receiving the RNC's emails. Google's unfair practice deprived these consumers their right to effectively associate with their desired political organization and to receive desired information about politics, among other things—when it mattered most. ER.104-05; ER.113; ER.124. Further, the harm to the RNC affects the Gmail users because Google's discrimination caused "substantial monetary injury" to the political organization the users chose to associate with, hindering the effectiveness of associating with that organization. ER.24. Taken together, Google's practice substantially injured consumers, while Google's practice has no legitimate benefits.

**2.** For substantially the same reasons, Google's practice challenged here is "'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Doe*, 982 F.3d at 1214. Discrimination based on political affiliation or views is immoral, unethical, and unscrupulous. *See, e.g.*, *Nia*, 603 F.Supp.3d at 908 (concluding that "intentional discrimination … amounts to immoral, unethical, oppressive, or unscrupulous conduct"); *Candelore*, 19 Cal. App. 5th at 1155-56. As explained, it significantly harms the RNC and the RNC's subscribers. The practice is particularly immoral because regardless of whether the RNC's email is in the requestor's inbox or spam folder, Google still receives the same payment for its services (*i.e.*, the user's data, which Google uses to make money). ER.94-95. Moreover, the danger of permitting corporate interference in the communications of political organizations cannot be overstated. History reflects

45

that bad-faith handling of political communications harms the public, especially when the communication is through a crucial conduit (as is the case here). *See* ER.91-93.

**3.** Finally, the third test is met because "the effects of [Google]'s conduct are comparable to" violations of Unruh and common-carrier law. *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F.Supp.3d 1017, 1047 (N.D. Cal. 2021) (cleaned up).

First, Google's actions are comparable to a violation of Unruh. Unruh reflects the public policy that "arbitrary discrimination" by businesses is harmful and against the public interest. *Koebke*, 36 Cal.4th at 840. Even if Unruh does not prohibit political-affiliation discrimination, such discrimination is comparable to the harm Unruh protects against because the discrimination is based on a trait that is fundamental to a person's core values and it's arbitrary to discriminate against a personal characteristic with no legitimate business justification. *See, e.g.*, *Divino Grp. LLC v. Google LLC*, 2022 WL 4625076, at *12 (N.D. Cal.) ("'tethering' test" met based on "alleged discriminatory conduct violates the policy concerns underlying [Unruh]"); *Candelore*, 19 Cal. App. 5th at 1155 ("in view of our conclusion that Tinder's alleged discriminatory pricing model violates the public policy embodied in the Act, the UCL's 'unfair' prong provides an independent basis for relief on the facts alleged").

Second, California's common-carrier law reflects the public policy that crucial communication conduits should send and receive messages reasonably and without arbitrary discrimination. *See, e.g.*, *Huang*, 4 Cal. App. 5th at 338-41; *NetChoice*, 49 F.4th at 471-73 (detailing the common law of common carriers). Regardless of whether

California common-carrier law applies to emails, bad-faith delivering or presenting of emails is like the bad-faith delivery by other indispensable means of communication like the telegraph and telephone. *See, e.g.*, *Lunney*, 94 N.Y.2d at 248-49.

### D. The RNC states a claim for intentional interference with prospective economic relations.

The RNC plausibly alleges all five elements of intentional tortious interference: (1) an economic relationship between the plaintiff and a third party that has a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) the actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's acts. *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal.5th 505, 512 (2017). The district court concluded that the RNC failed to plausibly allege the first and third elements; the court didn't address the other three. ER.25-29. The RNC plausibly alleged all five elements.

**1.** The first element requires "an existing economic relationship" that "contains the probability of an economic benefit to the plaintiff." *Roy Allan*, 2 Cal.5th at 512. The district court agreed that "the RNC has sufficiently alleged a pre-existing relationship with a class of Gmail users who had donated to the RNC in the past." ER.28; *e.g.*, ER.97-98. The court, however, disagreed that these relationships had a probability of economic benefit because the RNC alleged "a past economic relationship standing alone." ER.29.

47

But the RNC alleged far more than a "past economic relationship"; it alleged an ongoing relationship with these donors and subscribers. These donors subscribed to receive emails from the RNC, including emails asking for donations, and recently engaged with RNC content. ER.97-99; ER.105-07. But for Google diverting the RNC's emails, some of the RNC's many donors and subscribers would have interacted with the emails, as they do every month, including by donating to the RNC's cause. *E.g.*, ER.89-90 (Google's discrimination "caused the RNC to lose valuable revenue in California and the rest of the county"). The probability of economic benefit is even higher given that the mass relegations occurred during key periods "when fundraising and donations go up" and "when [the subscribers] are particularly attuned to politics and expect the RNC to be communicating with them." ER.104-05; ER.113; ER.124. These allegations plausibly show that there's a high probability of economic benefit to the RNC from these relationships and that the "expectancy … precede[d] the interfering conduct." *Roy Allan*, 2 Cal.5th at 518 (cleaned up). At any rate, the element covers even speculative expectancies when, as here, important public policies, such as "favoring fair elections," are implicated. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996).

