No. 24-5358

# In The United States Court of Appeals for the Ninth Circuit

---

REPUBLICAN NATIONAL COMMITTEE,

*Plaintiff-Appellant,*

v.

GOOGLE INC. AND GOOGLE LLC,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:22-cv-01904
Hon. Daniel J. Calabretta

---

## ANSWERING BRIEF OF DEFENDANT-APPELLEE GOOGLE LLC

Michael R. Huston
PERKINS COIE LLP
2525 E. Camelback Road
Suite 500
Phoenix, Arizona 85016
(602) 351-8000
MHuston@perkinscoie.com

Dominic E. Draye
 *Counsel of Record*
GREENBERG TRAURIG, LLP
2375 E. Camelback Road
Suite 800
Phoenix, Arizona 85016
(602) 445-8000
drayed@gtlaw.com

*Counsel for Defendant-Appellee Google LLC*

## Fed. R. App. P. 26.1 Disclosure Statement

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google is aware of no publicly owned corporation not a party to the appeal that has a financial interest in the outcome of this litigation.

Dated:  April 28, 2025

*s/ Dominic E. Draye*
Dominic E. Draye
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 800
Phoenix, Arizona 85016
(602) 445-8000
drayed@gtlaw.com

*Counsel for Defendant-Appellee*
*Google LLC*

# TABLE OF CONTENTS

Introduction ........................................................................... 1

Statement of the Issues ........................................................ 3

Statement of the Case ........................................................... 3

    I.    How Gmail filters spam email ................................. 3

    II.   The RNC's allegations ............................................. 5

    III.  The district court dismissed the RNC's original complaint ................................................................ 7

    IV.  The district court dismissed the RNC's amended complaint ................................................................ 8

Summary of Argument ........................................................ 8

Argument ............................................................................. 11

    I.    The RNC fails to plausibly allege that Gmail's spam filters discriminated against the RNC because of its political affiliation. ............................................... 11

        A.   The Complaint's own allegations make it obvious that Gmail presented a portion of RNC emails as spam because they appeared to be spam. .................... 11

        B.   The RNC's own allegations confirm that Google was helping the RNC, not scheming against it. .......... 14

        C.   The RNC's remaining allegations do not advance its discrimination theory. ............................................ 15

    II.   The district court correctly concluded that the RNC failed to plead each of its California-law claims. .................. 18

        A.   The RNC fails to state a common-carrier claim. ........ 18

        B.   The RNC fails to state an Unruh Act claim. .............. 24

            1.   The Unruh Act does not cover political affiliation. ................................................... 25

            2.   The RNC lacks statutory standing. .................... 30

        C.   The RNC fails to state a claim for intentional interference with prospective economic relations. ....... 33

TABLE OF CONTENTS
(CONTINUED)

D.   The RNC fails to state a claim for negligent interference with prospective economic relations. ......36

E.   The RNC fails to state a claim under California's Unfair Competition Law. ................................37

1.   The Court lacks subject matter jurisdiction over the UCL claim standing alone, and the RNC fails to plead the right to any remedy. ......37

2.   The RNC does not allege any "unlawful" business act. ...............................................39

3.   The RNC does not allege any "unfair" business act. ...............................................40

a.   The RNC fails to satisfy the tethering test. ...............................................42

b.   The RNC fails to satisfy the balancing test. ...............................................46

c.   The RNC's proposed third test does not apply, and in any event, the RNC fails to satisfy it. .........................48

III.   Section 230 of the Communications Decency Act bars the RNC's claims. ................................49

A.   Google is protected under Section 230(c)(1). ..............50

B.   Google is protected under Section 230(c)(2). ..............54

1.   Google's good-faith spam filtering is protected under Section 230(c)(2)(A). ...............55

2.   Google is also protected under Section 230(c)(2)(B). ...............................................57

Conclusion ...............................................................58

Certificate of Compliance ...........................................59

Certificate of Service ...............................................60

# TABLE OF AUTHORITIES

## CASES

*Angelucci* v. *Century Supper Club*,
41 Cal.4th 160 (2007) ............................................................... 29

*Apple Inc.* v. *Superior Ct.*,
56 Cal.4th 128 (2013) ............................................................... 22

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) .................................................................. 17

*Barnes* v. *Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009),
*as amended* (Sept. 28, 2009) ........................... 10, 51, 52, 54

*Bennett* v. *Google, LLC*,
882 F.3d 1163 (D.C. Cir. 2018) ............................................. 51

*Beverage* v. *Apple, Inc.*,
101 Cal.App.5th 736 (2024) ............................................ 44, 45

*Biakanja* v. *Irving*,
49 Cal.2d 647 (1958) ................................................................ 36

*Calise* v. *Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ......................................... 52, 53

*Candelore* v. *Tinder, Inc.*,
19 Cal.App.5th 1138 (2018) .................................................... 45

*Capito* v. *San Jose Healthcare Sys., LP*,
17 Cal.5th 273 (2024) ............................... 39, 41, 44, 47, 48

*Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*,
20 Cal.4th 163 (1999) ................................... 41, 42, 43, 44

*Citizens United* v. *Federal Election Commission*,
558 U.S. 310 (2010) .................................................................. 29

# TABLE OF AUTHORITIES
## (CONTINUED)

*Clark* v. *Superior Ct.,*
50 Cal.4th 605 (2010) ............................................................ 38

*Corales* v. *Bennett,*
567 F.3d 554 (9th Cir. 2009) ................................................ 30

*Curtis* v. *Irwin Indus.,*
913 F.3d 1146 (9th Cir. 2019) .............................................. 30

*Davis* v. *HSBC Bank, Nev., N.A.,*
691 F.3d 1152 (9th Cir. 2012) ........................................ 39, 42

*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.,*
11 Cal.4th 376 (1995) ............................................................ 35

*Divino Group LLC* v. *Google LLC,*
2022 WL 4625076 (N.D. Cal. Sept. 30, 2022) ..................... 45

*Doe* v. *CVS Pharmacy, Inc.,*
982 F.3d 1204 (9th Cir. 2020) ........................................ 48, 49

*Donadio* v. *Hyundai Motor Am.,*
751 F.Supp.3d 1013 (C.D. Cal. 2024) ............................. 46, 49

*Dreamstime.com, LLC* v. *Google LLC,*
2022 WL 17427039 (9th Cir. Dec. 6, 2022) ........................ 17

*Dyroff* v. *Ultimate Software Grp., Inc.,*
934 F.3d 1093 (9th Cir. 2019) ........................................ 50, 53

*e360Insight, LLC* v. *Comcast Corp.,*
546 F.Supp.2d 605 (N.D. Ill. 2008) ...................................... 56

*Eclectic Props. E., LLC* v. *Marcus & Millichap Co.,*
751 F.3d 990 (9th Cir. 2014) ................................................ 11

*Enigma Software Group USA* v. *Malwarebytes, Inc.,*
946 F.3d 1040 (9th Cir. 2019) .............................................. 56

# TABLE OF AUTHORITIES
## (CONTINUED)

*Epic Games, Inc.* v. *Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...................................... 41, 42, 46, 47, 49

*Estate of Bride by & through Bride* v. *Yolo Techs., Inc.*,
  112 F.4th 1168 (9th Cir. 2024) ...................................... 54, 56

*Fair Hous. Council of San Fernando Valley* v. *Roomates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc) ...................................... 50, 54

*Federal Bureau of Investigation* v. *Fikre*,
  601 U.S. 234 (2024) ...................................... 39

*Gastelum* v. *Cotton on USA, Inc.*,
  2023 WL 2957861 (E.D. Cal. Apr. 14, 2023) ...................................... 30

*Goldin* v. *Public Utilities Commission*,
  23 Cal.3d 638 (1979) ...................................... 19

*Gomez* v. *Superior Court*,
  35 Cal.4th 1125 (2005) ...................................... 19

*Harris* v. *Capital Growth Invs. XIV*,
  52 Cal.3d 1142 (1991) ...................................... 25, 26, 27

*Hauck* v. *Advanced Micro Devices, Inc.*,
  816 F. App'x 39 (9th Cir. 2020) ...................................... 42

*Hodsdon* v. *Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ...................................... 40, 42, 43, 45

*Holomaxx Techs.* v. *Microsoft Corp.*,
  783 F.Supp.2d 1097 (N.D. Cal. 2011) ...................................... 51, 55

*HomeAway.com, Inc.* v. *City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) ...................................... 50, 53

*Huber* v. *Biden*,
  2022 WL 827248 (N.D. Cal. Mar. 18, 2022),
  *aff'd*, 2022 WL 17818543 (9th Cir. Dec. 20, 2022) ...................................... 27

## TABLE OF AUTHORITIES
### (CONTINUED)

*Hunt* v. *County of Orange*,
  672 F.3d 606 (9th Cir. 2012) ................................................................. 32

*In re Cox*,
  3 Cal.3d 205 (1970) .............................................................................. 28

*In re McKee*,
  90 F.4th 1244 (9th Cir. 2024) .............................................................. 40

*In re Tobacco II Cases*,
  46 Cal.4th 298 (2009) ........................................................................... 38

*Janda* v. *T-Mobile USA, Inc.*,
  378 F. App'x 705 (9th Cir. 2010) .......................................................... 42

*Jensen* v. *United States Tennis Ass'n*,
  2025 WL 707447 (9th Cir. Mar. 5, 2025) ............................................. 19

*Jones* v. *Dirty World Ent. Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ........................................................... 52, 53

*Khoja* v. *Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................ 12

*Koebke* v. *Bernardo Heights Country Club*,
  36 Cal.4th 824 (Cal. 2005) ...................................... 25, 26, 27, 28, 29

*Korea Supply Co.* v. *Lockheed Martin Corp.*,
  29 Cal.4th 1134 (2003) ......................................................................... 34

*Kwan* v. *SanMedica Int'l*,
  854 F.3d 1088 (9th Cir. 2017) .............................................................. 39

*Levitt* v. *Yelp! Inc.*,
  765 F.3d 1123 (9th Cir. 2014) .............................................................. 42

*Madrid* v. *Perot Sys. Corp.*,
  130 Cal.App.4th 440 (2005) ........................................................... 38, 39

## Table of Authorities
### (Continued)

*Maine Cmty. Health Options* v. *Albertsons Cos.*,
993 F.3d 720 (9th Cir. 2021)................................................................ 38

*Marina Point. Ltd.* v. *Wolfson*,
30 Cal.3d 721 (1982) ........................................................................... 27

*Moody* v. *NetChoice, LLC*,
603 U.S. 707 (2024).............................................................................. 29

*Murphy Co.* v. *Biden*,
65 F.4th 1122 (9th Cir. 2023) ............................................................. 30

*Needelman* v. *DeWolf Realty Co.*,
239 Cal.App.4th 750 (2015) ................................................................ 22

*New.Net, Inc.* v. *Lavasoft*,
356 F.Supp.2d 1090 (C.D. Cal. 2004) ........................................... 35, 40

*North Am. Chem. Co.* v. *Superior Ct.*,
59 Cal.App.4th 764 (1997) .................................................................. 36

*Orr* v. *Pacific Sw. Airlines*,
208 Cal.App.3d 1467 (1989)................................................................ 19

*Puentes* v. *Wells Fargo Home Mortg., Inc.*,
160 Cal.App.4th 638 (2008) ................................................................ 48

*Roy Allan Slurry Seal, Inc.* v. *American Asphalt S., Inc.*,
2 Cal.5th 505 (2017)............................................................................ 33

