No. 24-5358

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

REPUBLICAN NATIONAL COMMITTEE,

*Plaintiff-Appellant*,

v.

GOOGLE INC. AND GOOGLE LLC,

*Defendants-Appellees*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:22-cv-01904 (Calabretta, J.)

_____

## BRIEF OF *AMICUS CURIAE* CHAMBER OF PROGRESS IN SUPPORT
## OF DEFENDANTS-APPELLEES

_____

Gina Elliott
Darin M. Sands
BRADLEY BERNSTEIN SANDS LLP
1212 Broadway, Suite 1100
Oakland, CA 94612
(323) 854-6543
*Counsel for Chamber of Progress*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................2

CORPORATE DISCLOSURE STATEMENT ...........................................6

STATEMENT OF AUTHORSHIP AND FINANCIAL SUPPORT ..................6

IDENTITY STATEMENT AND INTEREST OF AMICUS ...........................6

INTRODUCTION .......................................................................................7

ARGUMENT ..............................................................................................9

    I.    Section 230(c)(1) Provides Immunity from the RNC's Claims............9

        A.    Decisions Not to Publish Are Publisher Functions That Are Protected Under Section 230(c)(1) .............................................9

            i.    Publisher immunity extends to spam filtering and inbox placement decisions. ........................................................9

            ii.    Courts have correctly rejected the suggestion that protecting removal decisions under subsection (c)(1) renders subsection (c)(2) superfluous. ...........................13

        B.    RNC Seeks to Hold Google Liable as Publisher ......................15

    II.    RNC Does Not Sufficiently Allege Google Failed to Act in Good Faith .........................................................................................19

        A.    District Court's Decision On Section 230(c)(2)(A) Is Incorrect .................................................................................21

        B.    The District Court's Reasoning Would Undermine Section 230(c)(2)(A) ...............................................................24

    III.    Section 230(c)(2)(B) Also Bars the RNC's Claims ...........................26

CONCLUSION ..........................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................21

*Asurvio LP v. Malwarebytes Inc.,* 5:18-CV-05409-EJD, 2020 WL 1478345
    (N.D. Cal. Mar. 26, 2020) ..............................................................29

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009).................................... 9, 10, 11, 12, 13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................... 21, 22, 23

*Children's Health Def. v. Meta Platforms, Inc.*,
    112 F.4th 742 (9th Cir. 2024).........................................................13

*Diep v. Apple, Inc., 22-16514*,
    2024 WL 1299995 (9th Cir. Mar. 27, 2024) ....................................16

*Divino Group LLC v. Google LLC*,
    2022 WL 4625076 (N.D. Cal. Sept. 30, 2022) ................................18

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025).................................................. 16, 17

*Domen v. Vimeo, Inc.*,
    433 F. Supp. 3d 592 (S.D.N.Y. 2020)....................................... 18, 25

*e360Insight, LLC v. Comcast Corp.*,
    546 F. Supp. 2d 605 (N.D. Ill. 2008) ....................................... 21, 25

*Enigma Software Grp. USA v. Malwarebytes, Inc.*,
    946 F.3d 1040 (9th Cir. 2019).......................................................28

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)..................................... 10, 12, 21, 24

*Federal Agency of News LLC v. Facebook, Inc.*,
   395 F. Supp. 3d 1295 (N.D. Cal. 2019) ...........................................................18

*Force v. Facebook, Inc.*,
   934 F.3d 53 (9th Cir. 2019)................................................................ 14, 17, 19

*Fyk v. Facebook, Inc.*,
   808 F. App'x 597 (9th Cir. 2020) ....................................................................13

*Holomaxx Techs. v. Microsoft Corp.*,
   783 F. Supp. 2d 1097 (N.D. Cal. 2011) ...........................................................25

*Jones v. Dirty World Entertainment Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014)...................................................................... 12, 17

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016)..........................................................................20

*King v. Facebook, Inc.*,
   845 F. App'x 691 (9th Cir. 2021) .............................................................. 11, 12

*King v. Facebook, Inc.*,
   2019 WL 4221768 (N.D. Cal. Sept. 5, 2019) ........................................... 15, 18

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ......................................................................12

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021).........................................................................16

*Lewis v. Google LLC*,
   461 F. Supp. 3d 938 (N.D. Cal. 2022) ............................................................18

*Riggs v. MySpace, Inc.*,
   444 F. App'x 986 (9th Cir. 2011) .............................................................. 11, 12

