**No. 24-5358**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE,

*Plaintiff-Appellant,*

v.

GOOGLE INC. AND GOOGLE LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Hon. Daniel J. Calabretta

District Court Case No. 2:22-cv-01904

## BRIEF OF *AMICI CURIAE* NETCHOICE AND
## COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
## IN SUPPORT OF AFFIRMANCE

Anne M. Voigts
Pauleen Truong
PILLSBURY WINTHROP SHAW
PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304
T: (650) 233-4075
F: (650) 233-4545
E: anne.voigts@pillsburylaw.com
pauleen.truong@pillsburylaw.com

*Counsel for Amici Curiae
NetChoice and CCIA*

## CORPORATE DISCLOSURE STATEMENT

*Amici* state that (1) neither NetChoice nor the Computer &

Communications Industry Association have a parent corporation, and

(2) no publicly held corporation owns 10% or more of the stock of

NetChoice or the Computer & Communications Industry Association.

Date: May 5, 2025

Respectfully submitted,

*/s/ Anne M. Voigts*
Anne M. Voigts
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304
(650) 233-4075
anne.voigts@pillsburylaw.com

*Counsel for Amicus Curiae*
*NetChoice and CCIA*

2

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT..........................................2

TABLE OF AUTHORITIES.................................................................4

INTRODUCTION AND INTEREST OF *AMICI CURIAE* .......................7

SUMMARY OF ARGUMENT .............................................................9

ARGUMENT .....................................................................................11

I.  Email Service Providers' Choices About Disseminating Protected Speech Are Entitled to First Amendment Protection..................................................................................11

    A.  The First Amendment Protects Curated Compilations of Third-Party Speech .....................................11

    B.  Requiring Email Providers to Carry Particular Messages or Present Them in Particular Ways Violates Their First Amendment Rights..............................13

II.  Mislabeling Email as a "Common Carrier" Service Does Not Alter the First Amendment Analysis or Reduce Its Protections .........................................................................18

III.  First Amendment Concerns Aside, Requiring Courts to Micromanage Spam Policies Would Benefit No One....................22

CONCLUSION ..................................................................................23

CERTIFICATE OF COMPLIANCE .......................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ...............................................................21

*Arkansas Ed. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ...............................................................12

*Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) (plurality opinion).........................................12, 20

*FCC v. League of Women Voters of California*,
468 U.S. 364 (1984) ...............................................................21

*Goldin v. Pub. Utils.  v. Pub. Utils. Comm'n*,
23 Cal. 3d 638 (1979) ...........................................................19, 20, 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ...............................................................13

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ...........................................................11, 13

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).............................................................*passim*

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,
475 U.S. 1 (1986) (plurality opinion).........................................12, 13

*Packingham v. N. Carolina*,
582 U.S. 98 (2017) ...............................................................13

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) ...............................................................18

*Reno v. Am. Civ. Liberties Union*,
521 U.S. 844 (1997) ...............................................................14

*Republican Nat'l Comm. v. Google LLC*,
  742 F. Supp. 3d 1099 (E.D. Cal. 2024) ................................................. 19

*Rowan v. U.S. Post Off. Dep't*,
  397 U.S. 728 (1970) .............................................................................. 14

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ................................................................................ 18

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .............................................................................. 11

*Thunder Studios, Inc. v. Kazal*,
  13 F.4th 736 (9th Cir. 2021) .......................................................... 13, 14

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) .................................................................. 11, 17, 20

*U.S. Telecom Ass'n v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) ............... 20

## Constitutions

U.S. Constitution ..................................................................................... 9

U.S. Constitution
  Amendment I ............................................................................... *passim*

## Statutes and Codes

15 U.S.C. § 7701 ..................................................................................... 22

## Rules and Regulations

Federal Rules of Appellate Procedure
  Rule 29(a)(4)(E) ...................................................................................... 7

## Other Authorities

https://ccianet.org/about/members/ ......................................................... 7

https://netchoice.org/about/ ..................................................................... 7

5

https://support.google.com/mail/answer/3094499 (last visited May
    2, 2025) ............................................................................................... 15

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

*Amici* NetChoice and the Computer & Communications Industry Association ("CCIA") are trade associations that are composed of and advocate for Internet-based businesses.[1]  Their members operate a variety of popular websites, apps, and online services.  Defendant-Appellee Google is a member of both organizations, and their full membership can be accessed at https://netchoice.org/about/ and https://ccianet.org/about/members/.

