No. 24-5358

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE,

*Plaintiff-Appellant,*

v.

GOOGLE INC. AND GOOGLE LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of California, No. 2:22-cv-01904 (Calabretta, J.)

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## REPUBLICAN NATIONAL COMMITTEE

Michael A. Columbo
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post St., Suite 700
San Francisco, CA 94108
(415) 433-1700
mcolumbo@dhillonlaw.com

Thomas R. McCarthy
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

July 11, 2025

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... ii

Introduction ................................................................................................. 1

Argument ..................................................................................................... 1

    I.      The RNC plausibly alleges political discrimination. ........................... 1

    II.     The RNC states its California state-law claims. .................................. 9

          A.      The RNC states an Unruh Civil Rights Act claim. ................. 9

                1.     Political affiliation is protected by Unruh. ................... 9

                2.     The RNC has statutory standing. .................................. 12

          B.      The RNC states a common-carrier claim. .............................. 13

          C.      The RNC states an unfair-competition claim ......................... 16

          D.      The RNC states a claim for intentional interference with prospective economic relations. .............................................. 19

          E.      The RNC states a claim for negligent interference with prospective economic relations. .............................................. 22

    III.    As the district court concluded, §230 doesn't bar the RNC's claims. ........... 22

          A.      Section 230(c)(2) doesn't apply ............................................. 22

          B.      Section 230(c)(1) doesn't apply ............................................. 25

Conclusion .................................................................................................. 28

Certificate of Compliance ........................................................................... 29

Certificate of Service .................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Slater,*
   528 U.S. 216 (2000) .................................................................16

*Angelucci v. Century Supper Club,*
   41 Cal. 4th 160 (2007) ...........................................................13

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................21

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009) ...................................... 25, 26

*Bechtel Const. Co. v. Sec'y of Lab.,*
   50 F.3d 926 (11th Cir. 1995) ....................................................5

*Berlin Commc'ns v. FCC,*
   626 F.2d 869 (D.C. Cir. 1979) ..................................................7

*Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.,*
   398 F. Supp. 3d 660 (E.D. Cal. 2019) ...................................12

*Calise v. Meta Platforms, Inc.,*
   103 F.4th 732 (9th Cir. 2024) ...................................... 25, 26

*Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.,*
   20 Cal. 4th 163 (1999) ...........................................................18

*Champagne v. A. Hamburger & Sons,*
   169 Cal. 683 (1915) .................................................................15

*City of Almaty v. Khrapunov,*
   956 F.3d 1129 (9th Cir. 2020) ...............................................13

*Divino Grp. v. Google LLC,*
   2022 WL 4625076 (N.D. Cal.) ...............................................19

*Doe v. CVS Pharmacy,*
   982 F.3d 1204 (9th Cir. 2020) ...............................................17

*Doe v. Uber Techs.,*
   2019 WL 6251189 (N.D. Cal.) ...............................................14

*Enigma Software Grp. USA v. Malwarebytes, Inc.,*
   946 F.3d 1040 (9th Cir. 2019) ...............................................24

*Epic Games, Inc. v. Apple, Inc.,*
   67 F.4th 946 (9th Cir. 2023) ...................................... 17, 18

*Fair Hous. Council of San Fernando Valley v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) .......................................................27

*Friends of the Earth v. Laidlaw Env't Servs.*,
  528 U.S. 167 (2000).......................................................................16

*Garland v. USAir*,
  767 F. Supp. 715 (W.D. Pa. 1991) ................................................. 5

*Gray v. Kircher*,
  193 Cal. App. 3d 1069 (1987).......................................................10

*Harris v. Cap. Growth Invs. XIV*,
  52 Cal. 3d 1142 (1991) ........................................................... 10, 11

*Henderson v. Source for Pub. Data, L.P.*,
  53 F.4th 110 (4th Cir. 2022) ........................................................25

*Huang v. The Bicycle Casino*,
  4 Cal. App. 5th 329 (2016)...................................................... 15, 19

*Huber v. Biden*,
  2022 WL 827248 (N.D. Cal.)........................................................10

*Hunt v. Cnty. of Orange*,
  672 F.3d 606 (9th Cir. 2012).........................................................12

*In re Cox*,
  3 Cal. 3d 205 (1970) .....................................................................11

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
  525 F. Supp. 3d 1017 (N.D. Cal. 2021)........................................18

*Koebke v. Bernardo Heights Country Club*,
  36 Cal. 4th 824 (2005)..................................................................10

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ...............................................................21

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ......................................................26

*Lunney v. Prodigy Servs.*,
  94 N.Y.2d 242 (1999) ...................................................................14

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
  141 S. Ct. 13 (2020)......................................................................27

*Marina Point v. Wolfson*,
  30 Cal. 3d 721 (1982) ..................................................................... 9

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025 ) ...................................................20

*Morgan v. AT&T Wireless Servs.,*
    177 Cal. App. 4th 1235 (2009) ...............................................18

*Morgan v. Safeway Stores,*
    884 F.2d 1211 (9th Cir. 1989) ..................................................2

*NetChoice, L.L.C. v. Paxton,*
    49 F.4th 439 (5th Cir. 2022) .....................................................21

*New.Net v. Lavasoft,*
    356 F. Supp. 2d 1090 (C.D. Cal. 2004) ...............................21

*NRA v. Vullo,*
    602 U.S. 175 (2024) ....................................................................8

*People v. Duntley,*
    217 Cal. 150 (1932) ..................................................................13

*R.W. v. Columbia Basin Coll.,*
    77 F.4th 1214 (9th Cir. 2023) ...............................................16

*Rogers v. Interstate Nat'l Dealer Servs.,*
    2020 WL 4582689 (N.D. Ohio) ................................................4

*Rosemere Neighborhood Ass'n v. EPA,*
    581 F.3d 1169 (9th Cir. 2009) ...............................................16

*Schwake v. Ariz. Bd. of Regents,*
    967 F.3d 940 (9th Cir. 2020) .....................................................6

*SFFA v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ....................................................................8