Contra the district court, the RNC didn't have to provide "more facts about the nature or frequency of the past donations" at the motion-to-dismiss phase. ER.29. Courts must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)

(cleaned up). A plaintiff needn't provide "detailed factual allegations," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), just enough allegations that "permits the reasonable inference" that at least one of the many donors the RNC emails—all who still want to receive RNC content and recently actively engaged with RNC content—will donate again when asked to donate during a period when fundraising and donations generally increases, *Lemmon*, 995 F.3d at 1090 (cleaned up).

**2.** Google knew about the RNC's relationship with its email subscribers. *See* ER.177 ("the RNC made Google aware of the potential harm"). Google also knew about the monthly mass email diversions, that the end-of-month and end-of-quarter periods were vital for the RNC's donations, and that the mass relegations were harming the RNC's ability to fundraise, communicate with, and mobilize its supporters. *E.g.*, ER.104-06; ER.110-11.

**3.** Google's conduct is independently wrongful. The RNC "merely must allege that [Google's] acts were unlawful for a reason other than that they interfered with [the RNC's] prospective economic advantage." *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1110 (9th Cir. 2007). The RNC has done so because it states its other claims.

Google's conduct is also independently wrongful at least because it violated the common law's established common-carrier doctrine. *See Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*, 138 Cal. App. 4th 1215, 1222 (2006) (independent wrong includes "violation[s] of established industry, trade or professional rules or standards").

49

Under the common law, a communication firm qualifies as a common carrier if the firm "hold[s] itself out to serve any member of the public without individualized bargaining" and is "affected with a public interest." *NetChoice*, 49 F.4th at 470-72; *see* Candeub, *Common Carrier Law in the 21st Century*, 90 Tenn. L. Rev. 813, 838-46 (2023). Google "holds itself out to the public generally and indifferently." ER.160-61. Google has significant market power and its "service play[s] a central economic and social role in society." *NetChoice*, 49 F.4th at 471. And by hiding messages in users' spam folders based on political-affiliation discrimination, Google violated its common-carrier obligation to provide its service reasonably without discrimination.

**4 & 5.** The RNC plausibly alleges actual disruption of the relationship and causation. The RNC's relationships with supporters and donors were disrupted in several ways, including that the mass relegations were harming the RNC's ability to fundraise, communicate with, and mobilize its supporters. *See, e.g.*, ER.111; ER.113; ER.118-20; ER.124.

For similar reasons, the RNC plausibly alleges that Google's conduct proximately caused the economic harm. The loss of donations would not have occurred without Google's mass relegations. *See* ER.178 ("[T]he RNC likely lost donations as a result of Google's spam filter."); ER.177 ("Plaintiff has alleged sufficient facts to show some degree of certainty that they suffered injury because of Defendant's conduct."); ER.105-06; ER.113; ER.124; ER.136.

### E. The RNC states a claim for negligent interference with prospective economic relations.

To state a negligent-interference claim, the RNC must allege "an economic relationship" between the RNC and its supporters that had a "reasonably probable future economic benefit" to the RNC; Google knew of the relationship and should have known that its negligence would interfere with that relationship and cause the RNC economic harm; Google was negligent; and Google's negligence economically harmed the RNC by interfering with its relationships. *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 786 (1997). For the same reasons as the intentional-interference claim, the RNC plausibly alleged a sufficient economic relationship, that Google had the required knowledge, that Google was not just negligent but intentionally discriminated against the RNC, and that Google's misconduct harmed the RNC and its relationships.

When, as here, a claim involves an out-of-privity third party, the defendant must also owe the plaintiff a duty. Courts use six factors to determine whether there's a duty: (1) "the extent to which the transaction was intended to affect the plaintiff"; (2) "the foreseeability of harm to the plaintiff"; (3) "the degree of certainty that the plaintiff suffered injury"; (4) "the closeness of the connection between the defendant's conduct and the injury suffered"; (5) "the moral blame attached to the defendant's conduct"; and (6) "the policy of preventing future harm." *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804 (1979). The district court agreed that factors two and three favored finding a duty. ER.177-178. Contra the district court, the other four factors do as well.