*Shen* v. *Garland*,
109 F.4th 1144 (9th Cir. 2024) ........................................................... 32

*Simon* v. *Walt Disney World Co.*,
114 Cal.App.4th 1162 (2004) .............................................................. 20

*Soil Retention Prods., Inc.* v. *Brentwood Indus., Inc.*,
521 F.Supp.3d 929 (S.D. Cal. 2021) .............................................. 34, 35

# TABLE OF AUTHORITIES
## (CONTINUED)

*Squaw Valley Ski Corp.* v. *Superior Ct.*,
   2 Cal.App.4th 1499 (1992) .................................................. 20, 21, 22, 23

*Sybersound Recs., Inc.* v. *UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ............................................. 35

*Thurston* v. *Omni Hotels Management Corp.*,
   69 Cal.App.5th 299 (2021) ................................................... 31

*Tovar* v. *Sessions*,
   882 F.3d 895 (9th Cir. 2018) ................................................ 23

*Transamerica Life Ins.* v. *Richards*,
   695 F.Supp.3d 1120 (C.D. Cal. 2023) ................................. 36

*UMG Recordings, Inc.* v. *Glob. Eagle Ent., Inc.*,
   117 F.Supp.3d 1092 (C.D. Cal. 2015) .......................... 34, 36

*United States* v. *Councilman*,
   418 F.3d 67 (1st Cir. 2005) (en banc) ................................. 21

*United States* v. *Hansen*,
   599 U.S. 762 (2023) ............................................................. 29

*United States* v. *Sineneng-Smith*,
   590 U.S. 371 (2020) ............................................................. 32

*Van Maanen* v. *Youth With a Mission-Bishop*,
   852 F.Supp.2d 1232 (E.D. Cal. 2012),
   *aff'd*, 542 F. App'x 581 (9th Cir. 2013) ............................... 23

*Westside Center Associates* v. *Safeway Stores 23, Inc.*,
   42 Cal.App.4th 507 (1996) .................................................. 34

*Williams* v. *City of Bakersfield*,
   2015 WL 1916327 (E.D. Cal. Apr. 27, 2015) ................. 26, 28

*Zango, Inc.* v. *Kaspersky Lab, Inc.*,
   568 F.3d 1169 (9th Cir. 2009) ............................... 4, 46, 57, 58

## TABLE OF AUTHORITIES
### (CONTINUED)

**CONSTITUTION AND STATUTES**

U.S. Const., Amend. I ....................................................................... 9, 24, 29

15 U.S.C. § 7701(a)(2) ........................................................................ 4, 46

15 U.S.C. § 7701(a)(4) ............................................................................. 46

15 U.S.C. § 7701(a)(5) ............................................................................. 46

15 U.S.C. § 7701(a)(12) ............................................................................ 4

47 U.S.C. § 230(c)(1) ................................................... 10, 50, 51, 52, 53

47 U.S.C. § 230(c)(2)(A) ............................................... 10, 54, 55, 56

47 U.S.C. § 230(e)(3) .............................................................................. 50

Cal. Civ. Code § 2168 ............................................................................. 19

Cal. Civ. Code § 2207 ....................................................................... 18–19

Cal. Civ. Code § 2208 ....................................................................... 19, 23

Cal. Civ. Code § 2209 ............................................................................. 20

California's Unfair Competition Law,
  Cal. Bus. & Profs. Code § 17200 .......................... 7, 9, 35, 37–49, 49–50

California's Unruh Civil Rights Act,
  Cal. Civ. Code § 51(b) ................................................ 7, 9, 24–30, 43–45

California's Ralph Civil Rights Act of 1976,
  Cal. Civ. Code § 51.7 ................................................................... 30, 45

**RULES**

Federal Rule of Appellate Procedure 32(a)(5) ......................................... 59

Federal Rule of Appellate Procedure 32(a)(6) ......................................... 59

TABLE OF AUTHORITIES
(CONTINUED)

Federal Rule of Appellate Procedure 32(f) ............................................... 59

Federal Rule of Civil Procedure 12(b)(6) ................................................ 32

9th Circuit Rule 32-1(a) ............................................................................ 59

## INTRODUCTION

The Republican National Committee ("RNC") brought a lawsuit premised on the theory that Google LLC—the provider of the popular free email service Gmail—discriminated against the RNC because Google is antagonistic to the RNC's "political affiliation." To support that theory, the RNC alleged that, a few years ago for about nine months, Gmail's spam filter directed a fraction of the RNC's email messages to Gmail users' spam folders rather than to their inboxes.

The RNC's core contention—that this spam filtering was the product of political discrimination rather than the politically neutral Gmail algorithm reading signals from Gmail users about which emails they are likely to consider spam—is demonstrably false. The same Gmail algorithm governs emails sent by the Democratic National Committee—and everyone else. Even at the pleading stage, the RNC's discrimination theory is implausible for reasons that are obvious on the face of its complaint. The RNC's own allegations show a common-sense explanation why Gmail flagged some of the RNC's emails as potential spam: they appeared to be spam. *Many* Gmail users, in fact, were marking RNC emails as spam. Moreover, according to the RNC's own research, the spam filtering was *not* attributable to the fact that the RNC was the messages' sender; it occurred when the RNC linked to a webpage that "require[d] [a] donor to provide a cellphone number" before donating. The undisputed user-generated spam complaints and that troublesome link

are some of the many signals that could trigger Gmail's spam filter. The RNC further concedes that this filtering was not limited to Gmail; RNC emails periodically went to spam for users of another major email platform as well. And if all that weren't enough, the RNC admits other facts that undermine the plausibility of its political-discrimination theory, including that Google worked with the RNC for months to help resolve the inboxing problem—and that the problem was resolved within a few months.

Although the RNC's discrimination allegations do not get past the plausibility threshold, this Court need not reach the (im)plausibility of the RNC's theory because the district court correctly determined that the RNC failed to plead necessary elements of each of its causes of action under California law. The district court explained why those claims all suffer from various pleading deficiencies under well-established California precedent. The RNC does not seek in this appeal to apply existing California law; it wants this Court to dramatically *expand* California law to recognize multiple novel theories of liability. But this federal Court may not do so.

The RNC's claims also fail for another independent reason: They are foreclosed by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230. One of Congress's core purposes for Section 230 was protecting the ability of computer services like Gmail to moderate and filter online content for the benefit of Internet users without facing

lawsuits from (among others) the authors of that content. Section 230 protects Google here in three distinct ways: it protects Google's decisions about how it presented RNC emails to Gmail users; it protects Google's good-faith decisions to restrict access to content that appeared to be spam; and it protects Google's provision to users of technical means to restrict spam.

Because the district court correctly dismissed the RNC's claims, and because those claims are implausible and also fail under Section 230, this Court should affirm the judgment of dismissal.

## STATEMENT OF THE ISSUES

1. Whether the RNC plausibly alleged that Google discriminated against the RNC based on political affiliation.

2. Whether the district court correctly dismissed the RNC's five California-law claims because each fails to state a claim for relief.

3. Whether Section 230 of the Communications Decency Act protects Google from the RNC's claims.

## STATEMENT OF THE CASE

### I.  How Gmail filters spam email

Gmail is a free email service offered by Google. Consumers who agree to Google's Terms of Service can create a Gmail account and use Gmail to compose, view, and store emails. See ER-92. But the RNC "is not a Gmail user." ER-146. It is, instead, a bulk-email sender that sends

many millions of emails via the Internet, some of which are received by Gmail users. ER-89.

As a bulk-email sender, the RNC's emails sometimes are flagged by Gmail's spam filters, which protect users from unwanted and unsafe email content typically described as "spam." Spam is a serious problem. Congress once found that about "half of all [email] traffic" consists of spam. Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701(a)(2). Spam is not just irritating; it is often dangerous. It may contain harmful material like phishing attacks, offensive content, or malware, which can "compromis[e] a user's privacy, damag[e] computer files, steal[] identities, or spontaneously open[] … links to unwanted websites." *Zango, Inc.* v. *Kaspersky Lab, Inc.*, 568 F.3d 1169, 1171 (9th Cir. 2009). Spam filtering is therefore essential to a safe and enjoyable experience for email users—as Congress has recognized. See, *e.g.*, 15 U.S.C. § 7701(a)(12).

To determine whether each of the tens of billions of messages that Google processes every day might be spam, Gmail uses "automated systems and algorithms." SER-21.[1] Those systems are "based on thousands of signals" reflecting constantly changing conditions and inputs. SER-3 (incorporated by reference at ER-102). Some signals include how fre-

---

[1] The Terms of Service and an appended "program policies" were incorporated into the RNC's amended complaint, ER-94, and the district court took judicial notice of them, ER-181–182, ER-186.

quently an email address sends emails; how many emails it sends; and its "domain reputation," meaning a domain's history of user complaints. ER-90, ER-96–97. But the most important signal is user input: "When Gmail users mark emails as spam, it increases the likelihood that future messages [from that sender] will also be classified as spam by [Google's] anti-abuse systems." SER-39 (incorporated by reference at ER-94).

## II.  The RNC's allegations

The RNC alleges that, as a bulk-email sender, it sends millions of emails to Gmail users for "election fundraising," "community building," and more. ER-89. The RNC concedes that Gmail has presented "nearly all" of the RNC's bulk emails in Gmail users' inboxes. *Id.* But "for about nine months" during 2022, Gmail allegedly displayed the RNC's bulk emails in Gmail users' spam folders, rather than inboxes, for a short period of a few days sometimes (but not always) toward the end of each month. RNC's Opening Brief ("OB") 2. The rate at which emails are presented in Gmail users' inboxes rather than spam folders is called the "inboxing rate." ER-100.

According to the RNC's complaint, Google directed a fraction of the RNC's bulk emails to Gmail users' spam folders not because of the normal functioning of Gmail's algorithmic spam filter but rather exclusively because of Google's alleged disagreement with the RNC's "political affiliation and views." ER-89; *see also* ER-131 (claiming "Google is antagonistic" to "the political affiliation of the RNC"). Google allegedly "relegated"

the RNC's emails to spam folders toward the end of the month because, supposedly, that is "historically when the RNC's fundraising is most successful." ER-89. The RNC claims "[o]n information and belief" that this alleged issue cost the RNC "hundreds of thousands of dollars, if not more," in lost donations. ER-124.

Those "dips" in the RNC's inboxing rate allegedly occurred for just a few days per month in 2022, typically "at the end of each month." ER-89. In most months (March, May, June, July, and August), the dips occurred for one or two days only. ER-120. In others (February, March, April, June, July, and August), the dips stopped before the end of the month. *Id.* The last time the RNC alleges the issue occurred was October 2, 2022. *Id.* Anachronistically, the RNC attributes that resolution to the commencement of this case three weeks later. *Id.*

Importantly, the RNC's complaint identifies other explanations for the alleged inboxing issue that are unrelated to the RNC's political affiliation. The RNC acknowledges being told by Google, for example, that "the issue could be a result of" Gmail's spam-filtering algorithm that "collects spam reports over the course of the month and eventually causes a sender's email to be diverted to … spam" for a period based on the cumulative effects of that reporting. ER-116. The RNC also acknowledges that the average rate at which Gmail users flagged its email as spam "was approximately 0.14%" and its spam rate once hit as high as "0.3%"—an abysmal rate by industry standards. ER-102. And though the RNC con-

tends that its "inboxing rates on [other email] platforms did not reflect *any* dramatic cyclical decreases," ER-121, the RNC's own allegations show that RNC emails sent to Microsoft ("MSN") users experienced five dramatic inboxing-rate drops of 50 or more percentage points in five separate months. ER-122.