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...........................................................11

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
   697 F. App'x 526 (9th Cir. 2017) ............................................................ 11, 12

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24,1995)...........................................14

*Zango, Inc. v. Kaspersky Lab, Inc.*,
   568 F.3d 1169 (9th Cir. 2009)................................................................ 20, 27

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997)................................................................. 12, 17

## FEDERAL STATUTES

Title 47 U.S.C.
   § 230(a)(3)......................................................................... 20, 29
   § 230(b)(3)................................................................................29
   § 230(b)(4)...........................................................................7, 19
   § 230(c)........................................................................... *passim*
   § 230(c)(1)....................................................................... *passim*
   § 230(c)(2)....................................................................... *passim*

## FEDERAL RULES

Fed. R. App. P.
   Rule 29(a)(2) .............................................................................6
   Rule 29(a)(5) .............................................................................1
   Rule 32(a)(5) .............................................................................1
   Rule 32(f) .................................................................................1

## OTHER AUTHORITIES

Impact of Litigation on Small Providers, Chamber of Progress, 15 (2022),
   https://progresschamber.org/wp-content/uploads/2022/04/CoP_230-
   report_w1i.pdf ................................................................. 25, 26

Peek into the Political Biases in Email Spam Filtering Algorithms During US
   Election 2020 (2022), https://arxiv.org/pdf/2203.16743 .......................... 23, 24

Retrospective, The Center For Growth and Opportunity (Nov. 10, 2022),
https://www.thecgo.org/research/section-230-a-retrospective/ ................ 20, 20

## CORPORATE DISCLOSURE STATEMENT

No publicly traded company holds more than 10% of stock in Chamber of Progress. Chamber of Progress is aware of no publicly owned corporation not a party to the appeal that has a financial interest in the outcome of this litigation.

## STATEMENT OF AUTHORSHIP AND FINANCIAL SUPPORT

No counsel for any party in this case authored any part of this brief. No party or counsel for any party in this case contributed money intended to fund preparation or submission of this brief. No person or entity contributed money intended to fund preparation or submission of this brief.

## IDENTITY STATEMENT AND INTEREST OF AMICUS[1]

*Amicus* Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. In keeping with this mission, Chamber of Progress believes that Section 230 is essential to supporting a robust online speech environment. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors

---

[1] This brief is filed with the consent of the parties to this Action pursuant to Fed. R. App. P. 29(a)(2).

and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

## INTRODUCTION

Section 230 of the Communications Decency Act provides critical protection from liability to "interactive computer services" who display third-party content. 47 U.S.C. § 230(c). In particular, Section 230(c) protects providers from liability for either the content they chose not to remove or the screening decisions they make to encourage them to moderate the user-created content on their websites. Encouraging blocking and filtering content was a key motivation of the drafters of Section 230 and one of the stated goals of the legislation. *See* 47 U.S.C. § 230(b)(4) (aim of statute is "to remove disincentives for the development and utilization of blocking and filtering technologies"). Protection from liability for these decisions has therefore been consistently upheld by the courts, including this one.

But in this case, the Republican National Committee ("RNC") seeks to significantly limit Section 230. The RNC alleges that emails it sends to its supporters who use Gmail were diverted to spam at unusually high rates for about nine months, and that the only logical reason for this must be some intentional discrimination by Google. The RNC claims that these allegations of discrimination are sufficient to evade Google's Section 230 immunity under both Section 230(c)(1) and (c)(2). By

7

alleging Gmail's spam filter impermissibly diverted emails based on political bias, the RNC asks this Court to disregard settled law, undermine content moderation, and expose platforms to liability for automated decisions made in good faith.

The district court granted Google's motion to dismiss on state-law grounds, but incorrectly found that Section 230 did not apply to the RNC's complaint. In doing so, the district court made multiple legal errors: it wrongly held that Section 230(c)(1) does not apply to removal decisions (despite clear Ninth Circuit precedent to the contrary), it misapplied the standard for alleging "good faith" under Section 230(c)(2)(A), and it incorrectly held that Section 230(c)(2)(B) does not apply to Google's spam filter.