For over two decades, NetChoice has worked to make the Internet safe for free enterprise and free expression, to increase consumer access and options via the Internet, and to minimize burdens on small businesses that make the Internet more accessible to and useful for all. NetChoice advocates on behalf of its membership by, among other things, participating in litigation involving issues of vital concern to the online community both as a party to litigation and as *amicus*.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* certify that no person or entity, other than *amici* or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Because Appellant has not indicated whether or not it consents to the filing of this brief, amici are concurrently filing a motion for leave to file this brief.

CCIA is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks, including as a party to or *amicus* in litigation.

One particularly relevant example of *amici*'s litigation efforts is *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which arose out of two lawsuits *amici* brought to challenge the constitutionality of state laws restricting websites' ability to freely engage in content moderation. Suits like *Moody* (and this one) are critically important to *amici*'s members who collectively make billions of editorial decisions each day. And decisions like *Moody* reaffirm email providers' First Amendment right to curate the messages they disseminate and distribute. Accordingly, *amici* are uniquely poised to address the First Amendment issues raised by Plaintiff-Appellant Republican National Committee's suit and this appeal.

## SUMMARY OF ARGUMENT

The district court correctly recognized that the ruling the RNC seeks—that email providers are common carriers, obligated to deliver each and every message entrusted to them, even unwanted ones or "spam," exactly the way the sender wants—necessarily conflicts with the First Amendment. ER-21. But the RNC's brief never acknowledges those constitutional concerns. Instead, it asks this Court to expand a series of state law claims beyond both their limits and the boundaries imposed by the U.S. Constitution. This Court should decline that wholly unwarranted invitation.

The RNC's suit, which seeks to impose liability on Gmail for its alleged failure to deliver emails when, where, and how the RNC unilaterally wishes (regardless of the preferences of the recipients of those emails, or Google's own policies), is not immune from (and cannot be squared with) the First Amendment. That's because email providers like Google curate, disseminate, display, and label information provided by third parties, an endeavor that requires them to engage in a host of editorial decisions that the Supreme Court has recognized time and time again are entitled to First Amendment protections. Take Gmail—

9

it provides a "curated compilation" of messages that are "filter[ed], prioritize[d], and label[led]" consistent with its policies. *Moody*, 603 U.S. at 717. That "distinctive expressive offering" is entitled to robust First Amendment protection. *Id.* at 738.

Editorial discretion is a vital component of email service. Over 350 billion emails are sent *per day*, and nearly half of those emails consist of what many consider to be spam. Accordingly, as Google explains in its Terms of Service, it, like other email providers, is "constantly developing new technologies and features to improve" its services, and it uses artificial intelligence and machine learning to, *inter alia*, "better detect and block spam and malware." SER-23.

The RNC cannot squelch the First Amendment rights of email providers by mislabeling them "common carriers." That label cannot, consistent with the First Amendment, provide a basis for second-guessing email providers' content moderation decisions, stripping email providers of the ability to enforce their terms of service, or concluding that the First Amendment does not protect those expressive choices. Allowing the complaint here to proceed would put courts in the untenable position of substituting their own judgment for the particular

spam policies of private email providers like Google, Microsoft, and Apple. This Court should affirm the district court, reject the RNC's common carrier argument, and recognize that the sort of court-made common carrier regulation the RNC seeks violates fundamental First Amendment principles.