*Shen v. Garland,*
    109 F.4th 1144 (9th Cir. 2024) .............................................13

*Soil Retention Prods. v. Brentwood Indus.,*
    521 F. Supp. 3d 929 (S.D. Cal. 2021) ...........................19, 20

*Song fi Inc. v. Google, Inc.,*
    108 F. Supp. 3d 876 (N.D. Cal. 2015) .................................27

*Song v. Drenberg,*
    2019 WL 1998944 (N.D. Cal.) ..............................................20

*Squaw Valley Ski Corp. v. Superior Court,*
    2 Cal. App. 4th 1499 (1992) ..................................................14

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ....................................................................9

*State v. Google LLC*,
    2022 WL 1818648 (Ohio Com. Pl.) ..........................................................15

*Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*,
    138 Cal. App. 4th 1215 (2006) ..................................................................21

*Thurston v. Omni Hotels Mgmt.*,
    69 Cal. App. 5th 299 (2021)........................................................................13

*UMG Recordings, Inc. v. Glob. Eagle Ent.*,
    117 F. Supp. 3d 1092 (C.D. Cal. 2015) .....................................................20

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020)....................................................................................13

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...................................................................16

*Yellen v. Confederated Tribes*,
    594 U.S. 338 (2021)....................................................................................27

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ...................................................................23

**Statutes**

47 U.S.C. §230 ...............................................................................................passim

Cal. Civ. Code §2168 ................................................................................... 14, 15

Cal. Civ. Code §51.7 .................................................................................... 11, 19

**Other Authorities**

Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. §230(c)(2)*,
    1 J. Free Speech L. 175 (2021) ............................................................. 24, 27

Eugene Volokh, *Bans on Political Discrimination in Places of Public Accommodation and
    Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022) ........................................12

Oral Arg. Tr. in *Gonzalez v. Google LLC*, No. 21-1333 (S. Ct. Feb. 21, 2023) ...............26

## INTRODUCTION

Google defends the district court's 12(b)(6) dismissal with summary-judgment arguments. Google's lead argument is that "[t]he RNC's core contention … is demonstrably false." Red-Br.1. But at this stage, the RNC's factual contentions must be accepted as true. Google claims, for example, that "[t]he same Gmail algorithm governs emails sent by the Democratic National Committee." Red-Br.1. But the RNC alleges that Google treated the RNC differently "because of the RNC's political affiliation and views." ER.89. Google claims that many Gmail users "were marking RNC emails as spam." Red-Br.1. But the RNC alleges that its email domains had "no reputational issues" and the "complaint rate was incredibly low." ER.109 (cleaned up). Google claims that it "worked with the RNC for months" to solve the problem. Red-Br.2. But the RNC alleges that Google gave false explanations, ignored requests, and cancelled meetings, stringing out its discrimination before the midterm elections. ER.105-120. Google's shifting explanations don't make the RNC's allegations implausible. This Court should reverse.

## ARGUMENT

### I.  The RNC plausibly alleges political discrimination.

Google contests the district court's conclusion that the RNC plausibly alleges political discrimination. Red-Br.11-18. But Google doesn't deny that it knew that the RNC sends emails from the domain in question only to subscribers who recently actively engaged with RNC content and are thus "much less likely to report [the diverted] emails as spam." ER.9; *see* Blue-Br.4-6, 25-26. Google doesn't deny that it knew that the

end-of-the-month, end-of-the-quarter periods are critical messaging and fundraising periods for the RNC. ER.104, 113, 124; Blue-Br.28, 4. Google doesn't deny that it knew that during this time, the RNC's supporters are "particularly attuned to politics and expect the RNC to be communicating with them," and "fundraising and donations go up." ER.104, 113; Blue-Br.28. It doesn't deny that the RNC provided evidence, using Google's own tools, to refute Google's shifting excuses. Blue-Br.26-27, 6-7. And it doesn't deny "[p]erhaps the strongest allegation," that Google stopped the mass diversions once the RNC sued, even though the RNC "did not make any substantive changes to its email practice [that] would account for the change." ER.8-9; *see* Blue-Br.29-30. Nor could Google deny those well-pleaded allegations at this stage—the Court must accept them as true.

Instead, Google reraises the same arguments the district court rejected. ER.8-10. The arguments fare no better this time around.

**Spam Rate.** Google argues that the "obvious alternative" reason for every mass diversion "is that Gmail's spam-filtering algorithm thought some of the RNC's bulk emails were spam." Red-Br.11. The argument fails on its face because Google can't escape liability by blaming it on "Gmail's spam-filtering algorithm." Red-Br.11. Whether the vehicle for discrimination is an individual employee, a board decision, a line of code, or a sophisticated algorithm is irrelevant—the RNC alleges that Google is behind it. *Cf. Morgan v. Safeway Stores*, 884 F.2d 1211, 1214 (9th Cir. 1989) ("An employer

2

… cannot avoid title VII liability by delegating discriminatory programs to third parties.").

Even if Google weren't responsible for its own spam algorithm, the RNC's spam rate is not a plausible explanation for the diversions. The district court concluded that "Google's own data showed that the RNC's spam rate was within the limits suggested by Google." ER.5. "User reported spam did not correlate with these mass relegations." ER.120. From the first mass diversion in December 2021 to the filing of this suit, "the RNC's median spam rate was approximately 0.1%." ER.102. "For example, the RNC's spam rate before, during, and after the en masse [diversions] in May, June, July, and August were approximately either 0.1% or 0.0%." ER.120; *see* ER.112, 115, 118, 119.

If Google were right that the spam rate was the cause, the RNC should still be experiencing these mass diversions. Google ceased its discriminatory diversions after the filing of this suit, despite "no significant change in the spam rate each month which would account for the monthly drop." ER.9. And that is so even though after Google's cessation, "the RNC sen[t] even more emails leading up to and during the November 2022 election." ER.4.