51

The first factor supports the RNC because Google intentionally discriminated against the RNC, knew the mass diversions were harming the RNC's relationship with its supporters, and continued to wrongly relegate RNC emails to spam during periods that Google knew were "when the RNC historically receives most of its donations." ER.178. The fourth factor favors the RNC because Google's conduct is directly connected to the loss of funds from RNC supporters. But for Google diverting the RNC's emails, some of the RNC's many donors and subscribers would have interacted with the emails, as they do every month, including by donating to the RNC's cause. *Supra* 47-49. The fifth factor favors the RNC because Google's conduct is immoral. *Supra* I.A.2, I.C. Finally, public policy strongly supports preventing Google's arbitrary interference in the economic and political relationships of its users and groups like the RNC because of Google's dominance of the email market, the national interest in promoting political expression and association, the need for Americans to stay informed and provide financial support for parties and candidates of their preferred political ideology, among other things.

## II. As the district court concluded, §230 doesn't bar the RNC's claims.

Google will likely reraise that §230 shields its discrimination. The district court rightly rejected that affirmative defense. ER.7-12. So should this Court.

### A. Section 230(c)(2) doesn't bar the RNC's claims.

Section 230(c)(2)(A) only shields "action[s] voluntarily taken in good faith to restrict access to … material that the provider or user considers to be obscene, lewd,

lascivious, filthy, excessively violent, harassing, or otherwise objectionable." As the district court concluded, subparagraph (A) doesn't bar the RNC's claims because the RNC plausibly alleged political-affiliation discrimination, which means that "Google acted without good faith." ER.8-10.

Section 230(c)(2)(B) only protects "action taken to enable or make available to … others the technical means to restrict access to material described in" paragraph (2)(A). It does not apply here for two reasons.

First, while subparagraph (A) protects good-faith censorship by the *platform*, subparagraph (B) protects handing the censorship tools over to *users*. As the district court explained, "the RNC is specifically alleging that Google took unilateral action that was 'not based on *users'* spam designations.'" ER.11-12. The RNC is thus not holding Google liable for its "technical means" that "enable" users to mark emails as spam but Google's choice to discriminate. §230(c)(2)(B).

Second, §230(c)(2)(B) does not immunize censoring based on political affiliation or beliefs. In *Enigma Software Grp. USA v. Malwarebytes, Inc.*, this Court held that "§230[(c)(2)] does not provide immunity for blocking a competitor's program for anti-competitive reasons." 946 F.3d 1040, 1052 (9th Cir. 2019). This Court explained that §230(c)(2) doesn't give providers "unfettered discretion to declare online content 'objectionable,'" *id.* at 1047, and that materials blocked for an anticompetitive reason do "not fall within any category listed" in paragraph (2)(A), *id.* at 1052. The statute's

"history and purpose" supported that conclusion because "Congress expressly provided" that the statute sought to "protect competition, not suppress it." *Id.* at 1050-51.

If "allegations of anticompetitive animus are sufficient to withstand dismissal," *id.* at 1045, then plausible allegations of bad-faith conduct, including political-affiliation discrimination, are. Just as §230's "history and purpose" supported protecting competition and not immunizing "anticompetitive motive[s]," *id.* at 1050-51, so too does its purpose support protecting political affiliation and not immunizing political discrimination. Indeed, Congress expressly found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." §230(a)(3); *see* Candeub & Volokh, *Interpreting 47 U.S.C. §230(c)(2)*, 1 J. Free Speech L. 175, 183-86 (2021). Thus, §230(c)(2)(B) doesn't immunize Google's censoring based on political affiliation.

## B.    Section 230(c)(1) doesn't apply here either.

For §230(c)(1) to apply, the RNC must "treat [Google], under a state law cause of action, as a publisher or speaker." *Lemmon*, 995 F.3d at 1091 (cleaned up). A "claim 'inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another'" when the claim holds a provider "liable for the injuries that arise from publishing allegedly harmful content produced by another user or failing to remove harmful content." ER.10; *see Calise*, 103 F.4th at 738 ("Publication is … any act by which *unlawful matter* is intentionally or negligently communicated to a third

person." (cleaned up; emphasis added)); *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 120-21 (4th Cir. 2022) (§230(c)(1) requires "seek[ing] to impose liability based on that information's improper content."). As the district court concluded, that is not the case here: "[T]here is no allegation that Google published or failed to remove some potentially harmful content"; "the challenge is to Google's decision to restrict the availability of, or to *not* publish, the RNC's emails" because of the RNC's political affiliation. ER.11. Nor does the RNC's claims "*require[]* that [Google] moderate content to fulfill its duty" to not discriminate based on an emailer's status. *Est. of Bride v. Yolo Techs.*, 112 F.4th 1168, 1177 (9th Cir. 2024).