Many more factual allegations undermining the plausibility of the RNC's discrimination theory are discussed below.

### III.  The district court dismissed the RNC's original complaint

The RNC sued Google raising seven claims for relief. ER-89. Six arose under California law (ER-129–139, ER-140), plus one federal-law claim that the RNC acknowledged (ER-139) is "foreclosed by binding precedent" and that it does not press on appeal (OB9).

The district court granted Google's initial motion to dismiss all claims for failure to state a claim for relief. ER-145–182. The court dismissed with prejudice five claims: under California's common-carrier law (Count I) and California's Unruh Civil Rights Act (Count II), for the California tort of negligent interference with prospective economic relations (Count V), under the federal Telecommunications Act (Count VI), and for the California tort of negligence (Count VII). ER-160–172, ER-174–179. The court also dismissed the two remaining claims—under California's Unfair Competition Law (Count III) and for the California tort of intentional interference with prospective economic relations (Count IV)—but granted leave to amend. ER-172–174, ER-180–181.

As an additional ground for dismissal, the district court held that the RNC's claims were barred by CDA Section 230, which protects Google's good-faith filtering of objectionable spam email. ER-150–159; *see* 47 U.S.C. § 230. The court allowed the RNC to attempt to replead around Section 230. ER-159.

## IV. The district court dismissed the RNC's amended complaint

The RNC's amended complaint largely repeated its prior allegations. But it added at least one important new allegation: the inboxing issue "has stopped" completely since October 2, 2022. ER-90, ER-120.

The district court again granted Google's motion to dismiss. ER-4–30. This time, the court declined to rely on Section 230. ER-7–12. But the court found that the RNC had failed to adequately plead critical elements of its two remaining claims. ER-12–29. The court therefore dismissed the RNC's claims with prejudice, ER-30, and entered judgment for Google, ER-3.

## SUMMARY OF ARGUMENT

I. The theory at the core of all the RNC's claims—that Google manipulated Gmail's spam-filtering algorithms to discriminate against the RNC based on political viewpoint, but only for a handful of days each month—is implausible. The obvious alternative explanation for these inboxing issues is the common-sense one: various signals (including the high rate of user-generated complaints about the RNC's bulk emails, and

troublesome links in those emails) contributed to the algorithmic filter flagging some RNC emails as spam. The RNC's theory relies on speculation that defies judicial experience and common sense.

**II.** Even if the RNC inched its allegations over the plausibility threshold, the RNC's five California-law claims fail based on a host of legal deficiencies. To revive the RNC's case would require this Court to extend California law in ways that no California court ever has.

For the common-carrier claim, no California court has held that an email service is a common carrier. And the RNC fails to allege the other elements. For the Unruh Act claim, no California court ever held that the Unruh Act's protections extend to the unenumerated category of political affiliation. For the intentional- and negligent-interference claims, the RNC failed to plead several critical elements, including any specifics concerning its economic relationship with Gmail users. Furthermore, for the negligent-interference claim, Google did not owe any duty to the RNC, which admits it is not a Gmail user. And for the unfair-competition claim, no California court has held that differential treatment based on "political affiliation" is actionable.

Recognizing "political affiliation" as a new protected class would have dramatic public policy consequences and raise difficult First Amendment issues. The decision whether to take such a step must be made by the California Legislature, not a federal court.

**III.** Independent of the RNC's pleading failures, CDA Section 230 provides three independent protections against the RNC's claims.

Section 230(c)(1) protects decisions about whether and how to "publish" third-party content. That includes "all publication decisions, [including] whether to edit, to remove, or to post." *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009), *as amended* (Sept. 28, 2009). Because the RNC's claims seek liability against Gmail for exercising a traditional editorial function of sorting online content (spam or not), the RNC necessarily seeks to impose liability for Gmail's publishing activity.

Subsection 230(c)(2)(A) shields a provider's actions "in good faith" to "restrict access" to "material that the provider or the user considers to be … objectionable." Spam is undeniably objectionable. And here, the only plausible explanation for the RNC's allegations is that Gmail's algorithm thought the RNC's bulk emails were spam based on user-generated complaints, the links in the emails, the frequency of the emails, or other factors.

Last, Subsection 230(c)(2)(B) shields "any action taken to enable or make available to … others the technical means to restrict access to material described in" paragraph (2)(A). A spam filter is a tool that Google provides to Gmail users to help them filter objectionable content like spam in their inboxes, including through the ability to mark emails as spam.

## ARGUMENT

### I. The RNC fails to plausibly allege that Gmail's spam filters discriminated against the RNC because of its political affiliation.

#### A. The Complaint's own allegations make it obvious that Gmail presented a portion of RNC emails as spam because they appeared to be spam.

The RNC asks this Court to infer that Google must have been discriminating based on political affiliation. But before a plaintiff's claims will get past the plausibility threshold, "courts must also consider an 'obvious alternative explanation' for [a] defendant's behavior." *Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Bell Atl.* v. *Twombly*, 550 U.S. 544, 567 (2007)). Here, the common-sense explanation for the RNC's inboxing issue—readily apparent from the complaint's own allegations—is that Gmail's spam-filtering algorithm thought some of the RNC's bulk emails were spam.

The most obvious reason for RNC emails being flagged as spam is that Gmail users were too frequently marking them as such. As the RNC acknowledges, Google warned the RNC that "a lot of Gmail users were marking RNC messages as spam." ER-109 (cleaned up). The RNC's "average spam rate" during the relevant period—*i.e.*, the rate at which Gmail users identified the RNC's emails as spam—"was approximately 0.14%" and even hit "0.3%." ER-102. Despite the RNC's unsubstantiated opinion (OB1) that these rates were "extremely low," Google's guidance

and "best practices" show that rates over 0.1% (and especially 0.3%) can "lead to increased spam classification." SER-9.[2]

The RNC's inboxing issues were not limited to Gmail; the RNC experienced similar rate drops with Microsoft ("MSN") users. ER-122. As a graph in the RNC's complaint shows (with arrows added for emphasis), the RNC's emails to MSN users experienced *five* drops of at least 50 percentage points, across five months, with the steepest drop just before the 2022 elections:



*Id.* The RNC is thus incorrect in asserting (OB7) that the inboxing issue

---

[2] Below, the RNC disputed that the district court could consider this spam-rate guidance. But the RNC incorporated this guidance by reference into its own complaint. See ER-99. And because "courts must consider the complaint in its entirely, as well as … documents incorporated into the complaint by reference," *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citation omitted), the RNC cannot cherry-pick the parts of this guidance that it wants this Court to consider. The RNC's own vendor, Salesforce, has long agreed with these recommended spam limits: "The limit for spam complaints is … 0.1%" and "spam complaints have a lasting negative impact." Salesforce, *Abuse Reports* (Nov. 12, 2023), perma.cc/NQT6-556B?type=image.

was Google's alone.

The RNC says (OB5–6) that it "takes great pains to optimize email performance," including "us[ing] industry-standard tools and contracts with leading companies." But one of those tools—which the RNC tellingly now ignores despite initially relying on it—confirmed that whether RNC emails went to spam folders *did not* depend on the RNC's political affiliation. Specifically, the RNC ran an "A/B test," where it sent "'two versions of an email'" with identical substantive content to different mailing lists that it controls, to determine "which version performs better." ER-99 (citation omitted). If Google were truly "suppress[ing] … emails because it was the RNC sending them," ER-105, then Google would have sent all the RNC's test emails to spam.

But Google did not do so, as the RNC concedes. Instead, "Version *A* inboxed at the normal rate, while Version *B* inboxed at a rate of approximately 0%" (*i.e.*, only Version *B* went entirely to spam). ER-107. As the district court observed, then, clearly it was not the sender (the RNC) or its political views that caused the issue. See ER-155 ("some other factor" besides "the substantive content or sender of the email" must have been "triggering application of the spam filter," "such as the different links contained with the email or some other technical feature of the email").

When the RNC amended its complaint, it acknowledged for the first time that "[t]he only difference between the two pages [linked in the two emails] is that one requires the donor to provide a cellphone number."

– 13 –

ER-106. So the cause of the inboxing issue was not the RNC's political views, but the fact that one email solicited phone numbers and the other did not. See ER-118–119 (identifying "[c]ommon reasons links can cause an email to be classified as spam," including when a linked webpage "asks[] for personal/confidential information"). The spam filter reacted to the link in the RNC's email messages, not the RNC's political viewpoint. The district court thus correctly found that the A/B test "undermines the RNC's claim of bad faith discrimination on the basis of political affiliation." ER-155.

There is nothing remarkable about bulk emails being shown in spam folders. "It's not unusual for mass email campaigns, like the ones often sent by political campaigns, to land in a user's spam folder." SER-44–45 (incorporated by reference at ER-123). Categorizing emails into spam folders happens every day for myriad reasons. Those can include sending too many emails or hyperlinking to a suspicious webpage, or because "a lot of Gmail users are marking … messages as spam." ER-109.

These technical considerations of Gmail's spam-filtering algorithm provide an "obvious alternative explanation" why some RNC emails were categorized as spam—on not only Gmail, but also MSN.

## B. The RNC's own allegations confirm that Google was helping the RNC, not scheming against it.

The RNC urges this Court to reject that common-sense explanation and conclude that "Google was intentionally sending critical RNC emails

to the spam folder because it's the RNC sending them." ER-90. But that theory runs contrary to many of the RNC's own allegations.

For example, the RNC's allegations detail Google's long-running and intensive efforts to help address the RNC's concerns around the performance of their bulk emails. See, *e.g.*, ER-103, ER-106. The RNC acknowledges, for example, that Google worked with the RNC "[f]or nearly a year." ER-105. Those efforts even included Google employees traveling to the RNC's office to "give a training" on "Email Best Practices." ER-118–119. Less than two months after that training, the last alleged instance of the inboxing issue occurred. See ER-118–120.

The RNC belittles those efforts as "excuses" to cover Google's tracks. OB6–7. But the district court rightly found that judicial experience and common sense counsel otherwise: "the fact that Google engaged with the RNC for nearly a year and made suggestions that improved email performance is inconsistent with a lack of good faith." ER-155.

### C.   The RNC's remaining allegations do not advance its discrimination theory.

The RNC's theory depends on three speculative assumptions unmoored from any supporting facts or reasonable inference.

*First*, if Google were really trying to discriminate against the RNC's political viewpoint, then why would it label RNC's emails as spam only for one or a few days per month? The RNC sought to plug that obvious hole in its case by suggesting (OB1–2) that end-of-month periods were

"pivotal points in election fundraising, voting, and community building." But that suggestion can't explain the RNC's own graph plotting the inboxing dips, some of which *did not* occur in the last days of the month. See ER-120–122. According to the RNC's allegations, the alleged drops in June, July, and August 2022 were each only for a single day and were followed by *recovery* for the final days of the month—the days the RNC considers the most important to fundraising. ER-120. In February 2022, the RNC alleges that its inboxing rates decreased below 40% at least three times at the beginning and middle of the month (February 1–4, 8–15, and 20–22), while its rate allegedly stayed above 80% at month-end. ER-90.