As described in Google's brief, this Court should affirm the district court's ruling on state-law grounds and does not need to reach the Section 230 issues. But if necessary, the Court should affirm on the alternative ground that Google is entitled to immunity from suit based on Section 230. Section 230 exists precisely so that claims against internet providers can be dismissed quickly, reducing unjustified litigation risk and burden. Without the protection of Section 230 in a case like this one, providers of interactive computer services will become less likely to filter out objectionable content for fear of risking litigation – undermining the purpose of the statute.

## ARGUMENT

### I.   Section 230(c)(1) Provides Immunity from the RNC's Claims

The RNC's claims are barred by the immunity provided by Section 230(c)(1) because they seek to hold an interactive computer service liable as a "publisher or speaker" for content "provided by another information content provider." 47 U.S.C. § 230(c)(1). The District Court erroneously held that subsection (c)(1) does not apply because the RNC's claims are based on Google's decision to *not* publish, rather than publish, the RNC's emails. ER 11. This ignores binding precedent of this Court; if the Court reaches this issue, it should find that Google is immune from liability under Section 230(c)(1).

#### A.   Decisions Not to Publish Are Publisher Functions That Are Protected Under Section 230(c)(1)

##### i.   Publisher immunity extends to spam filtering and inbox placement decisions.

This Court has clearly defined parameters of subsection (c)(1) – it protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009), *as amended* (Sept. 28, 2009) (footnote omitted). The only element in dispute here is the second, whether the RNC seeks to hold Google liable "as a publisher or speaker." *Barnes* and other cases of

this Court have correctly established that the conduct alleged here – even if framed as the decision *not* to publish something – is the conduct of a publisher.

The Court addressed this issue in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc). Clarifying its earlier decisions, the Court noted that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under Section 230." *Id.* at 1170-71; *see also id.* at 1163 ("Congress sought to immunize the *removal* of user-generated content, not the *creation* of content[.]") (emphasis in original).

Then, in *Barnes*, the Court expanded on the broad applicability of subsection (c)(1). It noted that while the section is "most frequently associated with" defamation claims because that was the original target of the law, its scope is broader. *Barnes*, 570 F.3d at 1101. The correct inquiry, therefore, is "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id.* at 1102. And the Court confirmed that "publication involves reviewing, editing, and *deciding whether to publish or to withdraw from publication* third-party content." *Id.* at 1102 (emphasis added) (citing *Roommates*, 521 F.3d at 1170-71). It is "immaterial" whether the publication decision "comes in the form of deciding what to publish in the first place or what to

remove among the published material," particularly "in the context of the internet," where material can be published and removed "with ease." *Id.* at 1102 n.8.

Multiple decisions have confirmed that various claims based on a decision *not* to publish content are barred by subsection (c)(1). For example, in *Sikhs for Justice, Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015), the plaintiff brought discrimination claims based on Facebook blocking plaintiff's Facebook page in India. Examining *Barnes* and other Ninth Circuit cases, the district court held that plaintiff sought to hold Facebook liable as a publisher because "the act that Defendant allegedly conducted in a discriminatory manner is the *removal* of the [Sikhs for Justice] Page in India," and "'removing content is something publishers do.'" *Id.* at 1095 (quoting *Barnes*, 570 F.3d at 1103) (emphasis added). This Court affirmed that decision. *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) (Mem.); *see also Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (Mem.) (upholding dismissal of claims arising from MySpace's decision to delete user profiles, because "these claims were precluded by Section 230(c)(1) of the Communications Decency Act"); *King v. Facebook, Inc.*, 845 F. App'x 691 (9th Cir. 2021) (Mem.) (upholding dismissal under Section 230(c)(1) of claims based on Facebook's removal of certain posts and temporary suspension of account).

Other circuits agree that claims based on decisions to remove content impermissibly seek to hold defendants liable as "publishers." *See, e.g.*, *Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997) (Section 230 protects against liability for the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content"); *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (same); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) (quoting *Roommates*).

The district court's decision related to subsection (c)(1) ignored this binding precedent by holding subsection (c)(1) does not apply to the claims because the RNC's challenge is to "Google's decision to restrict the availability of, or to *not* publish, the RNC's emails." ER 11. The court essentially held that any claim based on a decision not to publish content of another does not treat the defendant as the "publisher or speaker." As described, this ignores repeated Ninth Circuit precedent that publication includes "deciding whether to publish or to withdraw from publication third-party content." *Barnes,* 570 F.3d at 1100 (citing *Fair Housing Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1170-71 (9th Cir.2008) (en banc)); *see also Sikhs for Justice, Inc.*, 697 F. App'x 526; *Riggs*, 444 F. App'x at 987; *King*, 845 F. App'x 691. It should not be affirmed.