## ARGUMENT

### I. Email Service Providers' Choices About Disseminating Protected Speech Are Entitled to First Amendment Protection

#### A. The First Amendment Protects Curated Compilations of Third-Party Speech

As the Supreme Court has repeatedly recognized, individuals or private entities are "entitled to the protection of the speech and press provisions of the First Amendment" both when they "engage in" creating speech and separately when they "transmit" it. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994). That's because the publication or dissemination of speech—even when it is compiled from others' speech—falls squarely within the ambit of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256, 258 (1974) (forcing a paper to print what "it would not otherwise print" "intru[ded]

into the function of editors" and violated the First Amendment); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 9–12, 16 (1986) ("*PG&E*") (plurality opinion) (compelling a utility "to carry speech with which it disagreed" required it to "alter its own message" and thus violated the First Amendment).

"Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing or presenting the included items—is expressive activity." *Moody*, 603 U.S. at 731. Those editorial choices are speech. *Id.* And "[w]hen the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation." *Id.* at 731–32. Accordingly, the Supreme Court reiterated, where, as here, "an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude," the First Amendment applies. *Id.* at 731 (citing *Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality opinion); *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)). "And that is as true when the content comes from third parties as when it does not." *Moody*, 603 U.S. at 731.

12

*Moody* reiterated three basic First Amendment principles that the Court has consistently applied over time "even as one communications method has given way to another." *Id.* at 731–34. First, the First Amendment "offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Id.* at 731. Second, "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732. And third, "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas." *Id.* (social media feeds); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (parades); *Miami Herald*, 418 U.S 241 (newspapers); *PG&E*, 475 U.S. 1 (monthly newsletter). The RNC's position here violates each of those principles.

## B. Requiring Email Providers to Carry Particular Messages or Present Them in Particular Ways Violates Their First Amendment Rights

"In general, emails and tweets, when published on the 'vast democratic forums of the Internet,' fall squarely within the protection of the First Amendment." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) (citing *Packingham v. N. Carolina*, 582 U.S. 98, 103

(2017); *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 851 (1997) (noting that an email is protected as "generally akin to a note or letter")).[2] Thus, when private email providers disseminate emails, they are distributing constitutionally protected speech.

In so doing, those providers also engage in their own expressive, protected activity by "exercising authority to remove, label or demote messages." *Moody,* 603 U.S. at 736. Take Gmail, for example. Gmail is a free email service that allows consumers who agree to Google's Terms of Service to create a Gmail account and use it to communicate with others. ER-92. As part of its services, Gmail organizes, categorizes, and labels emails. *E.g., Moody*, 603 U.S. at 716−17. More specifically, it analyzes incoming messages, and sorts them into different subjective categories, including:

- **"Primary:** Emails from people you know and messages that don't appear in other tabs.

- **Social:** Messages from social networks and media-sharing sites.

---

[2] As this Court also recognized, with regard to senders' emails themselves, "[a]t some point, however, repeated unwanted communications can lose First Amendment protection." *Thunder Studios,* 13 F.3d at 475 (citing *Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970)).

- **Promotions:** Deals, offers, and other promotional emails.

- **Updates:** Automated confirmations, notifications, statements, and reminders that may not need immediate attention.

- **Forums:** Messages from online groups, discussion boards, and mailing lists."

Add or remove inbox categories in Gmail, Gmail Help, https://support.google.com/mail/answer/3094499 (last visited May 2, 2025).

As particularly relevant here, Gmail labels and filters what it considers to be spam, routes it to a specific folder, and includes a warning at the top of each email that explains *why* it was evaluated as spam. And it does so based on its own determinations, "not necessarily just those emails that users themselves designate as spam...." ER-12. Because Gmail recognizes that "unwanted and spam emails" can be "harmful and disruptive to email users and providers," ER-21, it prohibits abuse, spam, malware, fraud, phishing, harassment, child sexual abuse imagery, and other illegal activity. But these are generally not binary, objective determinations—they are at their core judgment calls. Google's decisions about how to apply those standards,

evaluate incoming messages, and curate and label those messages are fundamentally editorial in nature and entitled to First Amendment protection. *Moody*, 603 U.S. at 738–39.