Moreover, Google says senders should "'aim'" for 0.1%. SER-19. At most, being above 0.1% explains why the RNC's inboxing rate is not always 100%, but around 80-90%. Google's mass diversions occurred during the most critical times of the month when the most subscriber engagement occurs—and in turn, the least amount of user-reported spam. Since Google stopped discriminating, Google's spam filter still sends

*some* RNC emails to spam, but at rates along the lines RNC emails were sent to spam outside the cyclical mass diversions. ER.90 n.2. In other words, since the RNC filed this suit, Google's spam filter is acting how it would for any other bulk sender that follows email platforms' best practices. It is thus far more plausible that barely ticking above 0.1% explains why the RNC's inboxing rate is not 100%—not why the RNC's inboxing rate repeatedly dropped to nearly 0% at critical times.

Google responds that the RNC's spam rate "once hit" 0.3%. Red-Br.6. But that "one instance of a 0.3% spam rate for a single day" can't explain the two months of mass relegations *before* the rate even occurred. ER.102. Nor is it a plausible reason for the six months of mass diversions after, particularly in light of Google's advice that "a spam rate of 0.30% or higher should be avoided, *especially for any sustained period of time*." SER-18. Google cites a *post*-filing change to its own website to argue that bulk emailers should avoid a 0.1% spam rate. *See* Red-Br.11; SER-9. The same page from months before the amended complaint had no spam-rate numbers. *See* D.Ct.Doc.30-15 (Jan. 23, 2023); *compare* bit.ly/3t6OyKK (Oct. 6, 2022, lacks spam-rate suggestion); bit.ly/47Ue9FB (Mar. 12, 2023, lacks spam-rate suggestion), *with* bit.ly/4afVlSO (Mar. 23, 2023, has it). This Court, like the district court, should disregard Google's self-serving, post-filing alteration. *Cf. Rogers v. Interstate Nat'l Dealer Servs.*, 2020 WL 4582689, at *6 (N.D. Ohio) ("The Court will not consider self-serving statements Dealer Services has made about itself on [a] website when considering a Motion to Dismiss.").

If the cause of the mass diversions were the spam-rate percentage being above 0.1% at some point, Google would have said so at the time. If the spam rate is such an "obvious" and "simple" explanation, it would not have taken years to come up with it, and only in litigation. "Reasons which are first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving." *Garland v. USAir*, 767 F.Supp. 715, 724 (W.D. Pa. 1991). Nor would Google have needed to proffer various "shifting explanations" for the relegations, which show the "pretextual nature of" its actions. *Bechtel Const. Co. v. Sec'y of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995). Google's months of stonewalling the RNC with erroneous excuses are only further evidence of discrimination.

Google's backup argument is that the RNC's low spam rate is irrelevant because of its "spam-filtering algorithm" that "'collects spam reports over the course of the month.'" Red-Br.6. But the monthly collection doesn't explain why the RNC no longer experiences mass diversions, given that the RNC's spam rate is materially identical to the rate before this suit's filing. ER.102; ER.9. Moreover, if the system works on a monthly basis, then during the nine months of back-and-forth, Google would have identified the problem, the spam-rate average threshold the RNC should avoid, and the remedy to avoid the issue. That Google said nothing about a spam-rate threshold during those months renders its post-lawsuit explanation implausible at best.

Google's month-to-month spam explanation also doesn't fit the facts. Take June 2022. From June 22 through the end of the month, the RNC's spam rate was 0.1%, but

5

the mass diversion occurred on June 27 and 28 anyway. ER.115. Or take August 2022. The days before the mass diversion were 0.1% (what Google wants); the day of the mass diversion was 0.0% percent (what Google wants); and the days after were 0.1% (what Google wants). ER.118-19. It would be perverse to punish the very spam rate Google suggests senders should target. (Never mind that the RNC's median is 0.1%, and the mean is 0.14%, so it's implausible that the RNC hit any imaginary threshold, a threshold Google never shared. ER.102.)

Google also fails to mention that its Postmaster Tools round to the nearest tenth. Although Google likely has more precise data, it does not provide it to senders. But that's precisely why the RNC passes the motion-to-dismiss phase: "It may be difficult for a plaintiff to know the full extent of alleged discrimination in decisionmaking before discovery allows a plaintiff to unearth information controlled by the defendant." *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020).

Google also suggests it isn't liable because MSN treated the RNC similarly. Red-Br.12. But Google papers over several crucial differences. MSN didn't relegate "all (or nearly all) of the RNC's emails from its supporters at any point." ER.121. None of the large MSN dips happened during the critical end-of-month period. The MSN dips were erratic, not cyclical. And from mid-June to October, there were no large dips at all. Red-Br.12. Even if MSN treated the RNC differently, its treatment does not reflect the intentional political discrimination that Google exhibited. These distinctions aside,

Google can't escape liability by pointing to another party who engaged in similar conduct. *See Berlin Comm'ns v. FCC*, 626 F.2d 869, 872 n.7 (D.C. Cir. 1979).

**A/B test.** Google insists that the RNC's A/B test undermines the plausible allegations of intentional discrimination. Red-Br.13-14. Google misunderstands the test. An A/B test is an "industry-standard technique[] to improve engagement" and performance of email sends. ER.99. Like a rational bulk emailer, the RNC runs several A/B tests every day to assess different email metrics. ER.106-07. The purpose of the first A/B test in question was "to assess whether making the cellphone-number field required on the donation form affected engagement by a certain audience segment." ER.106. "Even though no recipient received two emails, Version *A* inboxed at the normal rate, while Version *B* inboxed at a rate of approximately 0% (*i.e.*, Version *B* went entirely to spam, while Version *A* didn't)." ER.107.

Google supposes that the cellphone-number field might be "'confidential information'" that might have caused the email to be marked as spam. Red-Br.14. But both emails—like all fundraising emails—link to pages asking for personal information, including the donor's name, address, and payment details. *E.g.*, ER.106 & n.4. Google doesn't explain now—nor did it explain then—why it would single out a cellphone number among other personal information to cause an entire email send to go to spam. The RNC provides the emails, the links, and background on A/B tests in the industry. ER.99-101, 106-09. The emails and links are materially identical. ER.106-07. Google's shifting explanations make no sense, especially since at the time of the test the RNC's

email metrics were above the industry standard and the RNC had been following Google's best practices. ER.109.