Concluding that §230(c)(1) does not bar the claims here fits with this Court "consistently eschew[ing] an expansive reading of" §230 that "would render unlawful conduct magically lawful when [conducted] online." *HomeAway.com v. Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned up). Discrimination based on status is illegal conduct whether via the internet or not. *See* Oral Arg. Tr. 141:2-11 in *Gonzalez v. Google LLC*, No. 21-1333 (Feb. 21, 2023) (Q: "[W]hat about [the] dating hypothetical? The discrimination [that the company is] not going to match black people and white people, et cetera, what about that? Is that given 230's shield?" Google's Counsel: "Absolutely not, because any disparate treatment claim or race discrimination is saying you're treating people different regardless of the content."). As the district court concluded, §230(c)(1) doesn't apply because the RNC's claims are holding Google responsible for its own conduct regardless of a message's content. *See* ER.10-11.

## CONCLUSION

This Court should reverse the district court and remand for further proceedings.

Dated: January 21, 2025

Respectfully submitted,

Michael A. Columbo
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post St., Suite 700
San Francisco, CA 94108
(415) 433-1700
mcolumbo@dhillonlaw.com

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy
Thomas S. Vaseliou
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
tvaseliou@consovoymccarthy.com
conor@consovoymccarthy.com

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) and Circuit Rule 28.1-1 because it contains 13,987 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: January 21, 2025 _/s/ Thomas R. McCarthy_

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: January 21, 2025 _/s/ Thomas R. McCarthy_

## ADDENDUM OF STATUTORY PROVISIONS

| Statutory Provisions | Page |
| --- | --- |
| 47 U.S.C. §230 | ADD-2 |
| Cal. Bus. & Prof. Code §17200 (Unfair Competition Law) | ADD-6 |
| Cal. Civ. Code §51 (Unruh Civil Rights Act) | ADD-7 |
| Cal. Civ. Code §51.7 (Ralph Civil Rights Act of 1976) | ADD-10 |
| Cal. Civ. Code §2089 | ADD-13 |
| Cal. Civ. Code §2090 | ADD-13 |
| Cal. Civ. Code §2161 | ADD-13 |
| Cal. Civ. Code §2162 | ADD-13 |
| Cal. Civ. Code §2168 | ADD-13 |
| Cal. Civ. Code §2169 | ADD-14 |
| Cal. Civ. Code §2209 | ADD-14 |

## 47 U.S.C. §230
### Protection for private blocking and screening of offensive material

**(a) Findings**

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5) No effect on sex trafficking law

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

(A) any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

(C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section

2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**Cal. Bus. & Prof. Code §17200**
**Unfair competition; prohibited activities**

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

## Cal. Civ. Code §51
### Unruh Civil Rights Act; equal rights; business establishments; violations of federal Americans with Disabilities Act

(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

(c) This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, sexual orientation, citizenship, primary language, or immigration status, or to persons regardless of their genetic information.

(d) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

(e) For purposes of this section:

    (1) "Disability" means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code.

    (2)

        (A) "Genetic information" means, with respect to any individual, information about any of the following:

            (i) The individual's genetic tests.

(ii) The genetic tests of family members of the individual.

(iii) The manifestation of a disease or disorder in family members of the individual.

(B) "Genetic information" includes any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

(C) "Genetic information" does not include information about the sex or age of any individual.

(3) "Medical condition" has the same meaning as defined in subdivision (i) of Section 12926 of the Government Code.

(4) "Race" is inclusive of traits associated with race, including, but not limited to, hair texture and protective hairstyles. "Protective hairstyles" includes, but is not limited to, such hairstyles as braids, locs, and twists.

(5) "Religion" includes all aspects of religious belief, observance, and practice.

(6) "Sex" includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. "Sex" also includes, but is not limited to, a person's gender. "Gender" means sex, and includes a person's gender identity and gender expression. "Gender expression" means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.

(7) "Sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status" includes any of the following:

(A) Any combination of those characteristics.

(B) A perception that the person has any particular characteristic or characteristics within the listed categories or any combination of those characteristics.

(C) A perception that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics, or any combination of characteristics, within the listed categories.

(8) "Sexual orientation" has the same meaning as defined in subdivision (s) of Section 12926 of the Government Code.

(f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.

(g) Verification of immigration status and any discrimination based upon verified immigration status, where required by federal law, shall not constitute a violation of this section.

(h) Nothing in this section shall be construed to require the provision of services or documents in a language other than English, beyond that which is otherwise required by other provisions of federal, state, or local law, including Section 1632.