*Second*, the RNC relies (OB29) on a "study" that supposedly "found no similar disparity in other major email providers." But as the district court observed, the study "indicates that all three programs considered—Google, Outlook, and Yahoo—had a political bias"; "the study itself does not attribute any motive to Google"; and "a more plausible reason" for these inboxing issues "was user input, not bad faith efforts on the part of Google." ER-154–155. That is, Republican-identifying email recipients appeared likelier to mark messages as spam, regardless of which email provider they use.

*Third*, the RNC suggests that Google must have discriminated because Google allegedly "stopped" the "mass relegation" of RNC emails shortly after the RNC initiated this action. ER-90. But the RNC's com-

– 16 –

plaint does not show that the issue stopped when the RNC filed suit; it alleges only that the last instance of the inboxing issue occurred about three weeks earlier on October 2, 2022. ER-120.

Even if the RNC's timeline were correct, its reasoning *post hoc ergo propter hoc*—after the lawsuit, therefore because of it—is a logical fallacy, not a plausible inference. See *Dreamstime.com, LLC* v. *Google LLC*, 2022 WL 17427039, at *2 n.4 (9th Cir. Dec. 6, 2022) (mem.). The RNC's speculation attributing causation to correlation crumbles under the obvious alternative explanation—supported by *actual* factual allegations—that Gmail (and MSN) algorithms reasonably thought some RNC emails were spam.

Finally, despite asserting that Google is antagonistic to the RNC's "political views," ER-91, the RNC never identifies any specific (or even general) view that Google purportedly dislikes (or why). The RNC cannot rely on such ambiguous allegations to support its implausible theory that Google manipulated Gmail's complex algorithmic spam filters—but only for a few days per month for nine months—in hopes of sending some RNC emails to spam.

\*   \*   \*

In sum, though the RNC's factual allegations must be taken as true at this stage, its political-discrimination-by-algorithmic-spam-filtering theory is not plausible given its actual allegations combined with "judicial experience and common sense." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679

– 17 –

(2009). Those allegations support only one obvious, common-sense expla-nation: Gmail's spam filters occasionally categorized the RNC's bulk emails as spam because those emails appeared to the algorithm to be spam. That explains the RNC's spam-complaint rates. That explains why MSN users experienced similar inboxing issues. That explains the RNC's own A/B diagnostic test. And that explains why RNC emails were pre-sented as spam sometimes at the start of the month, sometimes mid-month, and sometimes not at all. This Court could affirm the judgment below on the ground that the RNC failed to plausibly allege its political-discrimination theory. ER-10–11.

## II. The district court correctly concluded that the RNC failed to plead each of its California-law claims.

The RNC appeals the dismissal of five of its state-law claims. For all five, the RNC urges this Court to enlarge California law in unprece-dented ways. But expansions of state law are the province of state courts and legislatures—not federal courts. In any event, those novel claims each suffer from several pleading deficiencies.

### A. The RNC fails to state a common-carrier claim.

The district court properly "decline[d] to be the first" court to inter-pret California's common-carrier law to include "an email service pro-vider." ER-160. Imposing common-carrier duties on email platforms would be extraordinarily significant because common carriers must "transmit every … message immediately" and indiscriminately. Cal. Civ.

Code § 2207. That would mean *all* spam filtering would be potentially unlawful, even for unsolicited pornography or advertising, phishing scams, or malware.

Far from encompassing any business involved in the communications industry, the California Legislature and courts have limited common-carrier duties to businesses that transport people from place to place, see *Gomez* v. *Superior Court*, 35 Cal.4th 1125, 1131–1132 (2005), plus mail carriers and telephone providers, see *Goldin* v. *Public Utilities Commission*, 23 Cal.3d 638, 662 (1979); Cal. Civ. Code § 2208. The RNC responds by asking this Court to be the first to expand a California law first enacted in 1872 beyond any prior recognition. That contravenes the "well-settled" principle that "federal courts sitting in diversity" should "proceed with caution" and "be slow to expand state law in the absence of any indication of intent by the state courts or legislature." *Jensen* v. *United States Tennis Ass'n*, 2025 WL 707447, at *2 (9th Cir. Mar. 5, 2025) (cleaned up) (collecting cases).

1. Even before reaching the broad question that the RNC poses—whether email providers categorically are common carriers—the Court should reject the common-carrier claim for two threshold reasons.

First, even assuming Google were a common carrier, common carriers owe a duty only to *customers*—those to whom they "offer[] to carry." Cal. Civ. Code § 2168; see *Orr* v. *Pacific Sw. Airlines*, 208 Cal.App.3d 1467, 1472 (1989) (explaining that the carrier-passenger "relationship"

arises "'when one offers to become a passenger, and is accepted as a passenger'") (citation omitted). The RNC admits it is not a customer of Google, ER-90, ER-101–103, and it doesn't allege that Google "offered" the RNC to carry its messages without filtering for spam. The "common carrier designation 'does not extend to cases where the relation of carrier and passenger does not exist.'" *Simon* v. *Walt Disney World Co.*, 114 Cal.App.4th 1162, 1170 (2004) (citation omitted). The RNC responds (OB40) that a common carrier's duty is "broad." But the RNC cannot skip to the *scope* of a common carrier's duty when it fails to show that *any duty* is owed under state law.

There's also another problem: California law provides recourse only when a "message is refused or postponed" by a common carrier. Cal. Civ. Code § 2209. Here, no message was allegedly "refused" or "postponed," but merely displayed for users in one folder (the spam folder) rather than another (the inbox). OB6; ER-103–104. So the RNC could not be entitled to damages even if Google were a common carrier.

2. Beyond those two flaws, the district court correctly determined that Google is not a common carrier. ER-160. "[A] common carrier … is any entity which [1] holds itself out to the public generally and indifferently [2] to transport goods or persons from place to place [3] for profit." *Squaw Valley Ski Corp.* v. *Superior Ct.*, 2 Cal.App.4th 1499, 1508 (1992), as modified (Feb. 25, 1992) (citation omitted). The RNC fails to plead all three about Gmail.

*First*, Gmail is not offered to the public generally and indifferently. Only those who agree to Google's Terms of Service may use Gmail. ER-94; see SER-21. In that contract, Google tells users that it uses "artificial intelligence and machine learning" to "detect and block spam," which may result in messages being displayed in a spam folder. SER-23; see also ER-246 (describing Terms of Service). No reasonable member of the public could take those terms to mean that Google promises to the public that it will deliver all messages "generally and indifferently." *Squaw Valley*, 2 Cal.App.4th at 1508.

*Second*, Google does not "transport" messages, as the district court correctly found. ER-165. As the First Circuit has explained, an email is not "carried" by a provider like Google; it is instead transported over the Internet to be "accessed" by a user through "an e-mail client program" like Gmail. *United States* v. *Councilman*, 418 F.3d 67, 69–70 (1st Cir. 2005) (en banc). The RNC describes its messaging program in the same way: it says it contracts with email service providers, Salesforce and Everest, to "transfor[m] the email into 'packets' that are sent through the internet" and "periodically reassembled and repacketized by intermediate computers on the network." ER-161–162.

In arguing otherwise (OB35), the RNC offers only a trial-court decision from Ohio interpreting that State's distinct common-carrier regime, plus dicta from a New York Court of Appeals decision that is not about "common carrier" status at all. Failing those, the RNC argues

(OB36) that Google can be a common carrier even if it "does not transport the email the entire way," neglecting to confront the district court's correct finding that Gmail does not "transport" messages *at all*, ER-165. The RNC then falls back on a request that the Court "updat[e]" California's purportedly "obsolete statut[e]" to keep up with new technologies and advance "legislative intent," OB37 (cleaned up), including by substituting the recognized legal requirement that a common carrier must actually transport a message with a new condition that the defendant merely *offer* to do so, OB34–35. But the statute unambiguously requires that a common carrier "transport[s]" messages, which Google does not. *Squaw Valley*, 2 Cal.App.4th at 1508. No amount of judicial creativity or incantation of "legislative intent" (OB37) could overcome that plain textual requirement. See *Apple Inc.* v. *Superior Ct.*, 56 Cal.4th 128, 136 (2013) (discerning "legislative intent" by reference to "the plain meaning of the statute's terms").[3]

---

[3] Amicus Professor McCleod (ECF No. 14.1) relies on an entirely atextual view of what makes a "common carrier." He is wrong that the transmission of an email involves a "bailment" of a message because sending an email involves no "delivery of a thing to another," and Google never even takes possession of a user's message. See *Needelman* v. *DeWolf Realty Co.*, 239 Cal.App.4th 750, 762 n.5 (2015). Academic articles, some centuries-old, about "[w]harfingers, warehouse keepers, auctioneers, and innkeepers" (Am.Br.5) do not reflect how California's statutes treat email providers.

*Third*, Google does not carry messages "for profit." *Squaw Valley*, 2 Cal.App.4th at 1508. The RNC admits that Gmail is "free of charge." ER-94. Even if Gmail makes money elsewhere (such as selling ads, *id.*) the RNC fails to allege, as it must, that the *transportation* of email is undertaken for profit. At most, Google's alleged "profit" is "incidental to the … services" that supposedly make Google a common carrier—its provision of access to email. *Van Maanen* v. *Youth With a Mission-Bishop*, 852 F.Supp.2d 1232, 1246 (E.D. Cal. 2012), *aff'd*, 542 F. App'x 581 (9th Cir. 2013).

This Court also should avoid the "absurd result" that would follow from accepting the RNC's common-carrier theory here. *Tovar* v. *Sessions*, 882 F.3d 895, 904 (9th Cir. 2018). For example, the common-carrier statute requires covered entities to "always give priority" to "messages from agents of the United States or of this State." Cal. Civ. Code § 2208. With its billions of users, see Nestor Gilbert, *Number of Active Gmail Users 2022/2023: Statistics, Demographics, & Usage,* FinancesOnline (updated Sept. 18, 2023), perma.cc/6ZBA-N8P2 (incorporated by reference at ER-94), Google could not reasonably fulfill that requirement (nor could any other email provider). And as the district court correctly concluded, requiring Google to inbox substantially all messages would "dramatically alter the manner in which email providers conduct their business," ER-165–166, including by *requiring* "email providers to treat political content in a certain manner"—a concern that "at least implicates the

– 23 –

First Amendment," ER-21. The RNC attempts to waive away this concern (OB41) by suggesting that even common carriers can filter out "harmful" or "dangerous" messages. But that is no answer: the RNC's claims seek to require the inboxing of all messages with political content, an unadministrable requirement that would at the very least severely limit Google's consumer-benefitting interest in screening out *harassing* or *fraudulent* messages.

As the district court correctly observed, "[r]eading email into the common carrier law would implicate significant policy and Constitutional considerations that the California Legislature has not addressed." ER-20. A federal court should not be the first to expand state law in such a remarkable way.

### B. The RNC fails to state an Unruh Act claim.

The Unruh Civil Rights Act outlaws certain discrimination based on "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." Cal. Civ. Code § 51(b). The district court declined to amend that list to include "political affiliation." ER-167–172. That was correct. The Unruh Act does not protect political affiliation, and in any event the RNC lacks statutory standing for this claim.