### ii. Courts have correctly rejected the suggestion that protecting removal decisions under subsection (c)(1) renders subsection (c)(2) superfluous.

As support for its erroneous decision, the district court stated that if "subsection (c)(1) applied to the decision to *remove* content (as opposed to publishing it), subsection (c)(2) would be rendered superfluous." ER 11. This conclusion is also squarely barred by this Court's prior decisions.

In *Barnes*, the Court "rejected the argument that, by construing subsection (c)(1)'s immunity as extending to actions concerning the monitoring and removal of content, we had rendered superfluous the distinct immunity set forth in subsection (c)(2)." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 779 (9th Cir. 2024) (Collins, J., concurring in part, concurring in judgment in part, dissenting in part) (describing *Barnes* decision). The *Barnes* court explained that subsection (c)(1) "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties," and that subsection (c)(2) provides "an additional shield from liability" for some persons whom subsection (c)(1) already protects, but also "*any* provider of an interactive computer service," including those who may have developed in part the content at issue. 570 F.3d at 1105; *see also Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020) ("We reject Fyk's argument that granting § 230(c)(1) immunity to Facebook renders § 230(c)(2)(A) mere surplusage.")

The overlapping nature of subsections (c)(1) and (c)(2) can be understood from the statutory history. In 1995, a New York state court held that an online service provider who had removed some, but not all, objectionable content from its website was liable for defamation for the content it failed to remove. *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, at *4 (N.Y. Sup. Ct. May 24, 1995). The two subsections of Section 230 "tackle, in overlapping fashion, the two jurisprudential moves of the *Stratton-Oakmont* court." *Force v. Facebook, Inc.*, 934 F.3d 53, 79 (9th Cir. 2019) (Katzmann, C.J., concurring in part and dissenting in part). Subsection (c)(1) abrogates that court's decision that screening posts for offensive content rendered the service provider a "publisher rather than distributor." *Id.* (quoting *Stratton Oakmont*, 1995 WL 323710 at *4). And subsection (c)(2) ensures that, in the future, making good-faith efforts to remove offensive material would not expose an interactive computer service to liability. *Id.*

Preserving the full scope of both subsections is critical to the statutory scheme. Denying protection under subsection (c)(1) for decisions to remove content would create a different standard for publishing and not-publishing content that is not contemplated by the statute. As a result, interactive computer service providers would be strongly incentivized to publish all content – even content that is harassing or discriminatory – rather than face potential suit over its decision to remove or withhold the content.

14

The availability of subsection (c)(2) does not alleviate this risk. Subsection 230(c)(1)'s prima facie elements do not include the defendant's scienter, meaning judges "can resolve all … elements based solely on the allegations in the plaintiff's complaint," and frequently grant motions to dismiss based on a subsection (c)(1) defense. Eric Goldman*, Why Section 230 Is Better Than the First Amendment*, 95 Notre Dame L. Rev. Reflection 33, 39 (2019); *see also King v. Facebook, Inc.*, 2019 WL 4221768 at *4 (N.D. Cal. Sept. 5, 2019) (collecting cases dismissed at pleading stage under Section 230(c)(1)). But as discussed further below, subsection (c)(2)(A) does have a scienter requirement, which may (though should not always) prolong litigation. The availability of a quick dismissal for meritorious subsection (c)(1) defenses allows interactive computer services to efficiently screen content and avoids the "proactive removal of legitimate content as a prophylactic way of reducing potential legal risk." Goldman, *Why Section 230 Is Better Than the First Amendment* at 41. In other words, the correct interpretation of subsection (c)(1) is critical to an internet that contains a diverse array of user-created content but is not overrun by objectionable material.

### B.    RNC Seeks to Hold Google Liable as Publisher

On appeal, the RNC largely ignores the district court's decision on Section 230(c)(1), but appears to argue that its claims are not based on Google's status as a publisher because they are discrimination claims. *See* Opening Br. at 55. Their

argument distorts the proper analysis; the RNC's claims necessarily seek to treat Google as a publisher and are therefore barred by subsection (c)(1). RNC's attempt to narrow the application of Section 230 based on the type of underlying claim should be rejected.