That Gmail and other providers use tools like algorithms or machine learning to do so does not diminish the constitutional interests at play. Those tools are designed to and do implement human judgment and human editorial priorities. They simply help sort and filter content and carry out those human decisions at scale. As *Moody* made clear, the First Amendment protects "content moderation" and "prioritization … achieved through the use of algorithms" even where "selection and ranking is most often based on a user's expressed interests and past activities." 603 U.S. at 734. For websites and apps, those tools are the means to an expressive (and constitutionally protected) end.

For email services, that expressive end (and the editorial discretion at play) might differ from social media services, but those are distinctions without a constitutional difference. *See Moody*, 603 U.S. at 733 (noting that "[n]ew communications media differ from old ones in a host of ways: No one thinks Facebook's News Feed much resembles an insert put into a billing envelope."). *Moody*'s speculation that

16

"[c]urating a feed and transmitting direct messages, one might think,
involve different levels of editorial choice, so that the one creates an
expressive product and the other does not," simply recognized that the
Supreme Court did *not* have a record before it about "how an email
provider like Gmail filters incoming messages." 603 U.S. at 725–26.
Here, this Court does have that record, and it demonstrates that Gmail
makes many of the same types of editorial choices in curating emails as
social media websites do in curating posts. Gmail has its own
community standards, which it enforces.

Moreover, commercial email providers actually compete on the
basis of curation because the better the filtering and the more useful
the compilation and categorization, the more attractive the particular
product is to consumers. In that sense, email is nothing like the U.S.
postal service (itself a government entity), which enjoys natural
monopolies and is understood not to employ the same editorial
discretion. Moreover, even where courts have recognized concerns over
media like cable television services having control over a network
"bottleneck," they have still recognized how First Amendment principles

17

apply to their programming choices. *Turner*, 512 U.S. 636; *see also infra* Argument, Section II.

Those First Amendment principles likewise protect Gmail's decisions about which third-party speech will be included or excluded, how to organize that speech, how to label it, and how to present it. Requiring email providers to set aside their own standards and blindly follow the dictates of the particular senders of particular emails as to how the senders believe those emails should be presented to their recipients ignores those principles and infringes on providers' First Amendment rights.[3]

## II.    Mislabeling Email as a "Common Carrier" Service Does Not Alter the First Amendment Analysis or Reduce Its Protections

The RNC tries to sidestep Gmail's First Amendment rights by contending that private email providers should be deemed common

---

[3] Neither *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), nor *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006), change that analysis. This Court need look no further than *Moody* itself where the Court limited those cases to their facts and rejected their application to circumstances where editorial standards, like Gmail's, are applied. 603 U.S. at 730–31 (distinguishing those cases because the compelled access in those cases did not affect the complaining party's own expression).

carriers.  Specifically, it asks that the courts deem Gmail a common

carrier under California law, obligated to immediately deliver all email

alike.

But Gmail is not a common carrier.  This Court should reject the

RNC's argument asking this Court to take the unprecedented step of

extending a California law initially enacted in 1872 to email service

providers.[4]  That shoe does not fit, either as a matter of California code

or the U.S. Constitution.

First, as the district court correctly recognized, "California's

common carrier law has historically been applied to services that

physically carry persons or goods, like stagecoaches, busses [sic], and

ski lifts." *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099,

1117 (E.D. Cal. 2024).[5]  The California Supreme Court has interpreted

the law as including telephone services, *see Goldin v. Pub. Utils.*

*Comm'n*, 23 Cal. 3d 638, 662 (1979), but neither the California

---

[4] Notably, in *Moody*, the majority did not even address the common carrier arguments made by Florida and Texas.