The *plausible* takeaways from the A/B tests are that the RNC acted precisely how a reasonable bulk emailer would; there was no content-based reason for Google's relegation of email to spam because the emails had the same content, *see* ER.99-100, 106-09; and the spam rate could not cause the arbitrary diversions because Versions *A* and *B* emails were contemporaneous, so the RNC's spam rate would have been the same for both sends. At best, Google's alternative explanation is nothing more than speculation about what might have caused the diversion. And "this Court cannot simply credit" that sort of bald assertion at the motion-to-dismiss stage. *NRA v. Vullo*, 602 U.S. 175, 195 (2024) (cleaned up).

**Feigning "help."** Google argues that because it tried to "help" the RNC for nine months and has been inboxing most of the RNC's emails, it didn't discriminate against the RNC. Red-Br.14-15. But stringing along the RNC with shifting explanations, empty assurances, and diminished service cannot defeat the RNC's claims. "History has repeatedly shown that … discriminators may go to great lengths to hide and perpetuate their unlawful conduct." *SFFA v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 257 (2023) (Thomas, J., concurring). Feigning good faith is no defense to discrimination.

*　　*　　*

Google resists the district court's inference of discrimination only by speculating about other factors that "could trigger" the mass diversions. Red-Br.2. But as explained,

8

the most plausible inference from Google's refuted explanations, its failed suggested solutions, and its post-filing cessation is that Google intentionally relegated critical RNC emails to subscribers' spam folders because it's the RNC sending them. At a minimum, the inference is plausible, which is all that's required at the motion-to-dismiss phase. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (cleaned up). The district court thus properly concluded that the RNC alleged political discrimination.

## II.  The RNC states its California state-law claims.

### A.  The RNC states an Unruh Civil Rights Act claim.

#### 1.  Political affiliation is protected by Unruh.

Google acknowledges that the California legislature intended courts to recognize new unenumerated characteristics under Unruh. Red-Br.25. And the parties agree that the California courts' three-part test controls that inquiry. Red-Br.25-26. Google disputes "that the California Supreme Court 'has at least three times stated that political affiliation is protected.'" Red-Br.27. But it ignores the language from those cases, which couldn't repudiate Google's denial more clearly. *E.g.*, *Marina Point v. Wolfson*, 30 Cal.3d 721, 726 (1982) (observing that the "Unruh Act protects individuals from such arbitrary discrimination" on the basis of "race, nationality, occupation, political affiliation, or age"). Google suggests that the California Supreme Court "overruled" those cases, but *Harris* expressly rejects that drastic reading. *Harris v. Cap. Growth Invs. XIV*, 52 Cal.3d

1142, 1155-56 (1991) (finding no "sufficiently compelling reason to overrule the hold-ings of *Cox* and its progeny," and rejecting the "defendants' suggestion that the *holdings* of *Cox*, *Marina Point*, *O'Connor*, and similar appellate decisions extending the Unruh Act beyond its specified categories of discrimination have somehow been repudiated by the Legislature"). In "revisit[ing]" the caselaw and supplying the "three-part" test (which both parties apply), the California Supreme Court didn't suggest that political affiliation isn't protected. *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 840 (2005).

When Google gets around to applying the three-part test, it starts by arguing that political affiliation is not a personal characteristic because it "aligns most clearly not with a person's *identity* but with their 'viewpoints.'" Red-Br.27. Google's arbitrary dis-tinction makes no difference, since both "identity" and "viewpoints" are personal char-acteristics. Google's best authority is a federal case that merely observes the lack of state-court cases protecting "viewpoints" under Unruh. Red-Br.27 (citing *Huber v. Biden*, 2022 WL 827248, at *10 (N.D. Cal.)). But Google doesn't address the reasoning of state courts recognizing that political affiliation is a personal characteristic akin to the other characteristics protected by Unruh. Blue-Br.16-17. Google doesn't meaningfully con-tend that one's political affiliation is intertwined with one's "deeply held personal beliefs and core values." *Koebke*, 36 Cal.4th at 843. And Google outright ignores that the Cali-fornia Court of Appeals has expressly held that Unruh protects political affiliation or beliefs. *See Gray v. Kircher*, 193 Cal.App.3d 1069, 1075 (1987).

As for a legitimate business justification, Google concedes that it has no legitimate interest in discriminating against the RNC. ER.238. Its only response is that *other businesses* might. Other businesses—even Google—likely do have legitimate business interests in not "host[ing] a white supremacist rally or Antifa gathering." Red-Br.28. Those different facts aren't at issue here, since Google admits it has no legitimate business justification in discriminating based on political affiliation. Blue-Br.20.

Though Google never mentioned the Ralph Act in the district court, it doubles down on the district court's use of it. Red-Br.29-30. Google dismisses the RNC's criticisms in passing, ignoring the core problem: this case is about Unruh, not the Ralph Act. Reading Unruh to protect political affiliation wouldn't render anything superfluous in the Ralph Act, a different law that prohibits different conduct. *See* Cal. Civ. Code §51.7. Both before and after the legislature passed the 1976 Ralph Act, the California Supreme Court recognized that Unruh protects political affiliation. *See In re Cox*, 3 Cal.3d 205, 217-18 (1970) (before); *Harris*, 52 Cal.3d at 1161 n.10 (after). Google cites no case adopting its narrow reading, which is supported only by stacking inference on inference from legislative amendments.