## Cal. Civ. Code §51.7
## Ralph Civil Rights Act of 1976

(a) This section shall be known, and may be cited, as the Ralph Civil Rights Act of 1976.

(b)

(1) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

(2) For purposes of this subdivision, "intimidation by threat of violence" includes, but is not limited to, making or threatening to make a claim or report to a peace officer or law enforcement agency that falsely alleges that another person has engaged in unlawful activity or in an activity that requires law enforcement intervention, knowing that the claim or report is false, or with reckless disregard for the truth or falsity of the claim or report.

(3) For purposes of this subdivision, "intimidation by threat of violence" includes, but is not limited to, terrorizing the owner or occupant of private property with the distribution of materials on the private property, without authorization, with the purpose of terrorizing the owner or occupant of that private property.

(4) For purposes of this subdivision, "terrorize" means to cause a person of ordinary emotions and sensibilities to fear for personal safety.

(c)

(1) A person shall not require another person to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, as a condition of entering into a contract for goods or services, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or

any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any court or other governmental entity.

(2) A person shall not refuse to enter into a contract with, or refuse to provide goods or services to, another person on the basis that the other person refuses to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any other governmental entity.

(3) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any other governmental entity shall be knowing and voluntary, in writing, and expressly not made as a condition of entering into a contract for goods or services or as a condition of providing or receiving goods and services.

(4) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section that is required as a condition of entering into a contract for goods or services shall be deemed involuntary, unconscionable, against public policy, and unenforceable. This subdivision does not affect the enforceability or validity of any other provision of the contract.

(5) A person who seeks to enforce a waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section has the burden of proving that the waiver was knowing and voluntary and not made as a condition of the contract or of providing or receiving the goods or services.

(6) The exercise of a person's right to refuse to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including a rejection of a contract requiring a waiver, does not affect any otherwise legal terms of a contract or an agreement.

(7) This subdivision does not apply to an agreement to waive any legal rights, penalties, remedies, forums, or procedures for a violation of this section after a legal claim has arisen.

(8) This subdivision applies to an agreement to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including an agreement to accept private arbitration, entered into, altered, modified, renewed, or extended on or after January 1, 2015.

(d) This section does not apply to statements concerning positions in a labor dispute that are made during otherwise lawful labor picketing.

(e)

(1) Speech alone shall not support an action brought pursuant to this section, except upon a showing of all of the following:

(A) The speech itself threatens violence against a specific person or group of persons.

(B) The person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property.

(C) The person threatening violence is acting in reckless disregard for the threatening nature of their speech.

(D) The person threatening violence has the apparent ability to carry out the threat.

(2) This subdivision shall not be construed to negate or otherwise abrogate the requirements set forth in subdivisions (b) to (d), inclusive, to bring an action pursuant to this section.

(f) The Legislature finds and declares that this section was enacted as part of the Ralph Civil Rights Act of 1976, in Chapter 1293 of the Statutes of 1976.

(g) This section does not negate or otherwise abrogate the provisions of Sections 1668, 1953, and 3513.

### Cal. Civ. Code §2089
### Gratuitous carriers; obligations

Carriers without reward are subject to the same rules as employé's without reward, except so far as is otherwise provided by this Title.

### Cal. Civ. Code §2090
### Gratuitous carriers; obligations after commencing to carry

A carrier without reward, who has begun to perform his undertaking, must complete it in like manner as if he had received a reward, unless he restores the person or thing carried to as favorable a position as before he commenced the carriage.

### Cal. Civ. Code §2161
### Carrier of messages; delivery; toll or ferriage; compensation for messenger

A carrier of messages for reward, other than by telegraph or telephone, must deliver them at the place to which they are addressed, or to the person for whom they are intended. Such carrier, by telegraph or telephone, must deliver them at such place and to such person, provided the place of address, or the person for whom they are intended, is within a distance of two miles from the main office of the carrier in the city or town to which the messages are transmitted, and the carrier is not required, in making the delivery, to pay on his route toll or ferriage; but for any distance beyond one mile from such office, compensation may be charged for a messenger employed by the carrier.

### Cal. Civ. Code §2162
### Care and diligence in transmission and delivery

A carrier of messages for reward, must use great care and diligence in the transmission and delivery of messages.

### Cal. Civ. Code §2168
### Common carrier defined

Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry.

### Cal. Civ. Code §2169
### Obligation to accept freight

A common carrier must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry.

### Cal. Civ. Code §2209
### Damages for refusing or postponing messages

Every person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual damages, and fifty dollars in addition thereto.