1.      **The Unruh Act does not cover political affiliation.**

As the RNC concedes (OB15), "political affiliation" does not appear in the statutory text. And the California Supreme Court has cautioned against expanding the Unruh Act to new, unenumerated categories, explaining that the "specified classifications of race, sex, religion, etc." are "a highly persuasive, if not dispositive, factor." *Harris* v. *Capital Growth Invs. XIV*, 52 Cal.3d 1142, 1159 (1991). Although the list of categories was previously described as "illustrative" rather than "restrictive," the Court has more recently been clear that the Act pays "close attention" to the enumerated categories and should not be expanded to a new status that is "fundamentally different than the categories either enumerated in the Act or added by judicial construction." *Koebke* v. *Bernardo Heights Country Club*, 36 Cal.4th 824, 840–841 (Cal. 2005).

The RNC's assertion (OB15) that the Act covers "all forms of" alleged discrimination relies on an expressly overruled view of the Act. As the California Supreme Court explained in *Koebke*, while decisions from the 1980's originally employed such broad language, in 1991 the *Harris* court "revisited th[o]se conclusions." *Koebke*, 36 Cal.4th at 840; see *Harris*, 52 Cal.3d at 1154. *Harris* refocused on the statute's text and explained that the "Legislature had not acquiesced in the broad proposition set forth in those [earlier] decisions that the Act was intended to ban all forms of arbitrary discrimination"; the court understood the Legislature instead to place "'emphasis on the specified categories … in the Act.'"

*Koebke*, 36 Cal.4th at 840–841 (citation omitted). Interpretation of the statute thus depends on the enumerated categories the Legislature has chosen to recognize. *Id*.

*Harris* replaced recognition of unenumerated protected classes with a much more restrictive three-part test that rejects any new status that is "fundamentally different than the … enumerated" categories. *Id*. at 840; *Harris*, 52 Cal.3d at 1154. That three-part test is: [1] whether the characteristic involves "personal as opposed to economic characteristics," [2] whether a "legitimate business interest justifie[s]" the alleged differential treatment, and [3] whether "adverse consequences … would likely follow from the plaintiffs' proposed interpretation." *Koebke*, 36 Cal.4th at 841 (quotation marks and citation omitted). Applying that new test, the court rejected a new claim of "economic status discrimination." *Id*. at 841–842.

Based on that test, California courts would reject the RNC's claim of political-affiliation discrimination as "fundamentally different" from the listed characteristics. *Id*. at 840. Another court has already held that "the Unruh Civil Rights Act does not protect against discrimination based upon political affiliation." *Williams* v. *City of Bakersfield*, 2015 WL 1916327, at *5 (E.D. Cal. Apr. 27, 2015). This Court should do the same, for three reasons.

*First*, political affiliation is insufficiently "personal" to qualify as a protected characteristic. *Koebke*, 36 Cal.4th at 841. To assess this prong,

the California Supreme Court employs the "doctrine of *ejusdem generis*," "seek[ing] to ascertain common characteristics among things of the same kind, class, or nature when they are cataloged in legislative enactments," extending the Act's protection only to unenumerated characteristics with similar qualities as the enumerated ones. *Harris*, 52 Cal.3d at 1159. *Harris* explained that because the enumerated characteristics are "personal"—matters such as "race, sex, religion, etc."—the Act should not be read to cover an impersonal characteristic such as "economic status." *Id.* at 1160–1161. The same result forecloses the RNC's claim here because political affiliation is importantly different from the enumerated characteristics. Political affiliation aligns most clearly not with a person's *identity* but with their "viewpoints." And "[t]he Unruh Act has not been held to protect persons based on their viewpoints." *Huber* v. *Biden*, 2022 WL 827248, at *10 (N.D. Cal. Mar. 18, 2022), *aff'd*, 2022 WL 17818543 (9th Cir. Dec. 20, 2022). If it were a close question, *Harris* and *Koebke* remind courts that the Legislature is perfectly capable of delineating protected versus unprotected statuses—for example, its choice to list religion but not political affiliation. This Court should "pay close attention" to that choice. *Koebke*, 36 Cal.4th at 840–841 (citation omitted).

The RNC is wrong (OB16–17) that the California Supreme Court "has at least three times stated that political affiliation is protected." That assertion relies on dicta from cases from before 1991 that was "reexamin[ed]" and rejected in *Harris*, 52 Cal.3d at 1154. See *Marina Point.*

*Ltd.* v. *Wolfson*, 30 Cal.3d 721, 726 (1982); *In re Cox*, 3 Cal.3d 205, 212 (1970); see also OB17 (citing *Gray* v. *Kircher*, 193 Cal.App.3d 1069, 1075 (1987)). And contrary to the RNC's assertions (OB16), the district court's conclusion that political affiliation is insufficiently "personal" does not depend on finding that political affiliation is "immutable." Political affiliation simply does not share similar qualities with the Act's enumerated characteristics, and therefore the "Unruh Civil Rights Act does not protect against discrimination based upon political affiliation." *Williams*, 2015 WL 1916327, at *5. Because the district court correctly found the first prong unsatisfied, it correctly declined to analyze the remaining prongs. ER-170 n.4.

*Second*, if further analysis were required, extending the Act would harm the "legitimate business interest[s]" of innumerable politically oriented businesses operating in California—including almost surely the RNC itself. *Koebke*, 36 Cal.4th at 841. To be clear: Google does not discriminate based on political affiliation. ER-238–239. And the RNC does not allege that other political organizations, including prominent Democratic political organizations, did not experience similar inboxing dips on Gmail. But if political affiliation were "added" to the statute "by judicial construction," then it becomes part of the statute going forward. *Koebke*, 36 Cal.4th at 840. The voters and legislators of California are entitled to conclude that addition would do more harm than good. Must every business that offers event space for rent agree to host a white supremacist

– 28 –

rally or Antifa gathering? Under the RNC's view, the answer is "yes," because when a status is protected by the Unruh Act, consideration of that status must be "banish[ed]." *Angelucci* v. *Century Supper Club*, 41 Cal.4th 160, 167 (2007). If California law is to take the dramatic step of requiring acceptance of all comers based on *any* political viewpoint, then that step should come from the voters rather than a federal court.

*Third* and similarly, "adverse consequences" would surely follow the RNC's invitation to add political affiliation as a protected status—including a significant threat to First Amendment rights. *Koebke*, 36 Cal.4th at 841 (citation omitted). The speech and expressive choices of businesses, including those operating online "platforms," plainly "receive the First Amendment's protection." See *Moody* v. *NetChoice, LLC*, 603 U.S. 707, 716 (2024). And because businesses themselves are free to speak and associate, *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 349 (2010), state law may not "forc[e] a private speaker to present views it wished to spurn," control "a private party's expressive choices," or require a business to associate with speakers and "messages it would prefer to exclude." *Moody*, 603 U.S. at 731–733. If the Unruh question here were even close, "the canon of constitutional avoidance would still counsel" the Court not to interpret California law to have such an extreme sweep. *United States* v. *Hansen*, 599 U.S. 762, 781 (2023).

The district court also grounded its refusal to extend the Unruh Act to political affiliation on the California Legislature's distinct treatment

of political affiliation in another statute. The later-enacted Ralph Civil Rights Act of 1976, which concerns violence, specifically protects "political affiliation" in addition to the characteristics "listed or defined" in the Unruh Act. Cal. Civ. Code § 51.7. As the district court explained, if the Unruh Act had already included political affiliation, "the Legislature would have had no need to specify political affiliation in the Ralph Act." ER-169–170. "The California Supreme Court has long made clear that 'interpretations which render any part of statute superfluous are to be avoided.'" *Curtis* v. *Irwin Indus.*, 913 F.3d 1146, 1154 (9th Cir. 2019) (citation omitted). This Court did not say anything different in *Corales* v. *Bennett*, 567 F.3d 554 (9th Cir. 2009), *contra* OB22, when it simply listed the Unruh Act's enumerated characteristics without further analysis, *id.* at 571. That conclusion does not "narrow" the Unruh Act or ignore its history. *Contra* OB23–24. Rather, respecting the Legislature's choice to include political affiliation in the Ralph Act—but not the Unruh Act— "give[s] effect" to "every clause and word" in the two statutes. *Murphy Co.* v. *Biden*, 65 F.4th 1122, 1134 (9th Cir. 2023) (cleaned up).

### 2.    The RNC lacks statutory standing.

In any event, the district court properly concluded that the RNC lacks statutory standing. ER-171. The Unruh Act's standing barrier imposes a "heightened requirement[]," *Gastelum* v. *Cotton on USA, Inc.*, 2023 WL 2957861, at *3 (E.D. Cal. Apr. 14, 2023), that limits relief to a plaintiff who "was in a relationship with the offending organization sim-

ilar to that of the customer in the customer-proprietor relationship," *Thurston* v. *Omni Hotels Management Corp.*, 69 Cal.App.5th 299, 306 (2021) (cleaned up). This relationship can be established by showing the plaintiff either is an actual patron of the business or had a "*bona fide intent* to sign up" but was blocked by "discriminatory terms." *Id.* at 306–307 (cleaned up). Neither exists here.

Far from alleging that it is Google's "customer," the RNC disclaims any such relationship. As the district court observed, the complaint makes clear that those who have a "typical customer-proprietor relationship" with Google are those who hold Gmail accounts. ER-171. The RNC, by contrast, "merely sends emails to Gmail users." *Id.* The RNC is a customer not of Google, but of third-party email services who send messages on the RNC's behalf. ER-101. The RNC's alleged relationship with Google is based on those third-party services sending emails to Gmail users, who then view those emails in either their inbox or their spam folder. ER-100–101. But no Gmail users are plaintiffs here or are alleged to be unsatisfied with how Google organized their emails.

The RNC claims it nevertheless has standing because the statute is "broad" and extends to all "victims" of the alleged discrimination. OB31–32. It claims that Google's mere interactions with "politically oriented senders" is enough to create a requisite "relationship." OB31. But these are no answers to the independent requirement of a customer-proprietor relationship. See *Thurston*, 69 Cal.App.5th at 306.

The RNC next attempts to dodge the district court's conclusion, arguing (OB31) that its pleading failure should be overlooked under the "party presentation principle" because Google purportedly did not raise the issue below. But the district court ruled on the question, ER-171, supplying a sufficient basis for this Court's review. District "courts may, in fact, dismiss sua sponte pursuant to F.R.C.P. 12(b)(6) when it is clear that the plaintiff has not stated a claim," and this Court may review that decision. *Hunt* v. *County of Orange*, 672 F.3d 606, 617 (9th Cir. 2012) (quotation omitted).

Anyway, Google *did* vigorously dispute below that the statute applied to the complained-of conduct. Whether the RNC has a cause of action is critical to that dispute, and that "basic 'claim'" was all Google needed to raise for it to be "adequately preserved for further review." Cf. *Shen* v. *Garland*, 109 F.4th 1144, 1158 (9th Cir. 2024) (holding that "an issue is adequately preserved for further review if the basic 'claim' was raised below," and clarifying that parties "are not limited to the precise arguments they made below") (citation omitted). That makes this case nothing like *United States* v. *Sineneng-Smith*, 590 U.S. 371 (2020), *contra* OB31, where the Supreme Court found that the circuit panel had adopted an argument made exclusively by an amicus appointed by the Court to argue a novel position. 590 U.S. at 375.

– 32 –

The district court was correct to hold the RNC to its burden of demonstrating compliance with the statute's requirements, especially where the RNC seeks to radically expand the bounds of state law.