This Court has explained in detail what it means for claims to seek to treat a defendant as a publisher or speaker. In order for Section 230(c)(1) not to apply, the claims must arise from duties that are "fully independent" of the defendant's role in publishing (or not publishing) third-party content. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021); *see also Diep v. Apple, Inc.,* 22-16514, 2024 WL 1299995, at *2 (9th Cir. Mar. 27, 2024) (holding court "need not decide whether violations of [alleged] duties can be boiled down to publication activities in every instance").

Most recently, in *Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025), this Court examined claims for defective design, defective manufacturing, and negligence to determine whether they derived from defendant's conduct as a "publisher or speaker." All of the claims were based on an alleged duty by Grindr to "suppress matches and communications between adults and children, so as to prevent the harmful sharing of messages between users that could lead to illegal activity." *Id.* at 1153. The Court held these claims "necessarily implicate Grindr's role as a publisher of third-party content," because they would require Grindr to

16

monitor and prevent certain content; the claims were therefore barred by Section 230(c)(1). *Id.*

Here, the RNC's claims are all based on Google's alleged duty to display all the RNC's emails in users' primary inboxes. This purported duty is dependent on Google's status as a publisher, and attempting to force Google to display content in a certain way implicates Google's "traditional editorial functions" as a publisher. *Jones*, 755 F.3d at 407 (quoting *Zeran*, 129 F.3d at 330). In *Force,*, 934 F.3d 53, for example, the Second Circuit held that "arranging and distributing third-party information" to form connections between content and viewers is "an essential result of publishing." *Id.* at 66. The court also acknowledged that internet services have "always" decided "where . . . particular third-party content should reside and to whom it should be shown," and it would "turn Section 230(c)(1) upside down" to hold that such decisions were not subject to immunity. *Id.* at 66-67.

So too here. Google's decisions about how to determine which emails to inbox are core publishing decisions. Allowing claims to proceed based on those decisions because the claims are styled as ones for discrimination would dramatically affect interactive computer services' ability to display third-party content on their websites. For example, courts have dismissed claims for discrimination under subsection (c)(1) based on the following conduct:

- A social media provider's decisions to remove posts and suspend accounts for violating their terms of service. *King*, 2019 WL 4221768 at *1; *Federal Agency of News LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1307-08 (N.D. Cal. 2019)

- A video provider's decision to "remove, restrict, or demonetize plaintiffs' videos." *Divino Group LLC v. Google LLC*, 2022 WL 4625076 at *16 (N.D. Cal. Sept. 30, 2022).

- A video provider's demonetization of plaintiff's postings. *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954-55 (N.D. Cal. 2022).

- A video-sharing website's removal of videos that violated a provider's explicit guidelines against "hateful, harassing, defamatory, and discriminatory content." *Domen v. Vimeo, Inc*., 433 F. Supp. 3d 592, 599, 601-02 (S.D.N.Y. 2020), *aff'd on other grounds*, 20-616-CV, 2021 WL 4352312 (2d Cir. Sept. 24, 2021).

If the RNC were to prevail on its argument, all such moderating conduct could expose interactive computer services to having to defend against discrimination claims based on the outcome of the moderation decisions – which would inevitably significantly discourage any moderation at all. The Court should not take the RNC's invitation to dramatically narrow Section 230 in this way.

## II.     RNC Does Not Sufficiently Allege Google Failed to Act in Good Faith

Section 230, subsection (c)(2)(A) protects a provider or user of an interactive computer service from liability on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2). The district court held that the RNC had adequately pled that Google did not act "in good faith" in filtering some of RNC's emails to spam. ER 8-10. This is incorrect and threatens to eviscerate subsection (c)(2)(A)'s protection and promotion of content filtering tools.

One of the five declared policies of the CDA is to "remove disincentives for the development and utilization of blocking and filtering technologies." 47 U.S.C. § 230(b)(4). The authors of Section 230, Congressmen Cox and Wyden, saw the *Stratton Oakmont* decision as "indicative of a 'legal system [that] provides a massive disincentive for the people who might best help us control the Internet to do so.'" *Force*, 934 F.3d at 79 (Katzmann, C.J., concurring in part and dissenting in part) (quoting 141 Cong. Rec. 22,045 (statement of Rep. Cox)). As Representative Cox has since written, if the *Stratton Oakmont* decision had been allowed to stand, it "would have created a powerful and perverse incentive for platforms to abandon any attempt to maintain civility on their sites." Christopher Cox, *Section 230: A*

19

*Retrospective*, The Center For Growth and Opportunity (Nov. 10, 2022), https://www.thecgo.org/research/section-230-a-retrospective/. "[D]etermined that good-faith content moderation should not be punished," Representatives Cox and Wyden drafted Section 230(c), known as the Good Samaritan provision. *Id.*; *see also Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175-75 (9th Cir. 2009) (holding that the "drafters' purpose and the plainly articulated policies of the statute" are served by "immuniz[ing] the providers of blocking software").