[5] Likewise, telephone service, which carries voice conversations by wire between points of the originating caller's choosing and without changing their form or content, is common carriage.  *See Goldin v. Pub. Utils. Comm'n,* 23 Cal. 3d 638, 662 (1979).

legislature nor California courts have held that email, which entails only the provisioning—by means of curation, arrangement, and moderation—of information, should be subject to those same standards. *Id.* The RNC does not and cannot provide this Court with a credible basis to upend centuries of common law and decades of U.S. telecommunications law.

In the context of cable television, courts have "analogized the cable operators to the publishers, pamphleteers, and bookstore owners traditionally protected by the First Amendment" and still applied constitutional scrutiny to regulations of their behavior. *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 428 (D.C. Cir. 2017) (Kavanaugh, J., dissenting). In the context of broadcast media, the Supreme Court in *Turner* explained, some accommodation is made in the First Amendment analysis because of "the unique physical limitations of the broadcast medium." 512 U.S. at 637. But Internet websites and applications lie very far away from those legacy television and cable media, and no First Amendment accommodation is appropriate, let alone required. *See, e.g.*, *U.S. Telecom Ass'n*, 855 F.3d at 428 (Kavanaugh, J., dissenting); *id.* at 433 ("Can the Government really

force Facebook and Google ... to operate as common carriers?"); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,* 518 U.S. 727, 738 (1996) (plurality opinion) (cable operators).

Thus, in *FCC v. League of Women Voters of California*, 468 U.S. 364, 379 (1984), the Supreme Court held that requiring broadcasters "to accept all paid political advertisements … would intrude unnecessarily upon the editorial discretion of broadcasters." *See also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) (noting "no public accommodations law is immune from the demands of the Constitution," especially when it is applied to businesses engaged in expressive activities and thus "deployed to compel speech."). "When a state public accommodations law and the Constitution collide, there can be no question which must prevail." *Id.*

Here, the First Amendment must prevail over attempts to force Gmail to curate, arrange, and disseminate speech in the manner the RNC wishes. No hasty analogy to public utility service should succeed in extinguishing the rights of email service providers to speak freely online.

### III. First Amendment Concerns Aside, Requiring Courts to Micromanage Spam Policies Would Benefit No One

The RNC's position also makes little sense as a matter of policy. As Congress recognized, unsolicited commercial electronic mail is estimated to account for over half of all email traffic. 15 U.S.C. § 7701. That deluge has real-world consequences that the RNC's position, if adopted, would only make worse. As Congress also recognized, the receipt of a large number of unwanted messages decreases email's convenience. *Id.* It can result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or both. *Id.* And, absent effective content moderation, it makes it virtually certain that wanted messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger volume of unwanted ones.

That is particularly true if private email providers cannot filter those messages without running the risk of any individual sender litigating the propriety of those decisions about how to categorize those messages down the road. And that would require courts to engage in deciding picayune, fundamentally subjective, and difficult-to-administer

22

claims. What constitutes spam is, as noted above, not a binary, objective determination.  It requires judgment calls made at scale.  Those calls should be left to individual providers rather than subjected on an individual basis to judicial second-guessing.

## CONCLUSION

This Court should affirm the district court, reject the RNC's common carrier argument, and recognize that the sort of court-made common carrier regulation demanded by the RNC violates fundamental First Amendment principles.

Date: May 5, 2025

Respectfully submitted,

/s/Anne M. Voigts
Anne M. Voigts
Pauleen Truong
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304
(650) 233-4075
anne.voigts@pillsburylaw.com
pauleen.truong@pillsburylaw.com

*Counsel for Amici Curiae*
*NetChoice and CCIA*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(C), I certify that this brief complies with the length limitations set forth in Rule 32(a)(7)(B)(i) because it contains 3,116 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word 365ProPlus in Century Schoolbook 14-point font.

Dated: May 5, 2025

Respectfully submitted,

*/s/ Anne M. Voigts*
Anne M. Voigts

*Counsel for Amici Curiae*
*NetChoice & CCIA*