Google's last defense is a policy argument. It suggests that extending Unruh to political discrimination would have "adverse consequences." Red-Br.28-29. The argument is neither true nor relevant. Several areas of law already delineate the scope of political affiliation. The Ralph Act has body of precedent on what constitutes "political affiliation." *E.g.*, *Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*, 398

11

F.Supp.3d 660, 679 (E.D. Cal. 2019). So do other States that bar political discrimination. Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022). Regardless, Google's argument is irrelevant because there's nothing ill-defined about extending Unruh to the RNC, which has a crystal-clear political affiliation. Any difficult question on the scope of political affiliation can be saved for case-by-case elaboration. And the legitimate-business-justification rule that Google disclaims here is a backstop to liability for political-affiliation discrimination.

The district court properly concluded that the RNC alleged political-affiliation discrimination. *Supra* Section I. But it erred in concluding that Unruh doesn't protect defendants from that sort of discrimination. This court should thus reverse the dismissal of the RNC's Unruh claim.

### 2.    The RNC has statutory standing.

Google doesn't dispute that it never raised statutory standing in the district court. It raises two arguments that this Court should excuse that failure and ignore the party-representation rule. First, citing a case that has nothing to do with the party-representation rule, Google points out that courts can dismiss a complaint "'*when it is clear* that the plaintiff has not stated a claim.'" *Hunt v. Cnty. of Orange*, 672 F.3d 606, 617 (9th Cir. 2012) (emphasis added) (quoting unpublished op.). Those cases say nothing about the court dismissing a complaint on grounds not raised by the defendant, let alone in a "close case." ER.34. Second, Google suggests it really did argue statutory standing because it argued that the RNC failed to state a claim. But its only support is a case

"describing what administrative exhaustion requires in the context of an appeal to the BIA." *Shen v. Garland*, 109 F.4th 1144, 1157 (9th Cir. 2024). Google blurs the distinction between arguments, claims, and defenses, but the law is clear: "A party waives an argument relating to statutory or prudential standing if the argument was not raised in the district court." *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1134 (9th Cir. 2020). Google says this case is "nothing like" *United States v. Sineneng-Smith*. Red-Br.32. But the district court here adopted an argument that *no party*—not even "an amicus appointed by the Court" (Red-Br.32)—had made, only making this a clearer violation of the party-representation rule than *Sineneng-Smith*.

Regardless, the RNC has statutory standing. Standing under Unruh is not limited to customers of a business. *See Angelucci v. Century Supper Club*, 41 Cal.4th 160, 175 (2007). Even if it were, Google ignores the various services it provides bulk senders like the RNC, including the numerous conversations it had with the RNC. Blue-Br.32-33. At a minimum, the complaint alleges a relationship "similar" to a "customer-proprietor relationship" covered by Unruh. *Thurston v. Omni Hotels Mgmt.*, 69 Cal.App.5th 299, 306 (2021) (cleaned up).

### B.      The RNC states a common-carrier claim.

Google "offers to the public." "The distinctive characteristic of a common carrier is that [it] undertakes to carry for all people indifferently." *People v. Duntley*, 217 Cal. 150, 164 (1932). That is, "the entity merely must be of the character that members of the general public may, if they choose, avail themselves of it." *Squaw Valley Ski Corp. v.*

*Superior Court*, 2 Cal.App.4th 1499, 1510 (1992). As the district court agreed, that's Google. ER.160-61. Google's counterarguments are unavailing.

**First**, Google insists that it doesn't offer services to the public because it's only willing to do business with users who agree to its terms of service. Red-Br.21. But the case it cites rejected that argument. In *Squaw Valley*, a ski resort argued that its chair lift was "not offered for use by the general public" because it "restricted" its chair lift "to persons who (1) wear skis, and (2) who purport to possess the ability to ski." 2 Cal.App.4th at 1509 (cleaned up). The court rejected the resort's argument that because it had "conditions" for using the lift, it could not be a common carrier. *Id.* at 1510. That's because the resort "offers the chair lift to carry any members of the general public who wish to avail themselves of this service *by complying with the conditions.*" *Id.* (emphasis added); *accord Doe v. Uber Techs.*, 2019 WL 6251189, at *6 (N.D. Cal.).

**Second**, Google's wordplay over whether it technically "carr[ies]" emails shouldn't obscure what it "offers to the public." Cal. Civ. Code §2168. Google markets itself "to the public" as a conduit for sending and receiving messages, *id.*, no different from the telephone and postal mail, *see Lunney v. Prodigy Servs.*, 94 N.Y.2d 242, 248-49 (1999). And Google doesn't dispute that it's at least responsible for "display[ing] [electronic] messages to users in the Gmail platform." ER.165. At a minimum, it "carr[ies]" emails to and from its users' spam folders, which is the only carrying at issue here. Cal. Civ. Code §2168. Whether the RNC is considered a "customer" or pays Google a fee

14

for carrying those emails is irrelevant. *Contra* Red-Br.19-20. Google "offers to carry" the RNC's emails, so it "is a common carrier." Cal. Civ. Code §2168.

**Third**, Google doesn't deny that it profits off Gmail. *See* ER.94-95. Rightly so: The RNC has plausibly alleged that "in lieu of charging a fee directly to its users, Google collects each user's data, which is then monetized by," for example, selling the information to advertisers or "targeted ad space." *State v. Google LLC*, 2022 WL 1818648, at *4 (Ohio Com. Pl.). Google argues instead that only a *direct monetary fee* exchanged for the service suffices. Red-Br.23-24. But as the district court concluded, California law doesn't require a direct monetary fee; "it is sufficient that Google profits off the email services it provides to its users." ER.161. Google's profits from user data are a direct consequence from—not incidental to—its email services. *Cf. Champagne v. A. Hamburger & Sons*, 169 Cal. 683, 692-93 (1915) (holding that elevators in department stores were common carriers and rejecting argument stores did not transport the passengers on the elevator for "reward," because the elevators "would increase [the store's] patronage and necessarily its profits in business"); *Huang v. The Bicycle Casino*, 4 Cal.App.5th 329, 339 (2016) (similar). That Google's fee is in the form of user data rather than the U.S. dollar doesn't excuse it from its common-carrier obligations.