### C. The RNC fails to state a claim for intentional interference with prospective economic relations.

The district court also properly dismissed the RNC's claim for intentional interference with economic relations. ER-25. For this claim, the RNC must show: "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc.* v. *American Asphalt S., Inc.*, 2 Cal.5th 505, 512 (2017). In dismissing the original complaint, the district court found that the RNC failed to satisfy the third element (a "wrongful act") but granted leave to amend. ER-174. It then dismissed the amended complaint for its continued failure to satisfy that element, and also because it failed to demonstrate a "probability of an economic benefit." ER-27.

That decision was correct. And the RNC fails to establish three other elements as well.

**Economic relationship.** The district court correctly observed that the California Supreme Court has "narrowly construed this element,"

– 33 –

ER-28, requiring allegations of a "probability of future economic benefit to the plaintiff," *Korea Supply Co.* v. *Lockheed Martin Corp.*, 29 Cal.4th 1134, 1164 (2003). This requirement screens out "speculative" claims like the RNC's that fail to connect a defendant's wrongdoing to a "specific" economic benefit, *Westside Center Associates* v. *Safeway Stores 23, Inc.*, 42 Cal.App.4th 507, 524–525 (1996), that was "almost certain" to occur, ER-28 (collecting citations).

Here, the RNC alleged only that the emails would have reached "supporters who are past, current, and future donors." ER-136. Such "vague allegations regarding a relationship with an as yet unidentified" individual do not suffice. *Soil Retention Prods., Inc.* v. *Brentwood Indus., Inc.*, 521 F.Supp.3d 929, 961 (S.D. Cal. 2021) (quotation omitted). The RNC must instead allege a "relationship with a particular individual." *UMG Recordings, Inc.* v. *Glob. Eagle Ent., Inc.*, 117 F.Supp.3d 1092, 1117–1118 (C.D. Cal. 2015) (citations omitted). It did not. The RNC attacks the district court's holding by claiming that it improperly required a factual showing. OB48. But the district court clearly held that the RNC failed to "allege" the required relationship. ER-29.

**Knowledge.** Because the RNC failed to allege the existence of a cognizable relationship, it also necessarily failed to allege Google's "knowledge" of such a relationship.

**Wrongful act.** The district court also correctly concluded that the RNC failed to allege an "independently wrongful act." ER-25. This ele-

ment requires conduct "that was wrongful by some legal measure other than the fact of interference itself." *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995). The RNC instead relies on a circular argument (OB49) that it has satisfied this element because it "states its other claims." Courts have rejected the same "tortured circular reasoning": invoking an (unsuccessful) UCL claim to prop up an (unsuccessful) intentional-interference claim, and vice-versa. *New.Net, Inc.* v. *Lavasoft*, 356 F.Supp.2d 1090, 1114 n.11 (C.D. Cal. 2004). Here the RNC failed to plead its other claims for the reasons explained throughout. And the RNC also attempts (OB49) to repackage an undefined "established common-carrier doctrine" independent of its statutory common-carrier claim, without specifying *which* common law it relies on or how Google violated that law—a new theory that does not appear in the RNC's allegations regarding this claim. ER-48–50.

**Actual disruption and harm.** The RNC also speculated that, because of Google's alleged conduct, the "long-term consequential losses likely total in the millions of dollars." ER-136–137. But this is "nothing more than conclusory allegations, unsupported by facts, that the [RNC's] economic relationship was disrupted." *Soil Retention*, 521 F.Supp.3d at 963. That does not suffice. See *Sybersound Recs., Inc.* v. *UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (affirming dismissal where plaintiff did "not allege … that it lost a contract nor that a negotiation with a [c]ustomer failed").

– 35 –

### D. The RNC fails to state a claim for negligent interference with prospective economic relations.

The district court also properly dismissed the RNC's claim for negligent interference with economic relations. ER-174–179. This tort "has many of the same elements as an intentional interference" claim. *UMG Recordings*, 117 F.Supp.3d at 1118. It, too, requires "an economic relationship" with "a reasonably probable future economic benefit or advantage to plaintiff," plus a showing that the defendant "knew of the relationship" or should have been aware. *North Am. Chem. Co.* v. *Superior Ct.*, 59 Cal.App.4th 764, 786 (1997). So the negligent-interference claim here is necessarily also "deficiently pled." *UMG Recordings*, 117 F.Supp.3d at 1118.

As the district court correctly held, ER-179, this claim further fails because Google did not owe the RNC "a duty of care." *Transamerica Life Ins.* v. *Richards*, 695 F.Supp.3d 1120, 1125 (C.D. Cal. 2023) (citing *J'Aire Corp.* v. *Gregory*, 24 Cal.3d 799, 804 (1979)). The RNC concedes (OB51) that it and Google were "out-of-privity," meaning that a duty can be established only if the parties had a "special relationship." *Transamerica*, 695 F.Supp.3d at 1125 (quoting *Southern Cal. Gas Leak Cases*, 7 Cal.5th 391, 400 (2019)). But the RNC fails to allege even one of the six factors the California Supreme Court has recognized as supporting that relationship. *Id.*; see also *Biakanja* v. *Irving*, 49 Cal.2d 647, 650 (1958). And even if this Court were inclined to consider those six factors, they do not sup-

port finding a special relationship between Google and the RNC for the reasons the district court explained. ER-175–178.

### E. The RNC fails to state a claim under California's Unfair Competition Law.

Finally, the Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Profs. Code § 17200. On appeal, the RNC abandons any claims about fraudulent conduct and now contests only the district court's rejection of the RNC's arguments on the "unlawful" and "unfair" prongs. OB41. The district court was right on both. And in any event, the RNC fails to plead its entitlement to the only available UCL remedy: injunctive relief. Indeed, if all the RNC's other claims have been dismissed, then the UCL claim must be dismissed for lack of subject matter jurisdiction.

### 1. The Court lacks subject matter jurisdiction over the UCL claim standing alone, and the RNC fails to plead the right to any remedy.

a. If this Court rejects the RNC's other claims, then it should not proceed to consider the UCL claim but should instead dismiss that claim for lack of jurisdiction. In the district court, the RNC pleaded one federal question, but it has now abandoned it. OB9 n.2. That leaves diversity as the only asserted basis for federal subject matter jurisdiction over the state-law claims.

Importantly, the only remedy the RNC seeks for its UCL claim is an injunction. ER-135. The statute does not permit damages, but only an

– 37 –

injunction or restitution (which the RNC did not and could not plead). See *Clark* v. *Superior Ct.*, 50 Cal.4th 605, 613 (2010) ("The only monetary remedy available in a private action under the unfair competition law is restitution."). So if the RNC's other claims are dismissed, then as the district court correctly observed, "the monetary hook required for diversity jurisdiction would not be met." ER-159. The RNC did not carry its "burden" to plead allegations that its requested "nonmonetary relief" has any value at all, let alone value that satisfies the amount-in-controversy requirement for federal jurisdiction. Cf. *Maine Cmty. Health Options* v. *Albertsons Cos.*, 993 F.3d 720, 723 (9th Cir. 2021).

b.      In any event, an injunction addresses only present or future wrongs—not past ones. And as the RNC concedes, no inboxing issue has occurred in over *two* years.

Under the UCL, "[i]njunctive relief is appropriate only when there is a threat of continuing misconduct." *Madrid* v. *Perot Sys. Corp.*, 130 Cal.App.4th 440, 463 (2005). "An injunction should not be granted as punishment for past acts where it is unlikely that they will recur." *In re Tobacco II Cases*, 46 Cal.4th 298, 320 (2009) (citation omitted).

The RNC does not plead an entitlement to an injunction here. As it concedes, the inboxing issue "has stopped," ER-90, and last occurred in October 2022, ER-120. That last occurrence was approximately three weeks before the RNC first sued. Since then, more than two years have passed, including the 2024 general election. But the RNC "has not expe-

– 38 –

rienced any" inboxing issue. ER-120. An injunction "is not a remedy designed to right completed wrongs." *Madrid*, 130 Cal.App. 4th at 464–465.

The district court found that, under "the UCL, the RNC has standing to seek injunctive relief under the voluntary cessation doctrine." ER-14. But that federal-law doctrine concerns whether a case is moot for purposes of Article III standing. *Federal Bureau of Investigation* v. *Fikre*, 601 U.S. 234, 240–241 (2024). The point here is different: California law does not permit an injunction as a remedy for past conduct; it requires a "threat of continuing misconduct" for a UCL injunction. *Madrid*, 130 Cal.App.4th at 463. The RNC did not show any plausible continuing threat here.

In addition to all the complaint's other problems, this Court should affirm the dismissal of the RNC's UCL claim on these alternative grounds. *Kwan* v. *SanMedica Int'l*, 854 F.3d 1088, 1090 (9th Cir. 2017) (considering a UCL dismissal).

### 2. The RNC does not allege any "unlawful" business act.

Assuming jurisdiction and a viable remedy, the RNC contends (OB41) that it alleged unlawful conduct by adequately pleading "its other claims." "To be 'unlawful' under the UCL, the [conduct] must violate another 'borrowed' law." *Davis* v. *HSBC Bank, Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *accord Capito* v. *San Jose Healthcare Sys., LP*, 17 Cal.5th 273, 283–284 (2024). But the RNC fails to adequately plead its other claims, as explained above. The RNC thus cannot "link[]" an un-

successful claim to revive its UCL claim. *Hodsdon* v. *Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018). That is especially so where the RNC attempts to merely borrow its intentional-interference claim, which also has an independent-wrongful-act element. ER-131, ER-136. But that "tortured circular reasoning" effectively eliminates key elements of both claims. *New.Net,* 356 F.Supp.2d at 1114 n.11. The RNC "may not 'bootstrap' its claims on one another," as the district court correctly recognized. ER-15.

### 3. The RNC does not allege any "unfair" business act.

The RNC next contends that it adequately pleaded that Google's conduct violated the UCL's "unfairness" prong. OB41–47. To establish unfairness, the RNC asks this Court to hold that the UCL covers discrimination based on political affiliation. It does not.

Here again the RNC urges this Court to extend California law without support from the State's courts or legislature. The RNC does not cite *any* case from *any* court holding that political-affiliation discrimination is covered by the UCL. And federal courts "cannot and do not" "extend California law" in ways in which no California court has. *In re McKee*, 90 F.4th 1244, 1249 n.1 (9th Cir. 2024). That limitation is especially important here given the implications—both policy and constitutional, as explained above (at p.29), see ER-20–21—that would follow from holding that California law not only requires a private business to accept all comers no matter their political affiliation, but even authorizes injunctive relief to compel them to do so. This Court should decline the RNC's dra-

matically consequential request to be the first court to judicially impose those standards. See *id.*

That caution is especially warranted given the unsettled ground on which the RNC's UCL claim stands. For decades, California courts have acknowledged their struggle to define what is "unfair." In December 2024, the California Supreme Court reiterated that this standard "'is currently unsettled.'" *Capito*, 17 Cal.5th at 284 (citation omitted). Despite that decades-long uncertainty, the court saw "no need to decide the UCL standard for 'unfair' business conduct." *Id.* This Court need not (and should not) tackle these novel, unsettled issues that the California Supreme Court has repeatedly refused to address. See *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 1001 n.22 (9th Cir. 2023) (declining an invitation to clarify the UCL's "insufficient guidance to businesses" because that invitation "fundamentally misunderstands our role when we interpret and apply state law").