To preserve the protections of this section, courts must carefully apply the correct standard on motions to dismiss to ensure providers are not subject to endless, and ultimately unmeritorious, litigation. Allowing plaintiffs to evade Section 230 simply by relabeling their theory would collapse the statute's protections. This Court has admonished plaintiffs for trying to plead around Section 230's restrictions and noted the importance of upholding *Twombly/Iqbal* pleading standards in this context. This is due to "congressional recognition" that the internet is a "forum for true diversity" and has flourished with "a minimum of government regulation." *See Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266, 1268 (9th Cir. 2016) (quoting 47 U.S.C. § 230(a)(3)–(4)) (rejecting "threadbare allegations" that Yelp fabricated statements as "implausible on their face and… insufficient to avoid immunity under the CDA"). "[C]lose cases" must therefore be "resolved in favor of immunity," lest the heart of Section 230 be cut out by "forcing websites to face death by ten thousand duck-

bites" in the form of meritless litigation. *Roommates*, 521 F.3d at 1174; *see also, e.g., e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) ("[T]o force a provider like Comcast to litigate the question . . . would render § 230(c)(2) nearly meaningless."). The district court took the opposite approach; if it reaches the issue, this Court should reverse the court's holding on subsection (2)(A).

## A.     District Court's Decision On Section 230(c)(2)(A) Is Incorrect

The district court failed to apply the correct legal standard and ignored key allegations in the complaint when it found that the RNC stated sufficient facts to allege a lack of good faith. To survive a motion to dismiss, a complaint must allege sufficient facts "to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above a speculative level," and "obvious alternative explanation[s]" will undermine that conclusion. *Twombly*, 550 U.S. at 555, 567.

The district court found the RNC's allegations that its emails were diverted to spam at a lower rate after this suit was filed and the "timing and the lack of a clear reason" for the problems before filing sufficient to allege that Google acted without good faith. ER 8-10. But both data points have "obvious alternative explanation[s]" – far more obvious than some purposeful discrimination by Google. *See Twombly*, 550 U.S. at 567. As the RNC has alleged, Google worked with the RNC for over a

year on its spam rates. *See* ER 105. The fact that these efforts may ultimately have been successful does not prove – or even suggest – some discriminatory animus before that time. The fact that Google could not easily identify the reasons for specific drops in inboxing rates likewise proves nothing; Google's spam filters are complex, as evidenced in part by the disparate ways they treated similar emails. *See* ER 106. An alleged inability to explain precisely why they were working in a certain way suggests technical complexity, not lack of good faith.

The district court also ignored the factual support in the complaint showing that the RNC's inboxing rates are most likely the result of users reporting its emails as spam in conjunction with Google's viewpoint-neutral algorithm, not discrimination or bias. The allegations in the complaint itself contain "obvious alternative explanation[s]" for the results alleged, and makes the conclusion that the inboxing rates overall are the result of discrimination or bias implausible. *See Twombly*, 550 U.S. at 567.

*First*, the RNC describes an "A/B test" showing that two emails with identical political content were treated differently – one version was inboxed at a "normal rate," and the other went entirely to spam. ER 106. The fact that two substantively identical emails were inboxed at entirely different rates shows that something *other* than discriminatory animus affected inboxing rates of RNC emails.

22

*Second*, the RNC claims that its user reported average spam rate of "approximately 0.14%" is "minim[al]," suggesting this cannot be the reason its messages are sent to spam. *See* ER 102-03, 120. But industry guidance, including general guidance from Google, indicates that rates over 0.1% can "lead to increased spam classification." SER 18 (incorporated into complaint at ER 99). The RNC's admitted rates of user-reported spam therefore provide an alternative explanation for the results it sees.