**Fourth**, Google contends that it didn't "refuse[]" or "postpone[]" the emails. Red-Br.20. But marking emails as spam that *are not spam* is effectively a refusal to transmit or accept the message. At a minimum, the practice postpones delivery because Google deprioritizes those messages and delays users' interaction with them. A mailman

15

doesn't discharge his duties by hiding mail under a doormat that should be placed in the mailbox. Neither does an email provider discharge its duties by hiding email in a spam folder that should be placed in the inbox.

### C.    The RNC states an unfair-competition claim.

As the district court concluded, Google's standing argument is meritless. ER.13-15. Google argues that the RNC lacks standing to seek injunctive relief because Google stopped its discrimination after this suit was filed. Red-Br.38-39. But Google's voluntary cessation after this suit was filed has nothing to do with standing and everything to do with mootness. *See White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000). That distinction matters because "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 189 (2000) (cleaned up). Even if the likelihood of the defendant resuming the illegal conduct is "'too speculative to support standing,'" a speculative possibility can still "'overcome mootness.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000).

Google's "bare assertion" that this "situation" is not occurring now "is not sufficient to deprive this Court of its constitutional power to adjudicate this case." *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1174 (9th Cir. 2009) (cleaned up). "The voluntary cessation of challenged conduct moots a case 'only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *accord, e.g.*, *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1225-26 (9th Cir. 2023).

Google's argument that injunctive relief has no monetary value ignores the RNC's allegations. Red-Br.37-38. This case is about Google choking off the RNC's access to "monetary donations." ER.176. Those donations amount to "well over $75,000.00," and the RNC "will continue to suffer irreparable injury to its reputation, goodwill, recruitment efforts, community outreach, and control over its communications." ER.135. Google ignores those impending monetary harms. The district court thus rightly concluded that Google's discrimination is "likely to be repeated, such that injunctive relief remains viable." ER.14.

Google's merits arguments fare no better. Google begins with a strawman, arguing that California law doesn't "require[] a private business to accept all comers no matter their political affiliation." Red-Br.40-41. The RNC doesn't make that argument. The issue here is whether it's "unfair" for a business with concededly no legitimate justification for discriminating based on political affiliation to nevertheless do so. *See* ER.238. Some businesses might have a legitimate reason to treat political affiliation differently. Google admits it doesn't. The significant harm Google caused the RNC and its supporters "outweighs" Googles' nonexistent "'reasons, justifications and motives.'" *Doe v. CVS Pharmacy*, 982 F.3d 1204, 1214-15 (9th Cir. 2020).

Google claims that the balancing test doesn't apply because the RNC isn't a "consumer" of Gmail. Red-Br.47 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023)). But *Epic Games* doesn't hold that the test applies *only* to direct consumers. California law applies the test to "'victim[s]'" broadly. *Morgan v. AT&T*

*Wireless Servs.*, 177 Cal.App.4th 1235, 1254 (2009). Regardless, Google doesn't attempt to define "consumer," and the RNC is indisputably a consumer of Google's products like Gmail and Postmaster Tools because it uses those services in sending emails to its subscribers. Google claims the "RNC did not raise this argument below." Red-Br.47. But that's only because Google never argued that the RNC wasn't a consumer—the district court came up with that argument on its own. ER.22-23.

Google makes the same mistake by pointing out that the "tethering test" applies "to competitors." Red-Br.42 (quoting *Epic Games*, 67 F.4th at 1000). *Epic Games* doesn't hold that the test applies *only* to competitors. In cases that "involve[] an action by a competitor alleging anticompetitive practices," courts generally "tether" the unfair act to antitrust and competition laws. *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 185-87 & n.12 (1999). But the California Supreme Court was careful to say that those limitations apply "to that context," and it was not announcing a blanket rule for cases that "involve injury to consumers." *Id.* at 187 n.12.

The RNC has alleged at least "comparable" legal violations. *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F.Supp.3d 1017, 1047 (N.D. Cal. 2021). Google tries to distinguish the common-carrier violation by arguing subtle differences between email, the telephone, and the telegraph. Red-Br.43. The RNC has explained why those technical distinctions don't rebut that Google is a common carrier. *Supra* Section II.B. Even if it mattered that "Gmail does not actually *transport* emails," Gmail occupies the same role in the market that common-carrier policies were designed to address. *See Huang*, 4

18

Cal.App.5th at 339. As for Unruh, Google responds that the California Legislature actually *permits* discrimination based on political affiliation. Red-Br.43. Its only support is an argument from legislative silence in enumerating political affiliation in the Unruh Act. The inference from that silence is unwarranted, as the RNC has explained. *Supra* Section II.A.1. Regardless, the Ralph Act explicitly prohibits political-affiliation discrimination, Cal. Civ. Code §51.7(b)(1), as Google admits, Red-Br.44. Contra Google's suggestion, the RNC doesn't need to allege a direct violation of each of these acts to "tether" them to the unfair-competition law. It's enough that the RNC alleges conduct that "violates the policy concerns underlying" those laws. *Divino Grp. v. Google LLC*, 2022 WL 4625076, at *12 (N.D. Cal.). For these reasons, the RNC stated an unfair-competition claim.

### D. The RNC states a claim for intentional interference with prospective economic relations.

The district court dismissed the RNC's intentional-interference claim only on the first and third elements, but Google disputes all five. Red-Br.33-35. On the first element, Google claims that the RNC's relationship with its donors and subscribers is "'vague.'" Red-Br.34 (quoting *Soil Retention Prods. v. Brentwood Indus.*, 521 F.Supp.3d 929, 961 (S.D. Cal. 2021)). The district court cases it cites prove otherwise. In *Soil Retention*, the complaint alleged merely that the parties "were in economic relationships that would probably result in future economic benefit to Plaintiff." 521 F. Supp. 3d at 962 (cleaned up). The complaint in *Song v. Drenberg* rested on a conclusory allegation that the

plaintiffs "'have lost many valuable business relationships as a direct and predictable result of [defendants'] actions.'" 2019 WL 1998944, at *7 (N.D. Cal.). Google's "actual disruption" argument suffers from the same problem. Red-Br.35. The plaintiffs in *Soil Retention* alleged merely that their relationship "'was disrupted.'" 521 F. Supp. 3d at 961. In contrast to those cases, the RNC alleges each detail of how its ongoing relationships were actually disrupted: who (existing donors and supporters), what (ongoing donations and support), when (specific dates at the end of each month throughout most of 2022), how (by suppressing the RNC's interactions with its existing donors and supporters), and why (because Google was discriminating against the RNC). Those detailed allegations are not "conclusory." *Id.*