Notwithstanding that confusion, this Court recently clarified that, for claims under the unfairness prong, "two tests" apply. *Id.* at 1000. "First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test[.]" *Id.* (quoting *Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 186–187 (1999)). "Second, to support a finding of unfairness to *consumers*, a court uses the balancing test[.]" *Id.* The

district court followed that approach here, and correctly determined that neither test supports the RNC's novel UCL claim. ER-16.[4]

### a. The RNC fails to satisfy the tethering test.

The "tethering test" applies "to *competitors*." *Epic Games*, 67 F.4th at 1000 (quoting *Cel-Tech*, 20 Cal.4th at 186–187). But again, "the RNC is not a … Google competitor," as the district court found. ER-22. For that reason alone, the RNC cannot satisfy the tethering test.

Even ignoring that major flaw, the RNC fails the tethering test. The RNC must establish that Google's alleged conduct is "tethered to some legislatively declared policy." *Cel-Tech*, 20 Cal.4th at 186–187; *accord Levitt* v. *Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014). That requires "a close nexus between the challenged act and the legislative policy." *Hodsdon*, 891 F.3d at 866. Stated otherwise, the allegations must be "comparable to or the same as a violation of the law." *Epic Games*, 67 F.4th at 1000 (quoting *Cel-Tech*, 20 Cal.4th at 186–187).

---

[4] The RNC describes the unfairness inquiry as "'usually … a question of fact.'" OB42 (citation omitted). But this Court "'will affirm a judgment of dismissal where the complaint fails to allege facts showing that a business practice is unfair.'" *Davis*, 691 F.3d at 1171 (quoting *Bardin* v. *Daimler Chrysler Corp.*, 136 Cal.App.4th 1255, 1271 (2006)). And this Court has not hesitated to affirm dismissals of UCL claims. See*, e.g.*, *Hauck* v. *Advanced Micro Devices, Inc.*, 816 F. App'x 39, 43 (9th Cir. 2020); *Davis*, 691 F.3d at 868; *Janda* v. *T-Mobile USA, Inc.*, 378 F. App'x 705 (9th Cir. 2010).

Here, the RNC contends that Google's conduct is comparable to violations of two other laws: California's common-carrier statute and Unruh Civil Rights Act. See OB46–47. But neither establishes a legislative policy covering political affiliation.

*First*, California's common-carrier law does not prohibit anything close to what the RNC alleges here. As explained above in Part II.A, *supra*, Gmail is not a common carrier. Instead of arguing the common-carrier elements, the RNC contends (OB47) that Google's alleged "bad-faith delivering or presenting of emails" is comparable to the common-carrier law's general "public policy that crucial communication conduits should send and receive messages reasonably and without arbitrary discrimination." But such an alleged "general policy" is insufficient to "provide a tether" to another law for the UCL. *Hodsdon*, 891 F.3d at 867. The RNC's attempted comparison (OB47) of Gmail to "the telegraph and telephone" elides the critical differences between the two—*e.g.*, Gmail does not actually *transport* emails—that defeat any attempt to rely on common-carrier principles in an email setting. See Part II.A, *supra*.

*Second*, the RNC's allegations are also unlike a violation of the Unruh Act. OB46–47. "[C]ourts may not use the unfair competition law to condemn actions the Legislature permits." *Cel-Tech*, 20 Cal.4th at 184. As California courts have explained, the Legislature may grant permission in "two ways: If the Legislature has permitted certain conduct or *considered a situation and concluded no action should lie*, courts may not

override that determination." *Beverage* v. *Apple, Inc.*, 101 Cal.App.5th 736, 753 (2024) (quoting *Cel-Tech*, 20 Cal.4th at 182). That second path is "not limited solely to instances where explicit statutory language either authorizes conduct as lawful or imposes a litigation bar"; it also includes situations of "the Legislature's nonintervention," where "the Legislature has amended [the relevant statute]" but did not "act" to change course. *Id.* at 753–755.

It is all but dispositive that, in enacting the Unruh Act, the Legislature rejected political affiliation as a protected category, see *supra* Part II.B. The RNC cannot now "plead around" that statutory limit by claiming it is close enough by way of the UCL, *Beverage*, 101 CalApp.5th at 753 (quoting *Cel-Tech*, 20 Cal.4th at 182); see ER-18. As discussed above, the Unruh Act contains fourteen enumerated categories, but it has not been amended to include political affiliation—even though the Ralph Act, enacted decades later, *did* enumerate political affiliation. Cal. Civ. Code § 51(b). California courts have routinely rejected the RNC's close-enough maneuver where "lawmakers have considered and declined to impose the additional duty [the plaintiff] urges here." *Capito*, 17 Cal.5th at 287; see *Beverage*, 101 Cal.App.5th at 753–755 (finding that "text and history," including the Legislature's "inaction on th[e] subject for … 45 years" is sufficient indication to conclude that the Legislature has considered and rejected a claim for UCL purposes).

The RNC contends (OB46) that political-affiliation discrimination "is comparable to the harm Unruh protects against because the discrimination is based on a trait that is fundamental to a person's core values." But again, that broad "general policy" lacks a close nexus with the allegations here. See *Hodsdon*, 891 F.3d at 867. And adopting the RNC's theory that the UCL prohibits differential treatment "based on a trait that is fundamental to a person's core values" would lack any limiting principle. Would it cover vegans? Horoscope followers? Flat Earthers? This Court need not guess: "Although the UCL's scope is broad, it is not unlimited." *Beverage*, 101 Cal.App.5th at 748.

To support its unlimited theory, the RNC cites two cases addressing different facts. OB46. In *Divino Group LLC* v. *Google LLC*, 2022 WL 4625076 (N.D. Cal. Sept. 30, 2022), a court found "a plausible Unruh Act claim" based on the plaintiffs' "allegations that defendants intentionally discriminated against them because of their sexual orientation." *Id.* at *10–12. But "sexual orientation" discrimination is expressly enumerated in the Unruh Act. Cal. Civ. Code § 51(a). And in *Candelore* v. *Tinder, Inc.*, 19 Cal.App.5th 1138 (2018), a court held that the Unruh Act "proscribes arbitrary discrimination based on an individual's age." *Id.* at 1145. But age—unlike political affiliation—is "a personal characteristic similar to" the Act's "enumerated" "classifications." *Id.*

To be clear, as discussed above, there is no need to assess how "tethered" these supposed statutory violations are. The RNC alleges no harm

– 45 –

to competitors, and so this test categorically does not apply. *Supra* at 42. But whether for that threshold reason or because the harms asserted are not actually tethered to a statutory violation, the district court correctly declined to find a plausible UCL violation. ER-20.

### b. The RNC fails to satisfy the balancing test.

Also under the UCL's unfairness prong, the RNC relies on a "balancing test." OB43–45. The district court correctly rejected that argument, too. ER-21–25.

This test "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Epic Games*, 67 F.4th at 1000 (quoting *Progressive W. Ins.* v. *Superior Ct.*, 135 Cal.App.4th 263, 285 (2005)). Some courts, like the district court here, ER-22, also consider whether "the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Donadio* v. *Hyundai Motor Am.*, 751 F.Supp.3d 1013, 1022–1023 (C.D. Cal. 2024) (citation omitted).

Here, any purported harm to Gmail users is significantly outweighed by the enormous benefits of spam filtering. Congress has recognized the "risk" from spam, including that it can contain materials that are "fraudulent," "deceptive," "vulgar," or "pornographic in nature." 15 U.S.C. § 7701(a)(2), (4)–(5); *see also Zango,* 568 F.3d at 1174 ("Malware may … expose users to … links to pornographic websites, or to software that can compromise the user's privacy, computer security, or identity."). To prevent those harms and as a service to its users, Gmail uses "artifi-

cial intelligence and machine learning" to "detect and block spam and malware." SER-23. The extraordinary utility of Gmail's spam filters is not subject to reasonable debate. See *Capito*, 17 Cal.5th at 285 (considering "state and federal law" that "'reflect[] a strong legislative policy'" related to the defendants' conduct) (citation omitted).

The RNC otherwise fails to show "the gravity of the harm to the alleged victim." *Epic Games*, 67 F.4th at 1000 (citation omitted). The RNC relies almost entirely on alleged "harm[] to the RNC." OB43. But the RNC cannot rest on harm to itself: Because this test focuses on "unfairness to *consumers*," *Epic Games*, 67 F.4th at 1000, the RNC must show harm to Gmail *users*—which the RNC is not, ER-22. Nor does the RNC identify any case where a court applying the balancing test considered the harm to a plaintiff that was neither a consumer nor a competitor. Because the RNC is neither, its purported harm does not tip the scales.

The RNC attempts to solve this problem by asserting (OB44) that it "is also a consumer in the relevant sense because it has a material relationship with Google and the RNC took Google up on its offer to receive emails from non-Gmail users and deliver them into the Gmail user's inbox." The RNC did not raise this argument below. But in any event, it once again cannot escape its concession that "the RNC is not a Gmail user." ER-22. Merely having "a material relationship" (whatever that means) and sending emails to Gmail users does not make the RNC

a "consumer" of Gmail's "goods or services." *Consumer*, Black's Law Dictionary (12th ed. 2024).

What's more, the RNC does not identify *any* specific harm to consumers, *i.e.* Gmail users. It does not allege, for example, that any of its recipients complained that fundraising emails were going to their spam folders. Any Gmail user wanting to donate to the RNC faced no plausible barrier to doing so. The RNC thus fails to allege any purported injury to consumers that is in any way "substantial." *Puentes* v. *Wells Fargo Home Mortg., Inc.*, 160 Cal.App.4th 638, 649 (2008); *see Capito*, 17 Cal.5th at 287–288 (holding that a hospital's failure to disclose certain fees to patients was "not 'unfair' under the UCL" in part because the plaintiff did not allege "that she otherwise had no way to access information about [the fees]" or that the hospital "denied her the information or the opportunity to inquire about it").

The district court correctly concluded that the RNC did not adequately allege a UCL claim under the balancing test. ER-24.

### c. The RNC's proposed third test does not apply, and in any event, the RNC fails to satisfy it.

The RNC also advocates a third, separate unfairness test: it claims the UCL prohibits any conduct that a court deems "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." OB45 (quoting *Doe* v. *CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020)). True, some courts have in passing "consider[ed]" these factors "[u]nder

the UCL's unfairness prong," along with other factors. *Doe*, 982 F.3d at 1214. But as this Court recently clarified, "[t]he California Supreme Court has refined th[e UCL's] 'wide standard' into two tests": "the 'tethering' test" and "the balancing test." *Epic Games*, 67 F.4th at 1000 (internal citations omitted). It is in applying *that* balancing test that some courts—but not all—have also considered whether "the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Donadio*, 751 F.Supp.3d at 1022–1023. Those considerations are not their own separate test, as the district court held. ER-16.

In any event, the conduct alleged in the complaint is not any of those things. Spam filtering is *good*, not bad. It is one of the essential services that Gmail offers and one of the reasons why Gmail is "the leading email service provider." ER-94. And even accepting the RNC's allegations that for a few months some (but not all) of its emails went to spam for a few days (or just one), any purported harm from that misclassification is not "substantially" injurious. *Donadio*, 751 F.Supp.3d at 1023.