*Third*, the RNC relies in part on a study by researchers at North Carolina State University regarding political biases in email spam filtering algorithms. ER 122. The study, while flawed, found that all three email services studied showed some political bias in their spam filtering algorithms.[2] This does not show that all three services purposely acted to introduce bias into their systems. In fact, the "obvious alternative explanation" for the finding about all three services is that *user input*, not bad-faith actions by Google, caused the allegedly disparate results. *See id.*; *Twombly*, 550 U.S. at 567.

Ultimately, the district court improperly took limited allegations of an allegedly discriminatory *effect* and, ignoring other allegations and noticeable facts

---

[2] *See* Hassan Iqbal et al., *A Peek into the Political Biases in Email Spam Filtering Algorithms During US Election 2020* (2022) https://arxiv.org/pdf/2203.16743.

to the contrary, determined that was sufficient to allege a lack of good faith on Google's part. That was error. If anything, this was a close case that should have been "resolved in favor of immunity." *Roommates*, 521 F.3d at 1174.

## B. The District Court's Reasoning Would Undermine Section 230(c)(2)(A)

The district court's decision was not only incorrect – its reasoning, if adopted, would also undermine the intent of Section 230(c)(2)(A). Interactive computer services would be forced to choose between hosting "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" content and risking costly litigation. 47 U.S.C. § 230(c)(2)(A). This is directly contrary to the purpose of the statute.

Under the RNC and the district court's reasoning, any company who is unable to fully explain the *output* of its filtering algorithm could be subject to lengthy litigation if a user can point to a potentially disparate impact of the filtering. This danger is apparent from the study cited by the RNC in this case – the study found *some* bias on the part of *all three* email providers studied.[3] Under the district court's reasoning, any of these three could be stuck litigating a suit claiming discrimination by plaintiffs vaguely alleging a politically disparate impact of algorithmic decisions.

---

[3] *See* Hassan Iqbal et al., *A Peek into the Political Biases in Email Spam Filtering Algorithms During US Election 2020* (2022) https://arxiv.org/pdf/2203.16743.

This would have a far-reaching effect. Most directly relevant, many interactive computer services attempt to filter out "spam" emails, or emails that are harassing or objectionable, from users. Legal challenges to these types of filters have routinely been rejected under subsection (c)(2)(A). *See, e.g.*, *e360Insight*, 546 F. Supp. 2d at 609 (finding plaintiff had failed to plead absence of good faith by ICS in blocking spam emails); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1105 (N.D. Cal. 2011) (same). But other types of filtering are also protected – and thus incentivized – by subsection (c)(2). For example, claims regarding the removal of videos that violated a provider's explicit guidelines against "hateful, harassing, defamatory, and discriminatory content" were dismissed under this subsection. *See Domen*, 433 F. Supp. 3d at 599.

If suits targeting these types of filtering were able to proceed past the pleading stage based on allegations that they affect different groups differently, interactive computer services would face the difficult decision of whether they should engage in this filtering at all. This is because the specter of lawsuits is no small thing. *See* Elizabeth Banker, *Understanding Section 230 & the Impact of Litigation on Small Providers*, Chamber of Progress, 15 (2022), https://progresschamber.org/wp-content/uploads/2022/04/CoP_230-report_w1i.pdf ("Most small businesses or individuals experience a lawsuit filed against them as an existential threat with profound emotional, financial, and opportunity costs."). For small companies in

25

particular, litigation that survives the pleading stage can "easily create a financial burden big enough to shutter a provider for good." *Id.* at 26. This means that without the full protections of Section 230, "it is likely that more small providers would be forced out of business by litigation costs." *Id.*

Small computer services are more likely to be dissuaded from filtering content by the fear of lawsuits, given their relative ability to absorb legal costs compared to larger companies. As a result, a stratification may appear – smaller companies will have fewer filters, and therefore have a less attractive experience for consumers, who may naturally move to larger providers. *See* Eric Goldman & Jess Miers, *Online Account Terminations/Content Removals and the Benefits of Internet Services Enforcing Their House Rules*, 1 J. Free Speech L. 191, 210 n.75 (2021) ("Internet services that are insufficiently aggressive about content moderation are not destined for long-term success.").

Defenses under subsection (c)(2) must be considered carefully in order to preserve the statutory goal of incentivizing good-faith content moderation. If it reaches the issue, this Court should make clear that the district court's analysis was incorrect.