Google focuses on language requiring an existing "'relationship'" with "'a particular individual.'" Red-Br.34 (quoting *UMG Recordings, Inc. v. Glob. Eagle Ent.*, 117 F. Supp. 3d 1092, 1117 (C.D. Cal. 2015)). The complaint alleges many such relationships. *E.g.*, ER.97-99; ER.105-07. The district court even agreed on that point. ER.28. And given the vast number of emails and relationships alleged, it's at least "'reasonably probable'" that the RNC would have realized some "'prospective economic advantage'" but for Google's "'interference.'" *Song*, 2019 WL 1998944, at *7 (N.D. Cal.); *cf. Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025 ) (organization relying on associational standing need not name particular injured members). That the RNC raises money and support from those emails (when Google doesn't stifle them) eliminates any doubt that

20

the RNC expects future benefit from those relationships. At the least, it permits a "reasonable inference" of such a benefit. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Next, Google misunderstands the "independently wrongful" element. Google perceives the RNC's argument as circular because it invokes the RNC's "'other claims.'" Red-Br.35. But violating "some constitutional, statutory, regulatory, [or] common law" is the most common reason "that an act is independently wrongful." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159 (2003). The reasoning becomes circular only when the *other* legal violation depends on a finding of "tortious interference." *New.Net v. Lavasoft*, 356 F. Supp. 2d 1090, 1114 n.11 (C.D. Cal. 2004). In that circumstance, a court can't find one violation without the other. But the RNC states its other claims regardless of whether the Court finds tortious interference, so there's no "circular reasoning." *Id.*

Google feigns ignorance about its common-law obligations, Red-Br.35, but it doesn't dispute that it "holds itself out to the public generally and indifferently," ER.160-61, and that it's "affected with a public interest," *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 471-73 (5th Cir. 2022). Under the "common law" of "American courts" "dating back long before our Founding," Google thus has a "duty to serve without discrimination." *Id.* at 469-73. By shirking that duty, Google engaged in an independently wrongful act, *Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*, 138 Cal.App.4th 1215, 1222 (2006), as the amended complaint alleges, ER.136 (citing *Stevenson*).

21

## E. The RNC states a claim for negligent interference with prospective economic relations.

In a conclusory fashion, Google claims that "the RNC fails to allege even one of the six factors" showing that Google owed the RNC a duty not to discriminate against it. Red-Br.36-37. But it doesn't engage with the RNC's arguments on each factor. *See* Blue-Br.51-52. And it ignores that the district court agreed with the RNC on three of those factors, finding that "the RNC made Google aware of the potential harm" (factor 2) and "alleged sufficient facts to show some degree of certainty that they suffered injury because of Defendant's conduct" (factors 3 and 4). ER.177-78. Google doesn't attempt to defend the district court's analysis on the other factors.

## III. As the district court concluded, §230 doesn't bar the RNC's claims.

The district court properly concluded that "subsections (c)(1) and (c)(2)(B) do not apply in this case," and that "section 230(c)(2)(A) … does not bar this suit given the RNC's allegations that Google was not operating in good faith." ER.12.

## A. Section 230(c)(2) doesn't apply.

Google agrees that if the RNC plausibly alleges political-affiliation discrimination, then subparagraph (A) doesn't bar the RNC's claims. Red-Br.55. Google tries one other argument, but it attacks a strawman. It claims that the RNC argues that "political content can never be filtered as spam." Red-Br.56. The RNC doesn't make that argument. The emails at issue here aren't spam; they were sent only to subscribers who recently engaged with the RNC's content. ER.9; *see* Blue-Br.4-6, 25-26. And Google admits it has no interest in filtering out content based on political affiliation. ER.238.

The RNC plausibly alleged that the content at issue here is not "objectionable" and that Google suppressed it in bad faith. §230(c)(2)(A). Recognizing those facts doesn't require holding that "political content can never be filtered as spam." *Contra* Red-Br.56.

Google also seeks refuge in subparagraph (B), but that provision simply "do[es] not apply," ER.12, because this case is not about users employing "technical means to restrict access" to RNC email, §230(c)(2)(B). As alleged, the RNC sends emails only to users who want them. Google relies on *Zango*, Red-Br.57, but in that case this Court assumed that at least "[t]heoretically … the user of the … software then has the option whether to allow or reject the download of the potential malware-carrying program." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1171 (9th Cir. 2009). Google, by contrast, does not give the user the option to view the email before it is marked as spam. Google is thus not being held liable for taking actions "to enable or make available to [users] the technical means to restrict access to material." §230(c)(2)(B). Google itself is restricting access.

Google argues that because its "filter learns from the user's preferences," its diversions are immunized by §230(c)(2)(B). Red-Br.57. But the RNC alleges that Google is *not* diverting RNC emails based on users' spam designations. And textually, Google's reading makes no sense because Google's algorithm is not giving *users* "the technical means to restrict access." §230(c)(2)(B). Rather, Google restricts a user's access to certain emails without that user's designation. Even Google admits it might send an email to spam because other users "collectively marked" a different email as spam, or for

23

other reasons that have nothing to do with user feedback. *See* Red-Br.11-12, 57. The problem with Google's conduct is that it *removes* from Gmail users the "means" to control their "access" to RNC emails they've signed up to receive.