## III. Section 230 of the Communications Decency Act bars the RNC's claims.

The district court's order dismissing the complaint can also be affirmed on the alternative ground that Google is protected from this suit by CDA Section 230. 47 U.S.C. § 230. In enacting Section 230, Congress protected "website operators" who develop "tools meant to facilitate the communication and content of others" by shielding them from "liability

– 49 –

for" their publishing of "third-party information[,] … unless the website operator 'is responsible, in whole or in part, for the creation or development of [the] information.'" *Dyroff* v. *Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096, 1098 (9th Cir. 2019) (quoting Section 230). Section 230 "explicitly preempts inconsistent state laws." *HomeAway.com, Inc.* v. *City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019); 47 U.S.C. § 230(e)(3). In "close cases," Section 230 issues "must be resolved in favor of immunity" as the statute protects providers from the threat of litigation, not just from ultimate liability. *Fair Hous. Council of San Fernando Valley* v. *Roomates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). Here, Section 230 bars the RNC's state-law claims in three independent ways.

### A.    Google is protected under Section 230(c)(1).

Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This Court has described that provision's "three-prong test" as protecting "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Dyroff*, 934 F.3d at 1097 (quotation omitted).

The RNC spends about one page discussing Section 230(c)(1) and fails to address this Court's test. OB54–55. But this Court's decisions show that Google is protected. The RNC does not appear to dispute the

first or third prongs. Nor could it. Google is obviously an "interactive computer service," meaning "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(c)(1). Google does that, of course, by facilitating Gmail users' access to emails that are stored on email servers. See *Bennett* v. *Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018) ("[A]s many other courts have found, Google qualifies as an 'interactive computer service' provider."); *Holomaxx Techs.* v. *Microsoft Corp.*, 783 F.Supp.2d 1097, 1104 (N.D. Cal. 2011) (collecting cases concluding that service providers (like Gmail) that "provide email services properly are characterized as 'interactive computer service' providers"). Under the third prong, the RNC's emails are clearly content "provided by another information content provider." 47 U.S.C. § 230(c)(1).

The RNC fights only the second prong. It argues that its claims do not seek to treat Gmail as a "publisher or speaker" of email content because the claims arise from an alleged failure to deliver messages, not an injury from the content itself. OB54. The district court agreed and held that Section 230(c)(1) protection is effectively limited to actions sounding in defamation or similar torts. ER-11. This Court, however, has held that such distinctions based on the cause of action have "little to do with the … statutory language" because Section 230(c)(1) "precludes courts from treating internet service providers as publishers not just for the purposes of defamation law, … but *in general*." *Barnes*, 570 F.3d at 1104 (emphasis

– 51 –

added). Protection under Section 230(c)(1) depends not on the plaintiff's stated cause of action, but on the "theory of liability." *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024) (cleaned up).

Section 230(c)(1) protection extends to a provider's decisions about whether and how to "publis[h]" third-party content: The statute "shields from liability *all* publication decisions," including whether to edit, to remove, or to post." *Barnes*, 570 F.3d at 1105. That describes Google's conduct here, where the RNC alleges that Google displayed emails in one location (spam folders) but should have displayed them in another (inboxes). Because the RNC's claims seek liability from Gmail for exercising the "traditional editorial functio[n]" of "deciding whether" and how "to publish" the RNC's email content, *Jones* v. *Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014), the RNC necessarily seeks to impose liability on Gmail "as a publisher" of that content, 47 U.S.C. § 230(c)(1). The RNC describes its own case, in fact, as challenging Google's alleged "decision to restrict the availability of, or to *not* publish, the RNC's emails" by displaying certain messages in the spam folder. OB55. But Section 230(c)(1) "protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online,'" because choosing where and how to display content, just like "removing content," is "something publishers do." *Barnes*, 570 F.3d at 1103.

Put differently, the "duty" that Google allegedly owed the RNC stems from a purported obligation to display all "third party content" (the RNC's emails), and that obligation has no source "separate from the defendant's status as a publisher." *Calise*, 103 F.4th at 742. It is therefore preempted by Section 230(c)(1). *Id*. And these protections apply equally to the "algorithm" Gmail uses to perform these editorial functions. See ER-12; *Dyroff*, 934 F.3d at 1098. Designing and employing an algorithm to make editorial choices is akin to placing a book on the back shelf of a bookstore rather than at the front door, or publishing a story on the front page of a newspaper rather than on page 25. Section 230 recognizes that such decisions are just as protected after the advent of the Internet as they were before.

Properly interpreting the statute to protect Google here does not "magically" transform unlawful conduct into lawful conduct. *Contra* OB55. Google's alleged conduct here is the review and presentation of email content provided by third-party senders, a service that cannot be distinguished from the traditional role of a "publisher." 47 U.S.C. § 230(c)(1); *Jones,* 755 F.3d at 407. That conduct—sorting content and presenting it to users in a specific way, in a specific place—is just as lawful offline as it is online, which is just the distinction that this Court has been careful to preserve in interpreting Section 230(c)(1). See, *e.g.*, *HomeAway.com*, 918 F.3d at 682 (website was not protected for facilitat-

ing unlawful housing discrimination through its own design features and communications).

A contrary result would sow chaos on the Internet. The Court has observed that "[n]o website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content." *Estate of Bride by & through Bride* v. *Yolo Techs., Inc.*, 112 F.4th 1168, 1181 (9th Cir. 2024) (quotation omitted). In much the same way, no email service provider could function if it faced litigation over every email routed to a spam filter. Gmail is the world's "leading email service provider," transmitting billions of messages daily. ER-94. One of the many benefits that attracts customers to the service is Gmail's ability to filter spam. ER-40. In enacting Section 230, Congress made the policy judgment that such decisions should be protected "not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Hous. Council*, 521 F.3d at 1175.

## B.    Google is protected under Section 230(c)(2).

Section 230(c)(2) "provides an additional shield from liability." *Barnes*, 570 F.3d at 1105. It contains two subsections. Subsection 230(c)(2)(A) shields a provider's actions "taken in good faith" to "restrict access" to "material that the provider or the user considers to be … objectionable." Subsection 230(c)(2)(B) shields "action taken to enable or make available to … others the technical means to restrict access to material described in" paragraph (2)(A). Google is protected under both.

– 54 –

### 1. Google's good-faith spam filtering is protected under Section 230(c)(2)(A).

Both sides agree (OB52) that Section 230(c)(2)(A) depends on whether Google allegedly "restrict[ed] access" to the RNC's emails based on a "good faith" belief that the material was "objectionable." 47 U.S.C. § 230(c)(2)(A). The district court initially granted Google protection under this provision, ER-150–159, but later found that the amended complaint crossed the plausibility threshold to allege the absence of good faith, ER-4. That conclusion was incorrect as a matter of law.

The RNC concedes (OB53) that its ability to overcome Section 230(c)(2)(A) depends on convincing this Court that it "plausibly alleged political-affiliation discrimination." For the reasons discussed above, Part I, *supra*, those allegations are implausible and fail to establish that Google discriminated *at all*. In the specific context of Section 230(c)(2)(A), courts have found bad faith *inadequately* alleged when a provider "reasonably could conclude" that the blocked "emails" were "objectionable." *Holomaxx Technologies*, 783 F.Supp.2d at 1104. Just so here, where the RNC makes no plausible allegations that Google did anything but filter what its algorithm reasonably flagged as likely spam email without regard to political content or viewpoint. It does not matter if the RNC misunderstands, or simply disagrees with, Google's spam filters. If the Court agrees that the RNC's allegations of political-affiliation discrimi-

nation are implausible, then it should find Google protected under Section 230(c)(2)(A) for the same reasons.

In any event—although Google emphatically denies any political discrimination—the RNC's allegations that Google acted without "good faith" fail as a matter of law. The sole case the RNC cites (OB53) in support of its theory that political discrimination evinces bad faith is *Enigma Software Group USA* v. *Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019). But that case confirmed that Section 230(c)(2) "establishes a subjective standard whereby" interactive computer service providers, including Google, "decide what online material is objectionable." *Id.* at 1044. *Enigma Software* was careful not to upset this general subjective standard, holding only that Section 230 cannot be used to shield "direct competitors" from liability when they block software out of "anticompetitive animus." *Id.* at 1050. The RNC now attempts, without authority, to expand *Enigma Software* into a holding that political content can never be filtered as spam—an issue the case does not address at all. Accepting that reading would compel innumerable Internet-based companies to change how they do business, and it may not even be possible. See *Estate of Bride*, 112 F.4th at 1181. To embrace that view—and "force a provider like [Google] to litigate the question of whether what it blocked was or was not spam"—would damage Section 230's subjective standard and "render § 230(c)(2) nearly meaningless." *e360Insight, LLC* v. *Comcast Corp.*, 546 F.Supp.2d 605, 609 (N.D. Ill. 2008).

– 56 –

### 2.    Google is also protected under Section 230(c)(2)(B).

For substantially the same reasons, Section 230(c)(2)(B) also protects Google from the RNC's claims. This protection covers Google's provision to its users of the "technical means to restrict access" to the material described in Paragraph (c)(2)(A), *i.e.*, emails that Google and its users in good faith deem to be "objectionable" spam. *Zango, Inc.*, 568 F.3d at 1173.

The RNC argues that Subsection 230(c)(2)(B) does not apply here because Gmail's spam filters are operated by Google rather than "handed … over to *users*." OB53. That's not correct. As the facts incorporated into the RNC's complaint make clear, a spam filter is a tool that Google provides to Gmail users to enable users to filter content in their own inboxes. See SER-3 (incorporated by reference at ER-102). The filter learns from the *user's* preferences and actions labeling various emails as spam (or not spam) and then applies the *user's* sorting preferences for future emails. *Id*. And importantly, the user retains substantial control over the inputs. *Id*. ("The spam rate is the percentage of email marked as spam *by users*[.]") (emphasis added). When users collectively mark a sender's emails as spam at a high rate, this increases "the likelihood that [its] future messages … will also be classified as spam." SER-39.

In any case, the RNC fails to substantiate its user-only view of Section 230(c)(2)(B). *Zango* held that "the statute plainly immunizes from suit a provider of interactive computer services that makes available soft-

ware that filters or screens material that the user *or the provider* deems objectionable." 568 F.3d at 1173 (emphasis added). *Zango* describes email spam filtering perfectly, and it controls here. Because both Google *and* its users find spam "objectionable," and Google "makes available" a spam filter to screen out unwanted messages, its spam filtering is protected under Subsection 230(c)(2)(B).

## CONCLUSION

The Court should affirm the dismissal of the RNC's claims.

April 28, 2025

Respectfully Submitted,

Michael R. Huston
PERKINS COIE LLP
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
MHuston@perkinscoie.com

*s/ Dominic E. Draye*
Dominic E. Draye
*Counsel of Record*
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, Arizona 85016
(602) 445-8000
drayed@gtlaw.com

*Counsel for Defendant-Appellee Google LLC*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 13,699 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  April 28, 2025                    *s/ Dominic E. Draye*
                                          Dominic E. Draye
                                          GREENBERG TRAURIG, LLP
                                          2375 E. Camelback Road, Suite 800
                                          Phoenix, Arizona 85016
                                          (602) 445-8000
                                          drayed@gtlaw.com

                                          *Counsel for Defendant-Appellee*
                                          *Google LLC*

– 59 –

CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2025, I electronically filed the fore-going Answering Brief of Defendant-Appellee Google LLC, with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  April 28, 2025

*s/ Dominic E. Draye*
Dominic E. Draye
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, Arizona 85016
(602) 445-8000
drayed@gtlaw.com

*Counsel for Defendant-Appellee Google LLC*