## III. Section 230(c)(2)(B) Also Bars the RNC's Claims

Under Section 230(c)(2)(B), "a provider of software or enabling tools that filter, screen, allow, or disallow content that the provider or

user considers. . . objectionable may not be held liable for any action taken to make available the technical means to restrict access to that material, so long as the provider enables access by multiple users to a computer server." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 (9th Cir. 2009). The district court incorrectly held this subsection does not apply to the RNC's claims because both users *and* Google may filter emails into spam folders. ER 11-12. On appeal, the RNC seeks to have this Court compound the error and hold that claims of political discrimination are entirely exempt from subsection (c)(2)(B) protection. It should not do so.

In *Zango*, the Court considered software that "both enables and makes available the technical means to restrict access to malware." *Id.* at 1176. The Court rejected an argument that the software was not protected by subsection (c)(2)(B) because the defendant, rather than the customer, determines what is malware. It pointed to the broad "make available" language in the statute – as long as the defendant has "made available" to its users the "technical means to restrict access to items," it is irrelevant for purposes of the statute whether the defendant actually does the restricting in most cases. *Id.* It is undisputed here that Google makes spam filtering tools available to users, and users do in fact designate RNC emails as spam. *See, e.g.* ER 102 (discussing "user reported spam rate" for RNC emails); SER 4

(describing that users may report emails as spam). Under *Zango*, the RNC's claims are barred by Section 230(c)(2)(B).

But the RNC argues that this Court's decision in *Enigma Software Grp. USA v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019), exempts claims of alleged political-affiliation discrimination from the protection of subsection (c)(2)(B). Opening Br. at 53-54. Not so. In *Enigma,* the Court examined Congress's statement on the aims of the CDA, including the aim "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." 946 F.3d at 1050-51 (quoting § 230(b)(2)). Considering that aim, the Court held that Section 230 immunity does not apply if filtering is aimed at "suppressing competition, rather than protecting internet users." *Id.* at 1051; *see also id.* at 1052 ("§ 230 does not provide immunity for blocking a competitor's program for anticompetitive reasons."). Plaintiff does not allege that Google had any anti-competitive motive in this case and therefore *Enigma* does not apply.

The Court should decline the RNC's invitation to reach the subsection (c)(2)(B) issue and expand the holding of *Enigma*. The limited holding of *Enigma* was supported by the explicit statutory aim of the CDA to preserve competition on the internet. There is no corollary aim in the statute to ensure all political statements are treated equivalently; on the contrary, one of the stated goals is to "maximize user

28

control over what information is received." 47 U.S.C. § 230(b)(3).[4] Providing the ability for users to report and filter spam does just this. The Court must not reach beyond the plain language of the statute and create an exemption from immunity that was not intended. Unlike the ruling in *Enigma*, which only applies if both parties are actually competitors, an exemption based on alleged discrimination could be twisted by litigants to attempt to plead around Section 230 immunity in a multitude of cases. *Cf. Asurvio LP v. Malwarebytes Inc.,* 5:18-CV-05409-EJD, 2020 WL 1478345, at *5 (N.D. Cal. Mar. 26, 2020) ("If the Court were to accept Asurvio's argument, then any developer of performance optimizing software designed for 'self-help' computer users could potentially plead around the broad immunity granted by Section 230(c)(2)(B) and render the statutory immunity meaningless."). This result is not warranted by the statutory text or history.

## CONCLUSION

The Court should affirm the district court's decision for failure to state a claim on which relief should be granted. But if it reaches the Section 230 issues, it should

---

[4] The Congressional finding that "The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," 47 U.S.C. § 230(a)(3), does not equate to a statutory goal and does not justify a limitation on subsection (c)(2)(B)'s immunity, *contra* Opening Br. at 54. The recognition of a diversity of political opinions does not override Congress's clear mandate to encourage tools that allow users to filter content they find objectionable.

reject the RNC's attempt to create law that would severely curtail Section 230's protections and disincentivize the exact type of filtering activity that Section 230 was designed to protected.

Date: May 5, 2025

/s/ *Gina Elliott*
Gina Elliott
Darin M. Sands
Bradley Bernstein Sands LLP
1212 Broadway, Suite 1100
Oakland, CA 94612
gelliott@bradleybernstein.com
dsands@bradleybernstein.com
(323) 854-6543

*Counsel for Amicus Curiae Chamber of Progress*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** __24-5358_____

       I am the attorney or self-represented party.

       **This brief contains ___5583_____ words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

       I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/_Gina Elliott_____ **Date** _May 5, 2025