Regardless, §230(c)(2) does not immunize censoring based on political-affiliation discrimination. Section 230(c)(2) at most "immuniz[es] Internet companies' enforcement of private rules analogous to restrictions on 'obscene, lewd, lascivious, filthy, excessively violent, [or] harassing' communications—not of completely different rules that the companies might make up." Candeub & Volokh, *Interpreting 47 U.S.C. §230(c)(2)*, 1 J. Free Speech L. 175, 183 (2021). The word "to" between "the technical means" and "restrict access" makes clear that the provided "technical means" must be *for the purpose of* restricting access to subparagraph (A) materials. The provider cannot create a new category of materials to restrict access to. Allowing "block[ing] [of] online content for improper reasons"—*i.e.*, reasons not in the objectionable-materials clause— would render the clause meaningless. *Enigma Software Grp. USA v. Malwarebytes, Inc.*, 946 F.3d 1040, 1049 (9th Cir. 2019).

The RNC plausibly alleges that Google's diversions have an impermissibly discriminatory purpose and that neither Google nor the relevant users actually "consider[ed]" the censored emails to be "harassing[] or otherwise objectionable." If "allegations of anticompetitive animus are sufficient to withstand dismissal," then plausible allegations of bad-faith conduct, including political-affiliation discrimination, are also sufficient. *Id.* at 1045.

## B.    Section 230(c)(1) doesn't apply.

The district court also properly concluded that §230(c)(1) "do[es] not apply in this case." ER-12. The district court did not say, as Google claims, that "Section 230(c)(1) protection is effectively limited to actions sounding in defamation or similar torts." Red-Br.51 (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1104 (9th Cir. 2009)). The court simply observed that claims *like* defamation rely on a theory of liability that the defendant "published or failed to remove some potentially harmful content that caused an injury." ER-10-11 (citing *Barnes*, 570 F.3d at 1102). Google agrees that's the appropriate test. It just wrongly claims that the district court applied some other test.

Google next claims that because its spam filter manages "third-party content," §230(c)(1) applies. Red-Br.52. This Court has rejected that argument, holding that "it is not enough that a claim, including its underlying facts, stems from third-party content for §230 immunity to apply." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024). Google's argument is also circular. It claims that displaying emails is a "'publication decision[]'" because it derives from Google's "'status as a publisher.'" Red-Br.52-53. But this case is about delivering messages, which is not a "'traditional editorial functio[n].'" *Contra* Red-Br.52. Traditional editorial decisions are "'based on the *content of the speech published*' by the interactive service provider." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022); *accord Barnes*, 570 F.3d at 1101. Google recently told the Supreme Court that "[the *Henderson*] test is correct, and it's also the Ninth Circuit's test." *See* Oral Arg. Tr. 144:22-145:8 in *Gonzalez v. Google LLC*, No. 21-1333 (S. Ct. Feb.

25

21, 2023). And because the RNC sends its emails to specific individuals—not the general public—Google is not "'the reproducer of a work intended for public consumption.'" *Barnes*, 570 F.3d at 1102. No "intellectual gymnastics" are necessary to observe that Google doesn't "publish" emails. *Id.*

As for rights and duties, "[t]he relevant question is whether the duty would 'necessarily require an internet company to monitor third-party content.'" *Calise*, 103 F.4th at 741. The answer here is no. To fulfill its obligations under California law, Google needn't monitor the "content" of emails any differently. Red-Br.53. Rather, the way Google "would comply with this obligation" is by not discriminating based on the sender's identity. *Calise*, 103 F.4th at 743. That duty "differs markedly from the duties of publishers as defined in the CDA." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021). Even if "some monitoring of content" is "required," the claims here don't seek to hold Google liable for that content. *Calise*, 103 F.4th at 741. Extending §230 immunity to the mere "'processing'" of information "relie[s] on an improperly broad reading of the [Act]." *Id.*

If Google were right that §230(c)(1) shields discrimination based on the status of the emailer, then "subsection (c)(2) would be rendered superfluous." ER.11. It would be contrary to §230's design, which "was meant to bring traditional 'distributor' immunity online." *Calise*, 103 F.4th at 739. And it would mean that §230 immunity is "limitless" when this Court has said it's not. *Id.*

\*     \*     \*

Three other considerations defeat Google's broad immunity arguments.

***First***, Congress found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §230(a)(3). That finding supports denying immunity to "filtering of 'political or religious content.'" Candeub & Volokh, *supra*, at 185.

***Second***, Section 230(c)'s title reinforces the RNC's reading. The "section is titled 'Protection for "*good samaritan*" blocking and screening of *offensive* material' and … the substance of section 230(c) can and should be interpreted consistent with its caption." *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (en banc) (emphases added). This is "yet another indication that Congress was focused on potentially offensive materials, not simply any materials undesirable to a content provider or user." *Song fi Inc. v. Google, Inc.*, 108 F.Supp.3d 876, 883 (N.D. Cal. 2015).

***Third***, "[e]xtending §230 immunity beyond the natural reading of the text can have serious consequences." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020) (statement of Thomas, J.). Under Google's reading, §230 would protect companies who, for example, racially discriminate in removing content. *Cf. id.* at 17-18. The Court should reject this "highly counterintuitive result." *Yellen v. Confederated Tribes*, 594 U.S. 338, 360 (2021).

## CONCLUSION

This Court should reverse the district court and remand for further proceedings.

Dated: July 11, 2025                          Respectfully submitted,

                                             */s/ Thomas R. McCarthy*

Michael A. Columbo                           Thomas R. McCarthy
Mark P. Meuser                               Conor D. Woodfin
DHILLON LAW GROUP INC.                       CONSOVOY MCCARTHY PLLC
177 Post St., Suite 700                       1600 Wilson Blvd., Suite 700
San Francisco, CA 94108                       Arlington, VA 22209
(415) 433-1700                               (703) 243-9423
mcolumbo@dhillonlaw.com                      tom@consovoymccarthy.com
                                             conor@consovoymccarthy.com

                    *Counsel for Appellant*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) and Circuit Rule 28.1-1 because it contains 6,993 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: July 11, 2025                    */s/ Thomas R. McCarthy*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: July 11, 2025                    */s/ Thomas R. McCarthy*